
*1047847101*

CJ2020 5127
Timmons

## IN THE DISTRICT COURT OF OKLAHOMA COUNTY
### STATE OF OKLAHOMA

ALAN P. NIEMANN

Plaintiff,

v.                                    Case No.

ROYAL ALLIANCE ASSOCIATES, INC.

Defendant.

**FILED** IN DISTRICT COURT
OKLAHOMA COUNTY

OCT 2 9 2020

RICK WARREN
COURT CLERK

112

**CJ - 2020 - 5127**

### PETITION

COMES NOW Plaintiff Alan Niemann ("Mr. Niemann" or "Plaintiff Neiman") and brings this Petition against Defendant Royal Alliance Associates, Inc. ("Royal Alliance"), based on his personal knowledge and the investigation of his counsel, and in support of this Petition, alleges the following:

### INTRODUCTION

1.      "A man's good name and reputation is his most valuable personal and property right and one that no man may wrongfully injure or destroy without being held accountable for." *Dusabek v. Martz*, 249 P. 145, 147 (Okla. 1926).

2.      After Plaintiff made the decision to part ways with Royal Alliance (his now-former broker-dealer) and seek to do business with a new broker-dealer, Defendant maliciously attempted to and succeeded in damaging Plaintiff's good name and reputation by either sending or directing that a letter filled with blatantly false statements about Plaintiff (the "Letter") be sent to Plaintiff's new broker-dealer, Cambridge Investment Research, Inc. ("Cambridge").

3.      Upon information and belief, Defendant also circulated the Letter to former associates and colleagues of Mr. Niemann, including Jim Duncan, Lucas Lawson, and Michael Smith. Additionally, the president of Royal Alliance, Dimitry Goldin, discussed the contents of

1

the Letter in a meeting with Plaintiff's former colleagues and advised them that Royal Alliance would soon be "going after" Plaintiff.

4.      Upon learning of the contents of the Letter (the "Response"), Plaintiff requested that Defendant retract its false statements through a written withdrawal of the statements.

5.      However, despite Plaintiff's extension of this figurative olive branch, Defendant has elected to stand by its defamatory statements and not provide a written withdrawal of the defamatory statements as graciously requested by Plaintiff.

6.      As such, Defendant should now be found liable and held accountable for its defamatory acts.

7.      Plaintiff's reputation has been damaged as a result of Royal Alliance's petulant and reckless behavior. Through this Petition, Plaintiff seeks: (i) to recover both general and special damages, including punitive damages, as required by Oklahoma law; (ii) injunctive relief enjoining Defendant from making false accusations against him, including those made against him in the Demand Letter; and (iii) declaratory relief requiring Defendant to provide a written withdrawal of the false allegations made against Plaintiff in the Letter which is to be sent to all third parties that received the Letter in an effort to correct the damage to Plaintiff's reputation that has certainly been done.

## PARTIES & BACKGROUND

8.      Plaintiff Alan P. Niemann is a resident and citizen of Oklahoma City, Oklahoma. After growing up on a farm and ranch in western Oklahoma and graduating from El Reno High School, Mr. Niemann pursued his undergraduate studies at Oklahoma State University, where he graduated with a Bachelor of Science degree in Agriculture Economics in 1982.

9.      Soon thereafter, Mr. Niemann became licensed by the Oklahoma Insurance Commission and FINRA registered and has since spent over thirty (30) years in the financial services industry. After beginning as a field underwriter, Mr. Niemann was appointed Regional Director, then Agency Manager of the Oklahoma City Mutual of New York office, then General Agent for the broker-dealer John Hancock (also located in Oklahoma City). He started a wealth management firm, Plaintiff Rockgate, in 2015, and ran an office of supervisory jurisdiction ("OSJ") for John Hancock Financial Network, Inc ("John Hancock"), Rockgate's broker-dealer.

10.     Following a John Hancock rebrand in July 2013 to Signator Investors ("Signator"), Signator was acquired and merged into Royal Alliance in late 2018, making Royal Alliance Plaintiff's broker-dealer.

11.     Several disagreements between Plaintiff and Royal Alliance ensued and the business relationship between the parties ended with Plaintiff's decision to leave Royal Alliance in the summer of 2020 for a new broker-dealer, Cambridge. This departure ultimately led to Defendant's defamatory acts at issue.

### STATEMENT OF FACTS

12.     Plaintiff left Royal Alliance for a new broker-dealer on September 1, 2020.

13.     On September 15, 2020, Royal Alliance, acting intentionally and with malice and reckless disregard of Plaintiff's rights, sent the Letter (attached hereto as **Exhibit A**) to both Plaintiff and Cambridge, and shared the contents of the Letter to Mr. Niemann's former associates and colleagues.

14.     The Letter was replete with baseless and false accusations, which Defendant refers to as "facts" in the letter, against Plaintiff. These defamatory statements include the following:

> "…you have unlawfully contacted clients of advisors who did not follow
> you to Cambridge Investment Research."

"Even before you moved to Cambridge, you sent a letter to Royal Alliance clients of other registered representatives, *including representatives that you no longer supervised*...There is no valid reason generally, let alone in the context of your impending broker-dealer switch, why you or Rockgate/Adaptation would have been sending such a communication to clients of representatives whom you no longer supervised, or would soon no longer supervise."

"Your conduct since the move to Cambridge has been even more egregious. We understand that you recently emailed clients serviced by *representatives who elected to remain at Royal Alliance*."

"These statements demonstrate that, not only have you improperly used Royal Alliance's confidential information, you improperly shared that information with Cambridge..."

"In addition to contractual breaches, your conduct to date constitutes a breach of your fiduciary duty to Royal Alliance."

"You abused [your] access to confidential information by, among other things, disclosing it to a third-party competitor, Cambridge."

"You later used Royal Alliance confidential information in an attempt to poach clients of those Royal Alliance registered representatives who chose not to move to Cambridge with you. Such conduct is a textbook example of a breach of fiduciary duty."

"[Y]ou violated SEC Regulation S-P and FINRA Rule 2010."

15.     These defamatory statements exposed Plaintiff to contempt, ridicule, and disgrace amongst his associates, colleagues and new broker-dealer, and have caused Plaintiff to suffer damage to his reputation as a wealth advisor and owner of his own wealth management firm, as well as pecuniary damage he has been forced to incur in defense of his name.

16.     On September 22, 2020, Plaintiff sent his Response (attached hereto as **Exhibit B**) requesting that Defendant "provide a written withdrawal of the false allegations made against Mr. Niemann." Plaintiff requested that this written withdrawal of the false allegations be provided no later than October 9, 2020 (see **Exhibit C**).

4

17.     Defendant has yet to comply with Plaintiff's demand and Plaintiff is now forced to bring this action in an attempt to salvage his damaged reputation.

### JURISDICTION AND VENUE

18.     This action arises under the authority vested in this Court by virtue of 12 O.S. § 2004. Venue is also proper in this Court under 12 O.S. §187.

### ALLEGATIONS

### COUNT I – DEFAMATION (LIBEL)

19.     The facts and allegations above are incorporated herein by reference.

20.     To prevail in an action for defamation in Oklahoma, a private individual must prove (1) a false and defamatory statement, (2) an unprivileged publication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either the actionability of the statement irrespective of special damage, or the existence of special damage caused by the publication.

21.     "Publication" means that the defamatory statement was communicated to a third-party. The publication may be either intentionally published or published as the result of the negligence of the publisher.

22.     These defamatory statements were published intentionally to Cambridge and Cambridge understood the statements to be about Plaintiff.

23.     Upon information and belief, these statements were also intentionally copied and published to multiple individuals or independent contractors by Royal Alliance, including to former associates of Mr. Niemann, and such former associates understood the statements to be about Plaintiff

5

24.     The defamatory statements made by Defendant in the letter were false, and Defendant did not exercise the care which a reasonably careful person would use under the circumstances to determine whether the statements were true or false.

25.     In fact, Plaintiff pointed out in his Response to Defendant's Letter that Defendant's false allegations were easily debased "from even a cursory review of the facts and applicable documents."

26.     In Oklahoma, whether a showing of special damages (i.e., a financial loss) is required depends on whether the defamation is libel per se or libel per quod.

27.     Defamation is libelous per se when the language used in the written defamatory statements is susceptible of but one meaning, and that an opprobrious one, and the publication on its face shows that the derogatory statements, taken as a whole, refer to the plaintiff.

28.     When the defamatory statements are libelous per se (as they are here) it is not necessary to allege or prove special damages, as malice and damage are implied. In contrast, libel per quod requires extrinsic proof of the defamatory meaning.

29.     Here, Defendant's defamatory statements, which Defendant refers to in the Letter as "facts," boldly and falsely state that Plaintiff violated SEC and FINRA rules and regulations and breached his contractual and fiduciary duties to Defendant (among other defamatory "fact" statements referred to in this Petition) and are thus libelous per se and actionable on their face.

30.     However, even if Defendant's statements are not found by this Court to be libelous per se, Plaintiff also hereby alleges that he has suffered special damages as a result of the false and defamatory statements made by Defendant in the Letter, including: (i) the time and costs incurred for the now necessary subjection to increased communications with and additional oversight by Cambridge's general counsel, including the time and costs incurred by holding multiple conference

calls with Cambridge's in-house counsel and business teams to explain and defend against the issues of the Letter, (ii) the attorney's fees already paid by Plaintiff so that Plaintiff's attorneys could meet and discuss these issues with Cambridge's general counsel and business teams, and (iii) the emotional distress experienced by Plaintiff resulting from the spread of these false allegations to his new broker-dealer and colleagues.

31.    As such, Plaintiff's allegations amount to both libel per se and libel per quod and Plaintiff is entitled to general and special damages, as well as punitive damages, in an amount to be determined at trial.

### PRAYER FOR RELIEF

Plaintiff Niemann respectfully requests that the Court grant the following relief:

i)   Award Plaintiff appropriate monetary relief, including general, special, and punitive damages, he has incurred as a result of Defendant's defamatory acts described herein;

ii)  Award Plaintiff injunctive and declaratory relief as may be appropriate, including injunctive relief enjoining Defendant from making any more false accusations against him (including those made against him in the Demand Letter), and declaratory relief requiring Defendant to provide a written withdrawal of the false allegations made against Plaintiff in the Letter and ordering that the withdrawal be sent to all third parties that received the Letter; and

iii) Any other favorable relief as allowable under law or at equity.

7

Dated: October 26, 2020

Respectfully Submitted,

William B. Federman, OBA # 2853
Tyler J. Bean, OBA #33834
FEDERMAN & SHERWOOD
10205 N. Pennsylvania
Oklahoma City, OK 73120
Telephone: (405) 235-1560
Facsimile: (405) 239-2112
wbf@federmanlaw.com
tjb@federmanlaw.com

Exhibit A



SPENCER F. SMITH
ATTORNEY AT LAW

A PROFESSIONAL CORPORATION

10TH FLOOR • TWO LEADERSHIP SQUARE
211 NORTH ROBINSON • OKLAHOMA CITY, OK 73102-7103
(405) 235-9621 • FAX (405) 235-0439
www.mcafeetaft.com

WRITER DIRECT
(405) 552-2334
FAX (405) 228-7334
spencer.smith@mcafeetaft.com

September 15, 2020

***Via Federal Express***
Mr. Alan P. Niemann
Rockgate Financial Partners
700 Cedar Lake Boulevard
Oklahoma City, OK 73114

     Re:   <u>Your Improper Solicitation of Royal Alliance Customers</u>

Dear Mr. Niemann:

     I am counsel for Royal Alliance Associates, Inc. ("Royal Alliance"). This letter concerns what appear to be unlawful activities on your part in violation of, at a minimum, the Independent Contractor Agreement (OSJ/Manager) ("ICA Agreement") that you signed with Royal Alliance on October 22, 2018. A copy of the ICA Agreement is attached hereto as <u>Exhibit A</u>.

     Specifically, Royal Alliance has learned that you have unlawfully contacted clients of advisors who did not follow you to Cambridge Investment Research ("Cambridge"). Not only have you sent letters to such clients, but you emailed targeted clients and requested that they DocuSign a form authorizing the transfer of their accounts from Royal Alliance to Cambridge, even though their advisor remains at Royal Alliance.

     Royal Alliance's position is based on the following facts. If any of these facts are untrue, I invite you to so advise me.

     The ICA Agreement defines "confidential information" as including

> all information and data provided by the Broker-Dealer and any of its affiliates to Representative, or acquired or used by Representative pursuant to this ICA, including the Broker-Dealer's business and proprietary information, actual or potential customers, customer lists, business partnerships, plans, reports, analyses, studies, models, sales data, marketing materials (including, without limitations, illustrations, disclosures and customer advertising), or any other secret or confidential work, knowledge, know-how, trade secret or business information of the

Broker-Dealer or its affiliates, any information, whether in written, electronic, or oral form, received, collected, provided to, processed, used or stored by Representative, pursuant to this ICA, including, without limitation, customer, applicant, contract or policy owner information, such as names, addresses, e-mail addresses, account numbers, and financial and health information. Confidential information does not include information which is or becomes (a) generally available to the public at the time of disclosure, or (b) independently developed by Representative.

Exhibit A, ¶5.1.

You also agreed to certain post-employment obligations. In particular, you agreed expressly that, for two years after leaving Royal Alliance, you would not:

... (ii) *use confidential information* of the Broker-Dealer (which shall include information as to customers, clients and registered representatives, provided that if Representative terminates his/her affiliation with Broker-Dealer, Representative may use such information as permitted in (i) above) *to solicit or induce any customer or client of Broker-Dealer, other than Representative's customers or clients, or those of the registered representatives under Representative's supervision or assigned to Representative who leave the Broker-Dealer with Representative*, to terminate or otherwise cease, reduce or diminish in any way client's or customer's relationship with the Broker-Dealer; or (iii) use or disclose any confidential information except as permitted in (i) or (ii) above or as required to comply with applicable legal process.

Id. , ¶17.3 (emphasis added).

On September 1, 2020, you changed broker-dealers, moving from Royal Alliance to Cambridge. Some, but not all, of the Royal Alliance registered representatives you supervised as Royal Alliance's OSJ moved to Cambridge with you.

Even before you moved to Cambridge, you sent a letter to Royal Alliance clients of other registered representatives, *including representatives that you no longer supervised*. That correspondence, on "Adaptation Financial" letterhead, states, in part:

Beyond that, we are making important operational enhancements to better serve you. One of the changes we are making to serve you better is updating our internal data management system. We will be using a consultant to help with this process, meaning they have been vetted by our firm to make certain your information remains protected.

The protection of your data is of the utmost importance to us so we want to provide you with the ability to opt out of this process if you deem necessary. Please check the box on the following page if you disagree with moving your data to an enhanced system and send this letter back to us within the next week to opt out.

Again, 2020 has brought all of us new challenges; please know we are here at Adaptation Financial to help you adapt to an ever-changing world. We take the privilege of working with you very seriously and look forward to visiting with you soon!

This letter was written at a time that you knew you would be moving to Cambridge. There is no valid reason generally, let alone in the context of your impending broker-dealer switch, why you or Rockgate/Adaptation should have been sending such a communication to clients of representatives whom you no longer supervised, or would soon no longer supervise.

Your conduct since the move to Cambridge has been even more egregious. We understand that you recently emailed clients serviced by *representatives who elected to remain at Royal Alliance.* Such solicitation is expressly prohibited by the terms of the ICA. *See* Exhibit A, ¶17.3. Nevertheless, the email advised that, "it has become necessary to change broker dealers in order to continue to serve you, and to grow our business. Effective today, I am registered with Cambridge Investment Research, a broker dealer based in Fairfield, Iowa." Remarkably, the email goes on to request that those clients – of *representatives who elected to remain at Royal Alliance* – DocuSign a form authorizing the transfer of their accounts from Royal Alliance to Cambridge: "You will be receiving a follow up encrypted email from Cambridge on behalf of myself, requesting your electronic signature, to initiate the new account paperwork, in order to re-register your account under Cambridge."

These statements demonstrate that, not only have you improperly used Royal Alliance's confidential information, you improperly shared that information with Cambridge, in contravention of your promise in the ICA "to use confidential information solely for the purposes of this ICA and *not to disclose such confidential information to any third party* in any form without the prior written consent of the Broker-Dealer, or as may be allowed by applicable law." Exhibit A, ¶5.2 (emphasis added).

In addition to contractual breaches, your conduct to date constitutes a breach of your fiduciary duty to Royal Alliance. As an OSJ for Royal Alliance, you were acting on Royal Alliance's behalf. *See, e.g.*, FINRA Rule 1021(b) (defining "Principal" as, "[p]ersons associated with a member[,] who are actively engaged in the *management of the member's investment banking or securities business*") (emphasis added); FINRA Rule 3110(f)(1) (defining an OSJ as an "office of a member" where delineated supervisory functions take place, including "*responsibility for supervising the activities of persons associated with the member* at one or more other branch *offices of the member*") (emphasis added). Indeed, maintaining Branch Offices and appointing Principals and OSJs are essential components of the "Supervisory System" imposed by FINRA Rules upon broker-dealers like Royal Alliance. Each such member must set up a system to supervise all associated persons and that system includes supervision by Principals who are charged "with authority to carry out the *supervisory responsibilities assigned to that office by the member*." FINRA Rule 3110(a)(4) (emphasis added); *see also* Rule 3110(a)(2) and (a)(5).

As an OSJ, you had access to confidential information concerning Royal Alliance registered representatives only because you were licensed and appointed an OSJ for Royal Alliance. You abused that access to confidential information by, among other things, disclosing

it to a third-party competitor, Cambridge. You first did so in connection with preparing written "Retention Packages" to Royal Alliance registered representatives to convince them to move with you to Cambridge. Notably, the letterhead you used for those "Retention Packages" was approved by Royal Alliance, yet you were trying to convince the targeted representatives that the "grass would be greener" at Cambridge.

You later used Royal Alliance confidential information in an attempt to poach clients of those Royal Alliance registered representatives who chose not to move to Cambridge with you. Such conduct is a textbook example of a breach of fiduciary duty. *See, e.g., Butcher v. McGinn*, 1985 OK 58, 706 P.2d 878, 881 (employee "will not be permitted to secure for himself that which is his duty to obtain for his principal."); *see also Superior Oil Co. v. Renfroe*, 67 F. Supp. 277, 281 (W.D. Okla. 1946) ("defendant has no right to use any of the information of a confidential nature, which he acquired while employed by the plaintiff, in competition with the plaintiff in any manner"); Restatement (Second) of Agency§ 387 ("Unless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency.").

Finally, to the extent that you shared client information with Cambridge without Royal Alliance's or its customers' knowledge or consent, you violated SEC Regulation S-P and FINRA Rule 2010. *See, e.g.*, FINRA Letter of Acceptance, Waiver and Consent No. 2019062346201 (re Patrick J. Knox), a copy of which is attached hereto as <u>Exhibit</u> B. In that matter, the respondent agreed that he did the following:

> While he was still registered through an association with Lincoln, and in anticipation of moving to the New Firm, Knox printed his Lincoln customer list and gave it to the New Firm. This list included non-public personal information for more than 300 Lincoln customers, including, among other information, social security numbers and birth dates, which was information provided to Lincoln by the customers. Knox improperly removed the customers' nonpublic personal information and gave it to the New Firm without Lincoln's or the customers' knowledge or consent.

Although we do not yet know all the facts, your conduct to date, including collaborating with Cambridge to move representatives and customers to Cambridge, appears very similar to, if not well beyond, that of Mr. Knox.

Royal Alliance therefore demands that:

1.  You immediately cease and desist from contacting any Royal Alliance client or customer who was not directly serviced by you or by a registered representative who joined you at Cambridge.

2.  You immediately instruct Cambridge to cease contacting any Royal Alliance client or customer who was not directly serviced by you or by a registered representative who joined you at Cambridge.

3.  On or before September 23, 2020, (a) you return to Royal Alliance any and all customer information that is in your (or Rockgate Financial's) possession,

custody or control where the client is serviced by a registered representative not under your current supervision, and (b) you certify under oath that you have returned all such information.

4.   On or before September 23, 2020, you certify in a writing signed under oath that you do not possess (or have access to), and will not in any way use, confidential information belonging to Royal Alliance, including but not limited to information about (a) Royal Alliance registered representatives who did not move to Cambridge, and (b) any customers whose advisors did not move to Cambridge.

If Royal Alliance does not receive confirmation that you have done the above, it will assume that you intend to continue acting in violation of your obligations to Royal Alliance. In that event, Royal Alliance will take steps to protect its interests from further irreparable harm. I look forward to your prompt cooperation.

Very truly yours,

Spencer F. Smith

Enclosures



10 Exchange Place
Suite 1410
Jersey City, NJ 07399

## INDEPENDENT CONTRACTOR AGREEMENT
(OSJ/Manager)

This Independent Contractor Agreement ("ICA") is entered into between **Royal Alliance Associates, Inc.** ("the Broker-Dealer") and the undersigned as an OSJ/Manager ("Representative"). The Broker-Dealer and Representative are collectively referred to as "the Parties."

In consideration of the mutual covenants and agreements contained herein, the Parties agree as follows:

1. **Scope of the ICA**

   1.1. This ICA and any attachments and addendums attached hereto and/or incorporated herein by reference govern the relationship between the Broker-Dealer and Representative in connection with the Representative:

      1.1.1. effecting securities transactions and providing such incidental advice about securities in Representative's capacity as a securities registered representative;

      1.1.2. providing investment advice in the capacity of a registered investment adviser representative under the Broker-Dealer's corporate investment adviser registration (the Broker-Dealer being a Registered Investment Adviser under the Investment Advisers Act of 1940) or as independent registered investment adviser and/or registered investment adviser representative under a state or federal registration independent of the Broker-Dealer's corporate investment adviser registration;

      1.1.3. effecting insurance sales in the capacity of a licensed insurance agent where such transactions, commissions or production credits are credited/processed through the Broker-Dealer under the Broker-Dealer's producer insurance license; and

      1.1.4 Any other activities that Broker-Dealer authorizes Representative to engage in.

   1.2 The term Representative as used herein means "registered representative", "investment adviser representative", "financial advisor", "advisor", "OSJ Manager", and/or "insurance agent", as appropriate.

   1.3 The term "customer" and "client" as used in the ICA shall mean a person and any entity utilizing Representative's services.

   1.4 Additional terms applying to Representative's activities not contained within the body of this ICA may be contained in addenda. Such addenda, when fully executed, will be considered part of this ICA. The Broker-Dealer may revise, from time-to-time, a list of addenda which may be included in this ICA as Attachment A. Revisions to Attachment A shall be deemed revisions within the meaning of Section 18 of this ICA.

   1.5 This ICA supersedes any prior ICA executed between the Broker-Dealer and Representative. Any addendum or attachment executed between the Broker-Dealer and Representative that was incorporated by reference in a prior ICA will be void unless such addendum or attachment is specifically provided for in this ICA when this ICA is executed. In the event any terms in a prior addendum or attachment conflict with this ICA, this ICA will control.

2. **The Broker-Dealer**

   2.1 In accordance with the paragraph herein titled "Compensation" the Broker-Dealer will pay to Representative or in the case of an investment advisor representative associated with an independent investment advisor entity, to the independent investment advisor entity, commissions and fees earned from customers for transactions in securities and insurance products and the furnishing of investment advisory services. The Broker-Dealer may pay such other compensation it deems appropriate. Payment of commissions, fees, or other types of

*Royal Alliance Associates, Inc., Member FINRA and SIPC*

EXHIBIT A



compensation to Representative from Broker-Dealer shall be in accordance with schedules or policies adopted by Broker-Dealer as revised from time-to-time.

3. **Representative**

    3.1    Applicable to all Products and Services;

        3.1.1    Representative will offer, solicit offers, and sell such products and services that have been expressly approved in advance by the Broker-Dealer, at Representative's sole risk and expense as an **INDEPENDENT CONTRACTOR** and not as an employee of the Broker-Dealer. In no way is this agreement intended to create a franchise relationship between Representative and Broker-Dealer.

        3.1.2  Representative will offer for sale and sell only products and services that have been expressly approved in advance by the Broker-Dealer, and for which the Broker-Dealer has executed an underwriting or selling agreement with the sponsor.

        3.1.3  In connection with each sale or solicitation of offers to buy securities or insurance products or to provide investment advisory services, Representative will deliver or cause to be delivered to the customer, in accordance with all applicable securities, investment advisory and insurance laws, rules and regulations, a current prospectus, offering memorandum, applicable Form ADV or such other documents that may be in effect and are required to be disclosed and Representative will make no representations to customers except as are contained in such prospectus, offering memorandum or other disclosure documents. In addition, Representative will furnish to the customer and prospective customers such other disclosure forms as required by the Broker-Dealer's policies and procedures. Representative will fully explain the items and conditions of the purchase or sale of securities and insurance products and investment advisory services to the customer or prospective customer. Representative will not make untrue statements, interpretations or misrepresentations, nor will Representative omit or neglect to disclose material facts relating to each such purchase or sale.

    3.2. Applicable to Securities Products and Services:

        3.2.1 Representative understands and agrees that a separate agreement regarding overrides must be negotiated between Representative as an OSJ Manager and any representatives working with or assigned to Representative's office, as to the allocation of commissions, fees and expenses between Representative as an OSJ and his/her representatives.

    3.3    Applicable to Investment Advisory Products and Services:

        3.3.1  Representative will conduct his or her actions as a registered investment adviser and/or investment adviser representative under the Investment Adviser's Act of 1940 (the "40 Act") and any other applicable federal or state laws or self-regulatory organization rules and in accordance with the policies and procedures adopted from time to time by the Broker-Dealer and its approved vendors.

        3.3.2  Representative, when acting in the capacity of an Investment Adviser Representative ("IAR") of the corporate Registered Investment Advisor ("RIA") authorizes the Broker-Dealer, as Registered Investment Adviser, to receive any investment advisory fees the Representative may charge clients for advisory services approved by the Broker-Dealer. Representative, when acting in the capacity of an IAR of an independent RIA, authorizes the Broker-Dealer to receive investment advisory fees, other than those specifically exempted by the Broker-Dealer (e.g., financial planning fees and non-discretionary investment advisory fees), the Representative may charge clients for advisory services approved by the Broker-Dealer.

        3.3.3  Representative agrees that advisory fees shall be processed through the Broker-Dealer, as set forth in 3.3.2, and the Broker-Dealer shall remit Representative's portion of such fees in accordance with the Advisory Fee Payout Schedule or Investment Advisory Fee Override Agreement, as applicable, which shall be incorporated herein by reference.

3.3.4  Representative agrees that in no event will the Broker-Dealer be liable to Representative for nonpayment of management fees and expenses related to Representative's advisory services.

3.3.5  Representative warrants that investment advisory services offered by Representative do not and will not constitute an investment company within the meaning of the Investment Company Act of 1940 (the "Investment Company Act"), that neither Representative nor such accounts are required to be registered under the Investment Company Act, and that Representative will comply with all regulations promulgated by federal and state regulatory agencies regarding investment advisory services.

3.3.6  Representative agrees that, should Representative's affiliation with the Broker-Dealer terminate during a period in which investment advisory fees have been billed and paid by clients in advance of such services being rendered, Broker-Dealer is authorized to credit customers in the amount of unearned advisory fees, and Representative shall refund all such fees to the Broker-Dealer.

3.3.7  Representative, if providing investment advisory services, will cause to be delivered to customers and prospective customers the applicable Form ADV and such other disclosures as are required by federal and state laws and regulations and the Broker-Dealer's policies and procedures relating to investment advisory services.

3.3.8  Representative will not exercise discretion in any investment advisory account without written authorization from the client.

3.4  Applicable to Insurance Products and Services:

3.4.1  In connection with the sale or solicitation of offers to buy insurance, Representative agrees not to perform any unauthorized act on behalf of the Broker-Dealer or any of its approved insurance carriers including, but not limited to, the following:

3.4.1.1  make, waive, alter, modify or change any contract on behalf of the Broker-Dealer or an insurance carrier;

3.4.1.2  accept any check made payable to Representative or any other entity not entitled to receive such funds;

3.4.1.3  endorse any check made payable to the Broker-Dealer or an insurance carrier;

3.4.1.4  accept any premium after the initial premium;

3.4.1.5  waive or modify any policy or application provision, condition, or obligation;

3.4.1.6  extend time for payment of any premium or to accept payment of any past due premium;

3.4.1.7  approve evidence of insurability;

3.4.1.8  bind or otherwise commit the Broker-Dealer or an insurance carrier to any risk; or

3.4.1.9  deliver any policy where the health of the insured, to Representative's knowledge, is other than as stated in the application for insurance.

4.  **Compliance**

4.1  Representative will comply with all applicable laws, rules, regulations and statements of policy of federal and state governmental or regulatory agencies including, but not limited to, the United States Securities and Exchange Commission ("SEC"), the By-Laws and Rules of the Financial Institution Regulatory Authority ("FINRA"), any other self-regulatory organization, and the state securities, investment advisory and insurance regulatory agencies.

4.2  Representative agrees to immediately notify the Broker-Dealer of any:

4.2.1   verbal or written communication that is, or has the potential to become, a customer complaint in accordance with the Broker-Dealer's policies and procedures;

4.2.2   arrests, charges, information, indictment or other proceedings filed or commenced, investment-related civil actions, disciplinary actions or any investigations, inquiries or document requests by federal or state regulatory authorities, agencies or self-regulatory organizations;

4.2.3   legal or regulatory proceeding or inquiry by an attorney, or by any federal or state agency related to the Broker-Dealer, or any matter covered by this agreement; or

4.2.4   action or decision involving a judgment, lien, garnishment or award involving Representative in any manner, including entities in which Representative may have any interest.

4.3   Representative will comply with all applicable policies and procedures of all approved securities and insurance product underwriters and sponsors for products sold through the Broker-Dealer.

4.4   Representative will read, understand and conduct Representative's business in accordance with the published policies and procedures and such instructions, directives, notices or other communications issued by the Broker-Dealer, including, but not limited to, the Broker-Dealer's Sales Practice Manual and Written Supervisory Procedures Manual.

4.5   Representative will offer for sale and sell only products and services that are expressly authorized by Broker-Dealer, and for which Representative is licensed or registered to sell by all applicable regulatory and self-regulatory organizations. Broker-Dealer reserves the right to revise its list of approved products/services at any time at its sole discretion.

4.6   Representative hereby agrees to fulfill both the regulatory element and firm element continuing education within the deadlines set by the Broker-Dealer. If at any time Representative should be deemed inactive for failure to complete Representative's continuing education, Representative understands that Representative is not entitled to any commission from the sale of securities products during the inactive period. Representative further understands that Representative is not able to act as a Registered Representative of the Broker-Dealer in any capacity until such time that Representative's continuing education has been satisfied.

4.7   Representative will advise all customers and prospective customers that Representative is acting as a registered representative of the Broker-Dealer and that any order for sale or purchase of products or services will be effected solely through the Broker-Dealer. Representative understands that Representative has no authority to act, and Representative will not act, for any customer in any dealings in securities or investment products except as a registered representative of the Broker-Dealer.

4.8   Representative will not accept, directly or indirectly, remuneration in any form from any person or business on account of any dealings in securities products without express prior written approval of the Broker-Dealer. Further, Representative will not accept or retain any affiliation or employment, directly or indirectly, with any dealer, underwriter, syndicator, broker or dealer of securities or investment advisor without the Broker-Dealer's written approval.

4.9   Representative will notify the Broker-Dealer in writing of any outside business activity prior to engaging in such activity. Representative will not engage in any conduct which conflicts with the business of the Broker-Dealer, nor will Representative engage in any conduct that is not the business of the Broker-Dealer at the location where Representative conducts the business of the Broker-Dealer without advising the Broker-Dealer in advance of such business activity, in writing and in such form as the Broker-Dealer may specify. Representative will not accept or retain employment or compensation from any person or business or as a self-employed person as a result of business activity outside the scope of Representative's affiliation with the Broker-Dealer without advising the Broker-Dealer in advance in writing of such employment or compensation. Representative agrees to make any and all books and records with respect to Representative's outside business activities available to the Broker-Dealer upon request. Such books and records shall include, without limitation, the financial records of such business activity. Representative agrees to conduct all outside business activities in accordance with all laws.

4.10 Representative will establish and maintain on behalf of the Broker-Dealer, and in such manner as the Broker-Dealer shall prescribe, all records required to be maintained by sections 17(a)(3) and 17(a)(4) of the Securities Exchange Act of 1934, by Rule 204-2 of the Investment Advisors Act of 1940, by FINRA, by other self-regulatory organizations, and by relevant state regulatory agencies for the securities and insurance businesses and investment advisory services conducted by Representative and for such business and services conducted by Representatives working out of or assigned to Representative's office. Representative agrees that any and all such records are property of the Broker-Dealer, and may be removed by the Broker-Dealer at any time.

5. **Confidential Information and Privacy Obligations**

5.1 Confidential information ("confidential information") includes all information and data provided by the Broker-Dealer and any of its affiliates to Representative, or acquired or used by Representative pursuant to this ICA, including the Broker-Dealer's business and proprietary information, actual or potential customers, customer lists, business partnerships, plans, reports, analyses, studies, models, sales data, marketing materials (including, without limitations, illustrations, disclosures and customer advertising), or any other secret or confidential work, knowledge, know-how, trade secret or business information of the Broker-Dealer or its affiliates, any information, whether in written, electronic, or oral form, received, collected, provided to, processed, used or stored by Representative, pursuant to this ICA, including, without limitation, customer, applicant, contract or policy owner information, such as names, addresses, e-mail addresses, account numbers, and financial and health information. Confidential information does not include information which is or becomes (a) generally available to the public at the time of disclosure, or (b) independently developed by Representative.

5.2 Representative agrees to use confidential information solely for the purposes of this ICA and not to disclose such confidential information to any third party in any form without the prior written consent of the Broker-Dealer, or as may be allowed by applicable law. Representative will advise and cause its respective employees, directors, officers, accountants, attorneys, agents, and representatives (collectively referred to as "Representative's Agents") who will have access to confidential information not to use or disclose any confidential information for any purpose other than for the purposes set forth in this ICA or as required by law and any such use or disclosure shall be at all times and in all events on the terms of and in compliance with the restrictions of this ICA.

5.3 Representative agrees to indemnify the Broker-Dealer and its affiliates, shareholders, directors, officers, employees, from any and all damages and losses, costs or expenses incurred as a result of the failure of Representative or Representative's Agents to perform their confidentiality obligations hereunder.

5.4 In the event Representative becomes legally compelled to disclose any confidential information or take any action prohibited by this ICA, Representative will provide the Broker-Dealer with prompt written notice for the purpose of enabling the Broker-Dealer to seek a protective order or other appropriate remedy, or waive compliance with the provisions of this ICA. In the event that such protective order or other remedy is not obtained within such time required to provide the confidential information, or if no such time period is specified, within thirty (30) days of such written notice to the Broker-Dealer, Representative so legally compelled will furnish only that portion of the confidential information or take such action which is, in the opinion of Representative's counsel, legally required, and will exercise reasonable efforts to obtain reliable assurance that confidential treatment will be accorded to any confidential information so furnished.

5.5 Representative shall maintain security procedures to protect against improper disclosure or use of confidential information, and shall comply in full with the privacy and security requirements of the Gramm-Leach-Bliley Act, Regulation S-P, the Health Insurance Portability and Accountability Act as may be applicable and any other federal and state laws and regulations governing the use and disclosure of confidential and private information. To the extent that any applicable federal, state or regulatory authority's requirements are more stringent, Representative's use and disclosure of confidential information shall be in accordance with such requirements. Except to the extent otherwise required or specifically permitted by law, Representative's use and/or disclosure of confidential information shall be limited solely to the purposes for which such information is disclosed to Representative to perform his or her obligations under this ICA.

5.6 Representative shall maintain appropriate administrative, technical and physical safeguards to assure that confidential information is not used or disclosed other than as provided by this ICA or as allowed by law.

Representative expressly warrants that all of Representative's Agents with access to confidential information will be advised of, and appropriately trained regarding the confidentiality and privacy obligations under this ICA and by law, and will comply in all respects with such obligations.

5.7     Representative agrees to report to the Broker-Dealer in writing within twenty-four (24) hours of discovering any use or disclosure of confidential information not provided for in this ICA or for a purpose not expressly permitted by law. To the extent such unauthorized use or disclosure occurs, Representative agrees to mitigate, to the greatest extent possible, any harmful effect thereof.

5.8     Representative agrees to abide by the limitations of the Broker-Dealer's and its affiliates' current privacy policies as published by the Broker-Dealer and its affiliates and as reasonably communicated to Representative from time to time.

5.9     Representative agrees to abide by the procedures and policies set forth in the Broker-Dealer's Code of Conduct and its Anti-Corruption Policy, and acknowledges receiving copies of these documents.

## 6.   Offsets/Amounts Owed the Broker-Dealer

6.1     If at any time Representative becomes indebted or otherwise liable to the Broker-Dealer, the Broker-Dealer shall be entitled to retain and apply toward the liquidation of any such indebtedness or liability any and all commissions, special compensation or other amounts otherwise due Representative. Any such compensation or other assets shall be a first lien upon amounts due hereunder. For the purpose of such lien and claim, Representative assigns to the Broker-Dealer, to the extent permitted by law, all commissions, or other amounts due or that become due at any time subsequent to the lien.

6.2     Any and all indebtedness or amounts due from Representative to the Broker-Dealer including, but not limited to, charge backs, rebated investment advisory fees paid in advance, debit balances, errors and omissions insurance premiums and deductibles, administrative charges, fines, penalties or advances and draws over and above the amount then actually due and payable from the Broker-Dealer to Representative, shall constitute a loan from the Broker-Dealer to Representative, repayable at any time upon the Broker-Dealer's demand, unless otherwise agreed to in writing between the Broker-Dealer and Representative. Any such loan shall bear interest at the maximum legal rate from date of termination of Representative's affiliation with the Broker-Dealer until paid in full.

6.3     Representative further understands and acknowledges that, upon the termination of his/her supervised representatives' affiliation with the Broker-Dealer, it is the practice of the Broker-Dealer to collect monies owed by such representatives from their OSJ Managers and that the Broker-Dealer may do so as provided in this ICA.

6.4.    The liens and assignments, as well as any indebtedness or amounts due from Representative to the Broker-Dealer, whether accrued before or after termination of this ICA, shall survive the termination of this ICA.

6.5     Representative agrees to pay all costs and expenses incurred by the Broker-Dealer in the collection of any indebtedness or amounts due from Representative to the Broker-Dealer including, but not limited to, investigative costs, attorneys' fees, collection agency fees, expert witness fees, arbitration fees and related travel expenses.

6.6     Representative authorizes the Broker-Dealer to release pertinent information concerning Representative's earnings and indebtedness to any government agency, self-regulatory organization, credit bureau or similar organization.

## 7.   Investigation

7.1     Representative authorizes the Broker-Dealer to prepare or obtain a consumer report or investigative credit report at any time regarding Representative and/or Representative's business and financial circumstances, including sources and amounts of income and assets. This information may be required by the Broker-Dealer in order to determine Representative's compliance with federal, State or local laws and regulations, the rules of a self-regulatory organization, any of Broker-Dealer's policies or such other authorized purposes. Representative

further authorizes and understands that the Broker-Dealer may share information regarding Representative, including personal information such as Representative's social security number, with its affiliates. If the Broker-Dealer requires an investigative consumer report, Representative authorizes the Broker-Dealer to proceed with an investigation, and releases any such person, or business associate from any and all liability of whatever nature by reason of furnishing such information to the Broker-Dealer or any agent acting on its behalf. Additional information concerning the nature and scope of this report has been provided in a separate document entitled "Fair Credit Reporting Act Disclosure and Authorization".

7.2     Representative acknowledges and agrees that the Broker-Dealer may, at any time, demand delivery of or otherwise physically secure all Books and Records maintained by Representative, with or without notice.

7.3     Representative certifies that all statements made by Representative, in connection with Representative's application to become or continue to be affiliated with Broker-Dealer as a Representative in any capacity, are true and complete to the best of Representative's knowledge and that Representative has withheld nothing that would, if disclosed, materially affect Representative's affiliation with the Broker-Dealer. Representative agrees to promptly disclose any material changes in information contained in Representative's application or otherwise provided by Representative to the Broker-Dealer. Representative understands that false, misleading or omitted information may constitute cause for rejection of Representative's application or termination from association with the Broker-Dealer.

## 8.   Sanctions

8.1     In the event that Representative fails to comply with the provisions of any applicable federal, state or other governmental law, rule or regulation or any self-regulatory organization's rules or regulations, or the Broker-Dealer's published procedures or policies, including periodic updates thereto, the Broker-Dealer shall have the option, in its sole discretion, to take such disciplinary or other actions as it deems appropriate including, but not limited to, assessing administrative charges, fines, penalties, limitations on activities or terminating affiliation with the Representative.

## 9.   Registration Fees and Other Expenses

9.1     Representative will pay the costs of Representative's registration or renewal with FINRA or any other applicable regulatory authority, examination fees, fees for appointments, bonding requirements, errors and omissions insurance premiums, termination fees, notification filing fees, continuing education fees, and any administrative fees or costs which may be incurred or imposed from time to time by the Broker-Dealer. Representative understands and agrees that such fees and costs are non-refundable if Representative's affiliation with the Broker-Dealer is terminated for any reason.

9.2     Representative will pay all of Representative's self-employment taxes and all other related governmental obligations including, but not limited to, social security, income and unemployment taxes, and any local fees or taxes on income, gross receipts, or otherwise.

9.3     The Broker-Dealer is not responsible for any expenses or charges incurred by Representative or anyone working on Representative's behalf in the conduct of Representative's business. Representative agrees that any person or persons with whom Representative contracts or designates to assist Representative in the performance of Representative's duties hereunder shall be considered Representative's employee/s or independent contractors, as the case may be, and shall not be employees or agents of the Broker-Dealer.

9.4     Representative further agrees that in the event of a dispute, arbitration, litigation or claim of any kind between or among the OSJ Manager and any of its affiliated representatives, or any of Representative's current or former employees, independent contractors (including but not limited to other Broker-Dealer Representatives), shareholders, partners, and/or other agents of any entity with which Representative is involved, Representative will indemnify and hold the Broker-Dealer harmless from all incurred obligations, costs, fees, losses, liabilities, claims, judgments, settlements paid, actions, damages and expenses including, but not limited to, attorneys' and expert witness fees.

## 10. Customer Issues

10.1   Representative will be liable and fully responsible for any loss, cost or expense which the Broker-Dealer sustains as a result of any transaction entered into involving Representative's customer or customer account(s) in which Representative was involved including, but not limited to, all costs incurred due to a client reneging, failures to comply with margin calls, and all other matters which involve the failure of a customer to meet his or her financial responsibility, unless the error giving rise to such loss is caused by the Broker-Dealer. Representative will indemnify the Broker-Dealer for any and all such losses including, but not limited to, the Broker-Dealer's attorneys' fees and other related legal fees and costs resulting from such customer transactions.

10.2   Representative acknowledges and understands that client information may be subject to and protected by privacy laws. Representative shall not use client information that is not otherwise available from public sources in any way that violates the client's privacy rights without first obtaining the client's permission. Furthermore, Representative will not, in affiliating with the Broker-Dealer, use client or other information which is the subject of any agreement in a manner that violates the terms of such agreement or any policy, procedure law or regulation. Representative understands that if the Broker-Dealer is named in any action involving the purported misuse of client information or proprietary information by reason of Representative's actions, Representative will defend and indemnify the Broker-Dealer in accordance with the indemnity provisions in this ICA.

10.3   If the Broker-Dealer determines, in its sole discretion, that a complaint in any way involves or may impact the Broker-Dealer or its principals, then the Broker-Dealer is authorized to direct and control the strategy to be employed with respect to such complaint, including whether to offer settlement and the amount of or other particulars with respect to such settlement, and may otherwise resolve the complaint in such a manner as the Broker-Dealer deems appropriate.

## 11. Compensation

11.1   For sales of securities and insurance products offered by and/or through the Broker-Dealer and effected by Representative, Representative will receive a percentage of Representative's individual production of gross dealer concession or commission as agreed upon in the agreement regarding overrides.

11.2   At any time, and at its sole discretion, the Broker-Dealer may reject any application for products transmitted to the Broker-Dealer by the Representative, and refund to customers any payments made by customers in connection with any product (including, but not limited to, any refund by the Broker-Dealer of monies to a customer in settlement of a dispute, complaint, or as a result of any regulatory action). If Representative has received compensation on any payments refunded to a customer, Representative agrees to repay the Broker-Dealer such compensation immediately, and in this regard, the Broker-Dealer is authorized to deduct the amount due the Broker-Dealer from any compensation due and payable from the Broker-Dealer to the Representative. The Broker-Dealer's election to deduct any amount due the Broker-Dealer from such compensation due to Representative is not an exclusive election and the Broker-Dealer may pursue collection of owed amounts by any additional means it deems appropriate.

11.3   The agreement regarding overrides may be modified at any time as agreed upon between OSJ Manager and any representatives working with or assigned to Representative's office, by giving the Broker-Dealer written notice. The effective date of any modification of the agreement regarding overrides will be the next available commission cycle date following the date that written notice was received by the Broker-Dealer.

11.4   Representative understands and agrees that upon termination of association or of the ICA, Representative's commissions may be held for a period up to ninety (90) days to allow for any charge backs, debit balances or other amounts owed to the Broker-Dealer to be assessed to Representative's commission account. The Broker-Dealer may hold Representative's commissions for any additional period of time if there are pending or threatened customer complaints, arbitrations, litigations or regulatory proceedings. The Broker-Dealer shall charge and deduct from Representative's commission account any amounts owed to the Broker-Dealer.

11.5   It is Representative's responsibility to notify Representative's customers and product sponsors of Representative's termination of affiliation from the Broker-Dealer and of any new broker-dealer affiliation. The Broker-Dealer will not be responsible for Representative's inaction or delay in connection with such notification.

11.6   Representative acknowledges:

    11.6.1   The Broker-Dealer shall not pay any commissions, fees, or other such payments to Representative until such time as the Broker-Dealer is in actual receipt of them, and Representative waives the right to receive any such payment until the Broker-Dealer has received it.

    11.6.2   The Broker-Dealer will not pay Representative any commissions earned on any transaction where the transaction date, defined as the date designated by the product sponsor, occurs after Representative's termination date, regardless of when Representative submitted the transaction.

    11.6.3   The Broker-Dealer is not obligated to credit or pay the Representative any 12b-1 fees, renewal fees, trails, continuing commissions, overrides or any other similar compensation paid to the Broker-Dealer by product sponsors, including but not limited to compensation from variable insurance products, after the date of Representative's termination of affiliation.

    11.6.4   In the event of Representative's retirement, disability or death:

        11.6.4.1   the Broker-Dealer agrees to pay to Representative, Representative's surviving spouse or other designated beneficiary, any commission which is due and payable by the Broker-Dealer from the sale of securities and insurance products with a transaction date prior to the date of Representative's retirement, disability or death, to the extent permissible under applicable rules and regulations;

        11.6.4.2   subject to any other rights of the Broker-Dealer set forth herein, the Broker-Dealer agrees to continue paying commissions and/or other compensation to a successor of Representative under a Succession or Buy/Sell Agreement which has previously been fully executed by Representative and Representative's successor prior to the time of Representative's retirement, disability or death; provided that the Broker-Dealer has previously approved such Agreement, and further provided that such successor is fully licensed with the Broker-Dealer and qualified to service the clients and business covered under such Agreement.

11.7   Representative agrees that, should Representative's affiliation with the Broker-Dealer terminate during a period in which investment advisory fees have been billed and paid by clients in advance of such services being rendered, Broker-Dealer is authorized to credit customers in the amount of unearned advisory fees, and Representative shall refund all such fees to the Broker-Dealer.

11.8   Representative understands that Representative may participate in special compensation declared payable by the Broker-Dealer, should Representative be eligible under the terms, conditions and qualifications of such special compensation program. Should the Broker-Dealer declare special compensation in the form of an annual bonus, unless otherwise agreed in writing between the Broker-Dealer and Representative, payment of such bonus is contingent on Representative being affiliated with the Broker-Dealer at the time the bonus is in fact paid. Representative understands and agrees that the Broker-Dealer reserves the right to discontinue or modify any special compensation that may now or in future be in effect.

11.9   Except for clerical error and undisclosed material facts, the regular compensation statement the Broker-Dealer issues to Representative is considered to be an accurate and complete record of all amounts the Broker-Dealer owes Representative. Settlement on the basis of these regular statements constitutes full satisfaction and agreement between Representative and the Broker-Dealer concerning the amounts reflected therein. The only exception occurs in the case of a claim to the contrary made within 60 days after the statement is issued, clerical error or undisclosed material fact.

11.10   Any additional provisions relating to compensation paid for providing investment advisory services not otherwise addressed above will be found in Section 3.3.

## 12. Authority

12.1   Representative's authority to act as a Representative of the Broker-Dealer is strictly limited and Representative has no authority or power to bind or obligate the Broker-Dealer by any statement, promise, representation, conduct, agreement or contract of any kind, or to waive any of the Broker-Dealer's rights or requirements unless specifically authorized by the Broker-Dealer in writing. Representative will not attempt to bind or obligate the Broker-Dealer, nor will Representative hold out or represent to others, in any way, that Representative has such authority to bind or obligate the Broker-Dealer.

12.2   Representative will use Representative's own judgment as to the time, place and means of exercising Representative's limited authority under the terms of this ICA, subject to and in compliance with, among other things, any applicable laws, rules, and regulations of federal and state governmental and regulatory agencies, the rules, regulations and policies of FINRA and other self-regulatory organizations and the policies and procedures of approved product underwriters and sponsors.

12.3   Representative will be treated and will act solely as an independent contractor and not as an employee of the Broker-Dealer, including for purposes of federal, state, or local taxation of income or any other matter. As an independent contractor, Representative understands that Representative is not eligible for any benefits that may be made available to the Broker-Dealer's employees.

## 13. Indemnity

13.1   Representative will defend, indemnify and hold the Broker-Dealer harmless from any and all obligations, costs, fees, losses, liabilities, claims, judgments, settlements paid, actions, damages and expenses including, but not limited to, those at any time or from time to time paid, suffered, incurred or sustained by the Broker-Dealer which arise out of or are related to:

13.1.1   Representative's alleged or actual errors, omissions, negligence, intentional wrongdoing, breach of duty and/or any violation or alleged violation of any applicable laws, rules and regulations of any federal and state governmental and regulatory agency, self-regulatory organization or the policies and procedures of approved underwriters and product sponsors;

13.1.2   any activity by Representative outside the scope of Representative's affiliation with the Broker-Dealer, which affiliation Representative acknowledges is limited solely to the sale or purchase of securities and insurance products approved by the Broker-Dealer, or the furnishing of investment advisory services;

13.1.3   any dispute, claim, litigation or arbitration filed against the Broker-Dealer arising out of any agreement or alleged policy violation by Representative relating to changing broker-dealer affiliation; and

13.1.4   any dispute, claim, litigation or arbitration involving Representative and any party with whom Representative has entered into a Buy/Sell or Succession Agreement as referred to herein, or involving Representative and any individual employed or retained by Representative.

## 14. Errors and Omissions

14.1   Representative understands that Errors and Omissions (E&O) coverage includes a deductible that is payable to the Broker-Dealer upon notification by the Broker-Dealer that the Representative and/or the Broker-Dealer are involved in a customer dispute, arbitration or civil action arising out of actions involving the Representative. Representative agrees to pay to the Broker-Dealer upon demand the full amount of the deductible within 30 days of said demand. Failure to promptly pay the deductible by the date due will subject the Representative to the deductible being paid from any commissions and fees due and payable or through such other means, including legal collection efforts, as the Broker-Dealer deems appropriate.

## 15. Termination of ICA

15.1   This ICA may be terminated at any time by either party, and for any reason whatsoever, by written notice, which notice shall specify the effective date of termination.

15.2   Upon termination, Representative will immediately deliver to the Broker-Dealer's home office all funds, property, books and records and supplies of every kind belonging to the Broker-Dealer, including but not limited to: investment applications/subscription agreements and related forms, *e.g.*, copies of checks, 1035 exchange forms, etc., explanation of investment forms, switch letters, checks and securities received and delivered logs, seminar files, outgoing correspondence files with all correspondence (including e-mail), incoming correspondence files (including e-mail), the Broker-Dealer's investment advisory services documents, *e.g.*, customer agreement with third party advisor, copies of branch office examination forms, required customer disclosures for offices located in financial institutions, and advertising files. Without limitation the foregoing may be collectively referred to as the "Books and Records" and such term refers to records in whatever medium they are maintained. Representative further acknowledges and agrees that the Books and Records are required to be maintained by the Broker-Dealer pursuant to state and federal laws, rules and regulations, that all such Books and Records are the property of the Broker-Dealer, and that Representative will maintain and provide the Books and Records to the Broker-Dealer immediately upon request, either prior to or after termination of Representative's affiliation with the Broker-Dealer. The Broker-Dealer and the Representative agree that the Representative will, in the ordinary course of business, provide the Broker-Dealer with the foregoing documents on an ongoing basis. The Representative agrees to provide supplements to the documents previously provided to the extent necessary to allow the Broker-Dealer to fulfill its legal and regulatory obligations. The Broker-Dealer and the Representative agree to accomplish this supplemental provision of documents in a reasonable but prompt fashion and under reasonable conditions which allow for the prompt completion of the Broker-Dealer's possession of the Books and Records.

15.3   Upon termination of affiliation from the Broker-Dealer, Representative will cease holding Representative out in any capacity as a Representative of the Broker-Dealer.

15.4   Representative understands that it is a violation of the Broker-Dealer's policy to leave the Broker-Dealer with any debit in Representative's account and unpaid balance for any promissory note or other obligation. Representative agrees that upon termination of affiliation from the Broker-Dealer, any and all outstanding obligations to the Broker-Dealer and any current debit balances shall be immediately due and payable and that any debit balances that become due thereafter shall be paid within fourteen (14) days after notification by the Broker-Dealer. Representative understands, accepts and agrees that failure to pay such balances may result in the Broker-Dealer taking such action it deems appropriate to collect said debts and obligations.

15.5   Upon termination of the ICA, Representative acknowledges that he/she will have no claim for profits, anticipated profits or future earnings. Representative will also have no claim for a refund or reimbursement of any funds that Representative has advanced or expenses paid or incurred in connection with Representative's responsibilities under this ICA or for any other reason. The only exception will occur if the Broker-Dealer specifically authorizes reimbursement in writing before termination of this ICA.

## 16.  Claims/Disputes between the Parties

16.1 Excepting any action by the Broker-Dealer to collect on a debit or debt owed by Representative which Broker-Dealer may at its election pursue by arbitration, civil action or use of a collection agency or any combination of the foregoing, any other claim or dispute between the Parties shall be resolved by a FINRA arbitration panel in the city and/or county where the Broker-Dealer's principal office is located in accordance with the then current rules of FINRA. If FINRA does not agree to hear the dispute for any reason or if Representative is no longer subject to FINRA jurisdiction or if the Parties mutually agree that the FINRA arbitration venue is not the proper venue, then such dispute may be resolved either through arbitration in accordance with the rules and regulations of the American Arbitration Association or civil court in the city and/or county where the Broker-Dealer's principal office is located. Any award by an arbitration panel shall be final and not subject to appeal, and judgment upon the award may be entered in any court having jurisdiction.  The prevailing party shall be entitled to reimbursement from the losing party of all costs and expenses including, but not limited to, attorneys' fees, expert witness fees, forum fees, mediation fees and travel expenses. Representative agrees that if Representative is the losing party, such costs and expenses may be offset against any compensation or commissions due Representative.

### 17. Additional Terms

17.1 As an OSJ Manager, Representative will supervise registered representatives assigned to Representative's OSJ in accordance with the laws, rules and regulations of federal and state governmental and regulatory agencies, self-regulatory organizations, and the Broker-Dealer's policies and procedures.

17.2 Representative understands that the Broker-Dealer may, in its sole discretion, hold a Representative who is an OSJ Manager responsible for any unpaid fees and costs which may be incurred or imposed from time-to-time by the Broker-Dealer against registered representatives under the supervision of such OSJ Manager, including, but not limited to charges, charge backs, debit balances, fees involving registration, continuing education, terminations, bonding requirements, errors and insurance premiums and deductibles payable, and other losses, liabilities, judgments, settlements and damages.

17.3 During the term of this ICA and for two (2) years thereafter, Representative agrees not to (i) recruit, solicit or induce any non-clerical employee, registered principal or registered representative of the Broker-Dealer, other than registered representatives under the supervision or assigned to the Representative, to terminate his/her affiliation with the Broker-Dealer; (ii) use confidential information of the Broker-Dealer (which shall include information as to customers, clients and registered representatives, provided that if Representative terminates his/her affiliation with Broker-Dealer, Representative may use such information as permitted in (i) above) to solicit or induce any customer or client of Broker-Dealer, other than Representative's customers or clients, or those of the registered representatives under Representative's supervision or assigned to Representative who leave the Broker-Dealer with Representative, to terminate or otherwise cease, reduce or diminish in any way client's or customer's relationship with the Broker-Dealer; or (iii) use or disclose any confidential information except as permitted in (i) or (ii) above or as required to comply with applicable legal process. If any such restriction is found to be unenforceable because it extends for too long a period of time or over too great a range of activities or in too broad a geographic area, it shall be interpreted to extend over the maximum period of time, range of activities or geographic area to which it may be enforceable. In the event of a reach or potential breach of such restrictions, Representative acknowledges that the Broker-Dealer will be caused irreparable harm and that money damages may not be an adequate remedy. Accordingly, Representative acknowledges that the Broker-Dealer shall be entitled to injunctive relief (in addition to other remedies at law) to have such provisions enforced without posting any bond.

### 18. Entire ICA /Amendment

18.1 This ICA contains the entire understanding of the Parties relating to the subject matter of this ICA and supersedes all prior and collateral agreements, understandings, statements and negotiations of the Parties. All addendums and attachments referred to in this ICA are incorporated herein by reference.

18.2 No representation, inducement or commitment other than as expressly set forth in this ICA has been made or relied upon by the Representative. If a conflict exists between this ICA and any other agreement, addendum or written commitment, the terms of this ICA shall take precedence unless such other agreement, addendum or commitment signed by the Parties to this ICA specifically states otherwise, so long as those conflicting terms do not materially impair the application, operation and enforcement of this ICA.

18.3 This ICA shall be subject to the policies, procedures, rules and regulations of the Broker-Dealer as such may be in effect from time to time. Such policies, procedures, rules and regulations of the Broker-Dealer shall control in the event of any inconsistency between this ICA and such policies, procedures, rules and regulations.

18.4 This ICA may only be modified or amended in writing signed by the Broker-Dealer and Representative, except that the Broker-Dealer may make minor non-material revisions as it deems appropriate and implement such changes by way of negative consent notification to Representative.

18.5 This ICA and any amendments must be signed by an officer of the Broker-Dealer or a person designated as an authorized agent if such agent is provided for within the Broker-Dealer's by-laws.

### 19. No Waiver

19.1 The failure or delay of the Broker-Dealer to declare a breach or termination of this ICA because of any violation of its terms shall not be deemed to be a waiver of any subsequent violation of this ICA.

### 20. Severability

20.1 This ICA shall be severable. Should any term, condition or provision of this ICA be determined by an arbitration panel or court of competent jurisdiction to be invalid or ineffective for any reason, all of the remaining terms and conditions of this ICA shall remain in full force and effect.

### 21. Binding on Successors/Assigns

21.1 This ICA is not assignable by Representative; the ICA shall be assignable by the Broker-Dealer, provided that any such assignee shall assume this ICA in a writing delivered to Representative. This ICA shall be binding upon and inure to the benefit of the Parties and their respective successors-in-interest and permitted assigns.

### 22. Notice

22.1 Notice shall be deemed given upon transmission via facsimile, email with or without attachments or by placement of such written notice in the U.S. mail, postage prepaid, addressed to the other party hereto, either at Representative's last known address as contained in the Broker-Dealer's records or to the Broker-Dealer at its principal place of business.

### 23. Effective Date

23.1 This ICA Agreement is made and entered into as of the date executed by an authorized officer of the Broker-Dealer.

### 24. Agreement Non-Violative/Choice of Law

24.1 Nothing herein shall be violative of any applicable law, rule or regulation and this ICA Agreement shall be governed by and construed in accordance with the laws of the state of Delaware.

### 25. Separate Authorization and Approval

25.1 Representative understands that execution of this ICA by the Parties does not constitute automatic approval for Representative to engage in such securities, investment advisory or insurance activities if the Broker-Dealer's policies and procedures require additional and separate approval to engage in specific activities.

### 26. Electronic Signatures

26.1 This ICA and any amendments may be executed by electronic signature provided that such electronic signature is facilitated through an electronic medium/process approved by the Broker-Dealer.

October 22, 2018

*ALAN NIEMANN*

Date_____     By:_____

(Signature of OSJ/Manager)

Name: Alan P Niemann_____

(Please Print)

Date_____

By:_____
          (Signature of OSJ/Manager, if applicable)

Name:_____
                 (Please Print)

Date___10/19/2018_____

Royal Alliance Associates, Inc.

By:_____
        (Signature)

Dmitry Goldin
President and CEO

Rev. 7.18.18

### FINANCIAL INDUSTRY REGULATORY AUTHORITY
### LETTER OF ACCEPTANCE, WAIVER AND CONSENT
### NO. 2019062346201

TO:    Department of Enforcement
        Financial Industry Regulatory Authority (FINRA)

RE:    Patrick J. Knox, Respondent
        General Securities Representative
        CRD No. 1206837

Pursuant to FINRA Rule 9216 of FINRA's Code of Procedure, Respondent Patrick J. Knox submits this Letter of Acceptance, Waiver and Consent (AWC) for the purpose of proposing a settlement of the alleged rule violations described below. This AWC is submitted on the condition that, if accepted, FINRA will not bring any future actions against Respondent alleging violations based on the same factual findings described herein.

I.

### ACCEPTANCE AND CONSENT

A.    Respondent hereby accepts and consents, without admitting or denying the findings, and solely for the purposes of this proceeding and any other proceeding brought by or on behalf of FINRA, or to which FINRA is a party, prior to a hearing and without an adjudication of any issue of law or fact, to the entry of the following findings by FINRA:

### BACKGROUND

Knox first became registered with FINRA in 1983. From September 1988 to July 2018, Knox was registered as a General Securities Representative through an association with Lincoln Investment (CRD No. 519). According to the Uniform Termination Notice for Securities Industry Registration (Form U5) that Lincoln filed on July 1, 2018, Knox voluntarily left Lincoln.

Since June 29, 2018, Knox has been registered as a General Securities Representative through an association with another FINRA member firm (New Firm).

### RELEVANT DISCIPLINARY HISTORY

Respondent does not have any disciplinary history with the Securities and Exchange Commission, any state securities regulators, FINRA, or any other self-regulatory organization.

### OVERVIEW

In June 2018, Knox took nonpublic personal customer information from Lincoln and

EXHIBIT B

gave it to the New Firm, without Lincoln's or the customers' knowledge or consent. As a result, Knox caused Lincoln to violate the SEC's Regulation S-P: Privacy of Consumer Financial Information and Safeguarding Personal Information (Regulation S-P) and, in so doing, violated FINRA Rule 2010.

## FACTS AND VIOLATIVE CONDUCT

Regulation S-P generally prohibits financial institutions from disclosing "nonpublic personal information" about a customer unless the customer receives proper notice and opportunity to opt out.

Information is considered to be "nonpublic personal information" if it contains personally identifiable financial information about one or more consumers, including: (1) information a consumer provides to a broker-dealer to obtain a financial product or service; (2) information about a consumer resulting from any transaction involving a financial product or service between a broker-dealer and a consumer; or (3) information a broker-dealer otherwise obtains about a consumer in connection with providing a financial product or service to that consumer. "Nonpublic personal information" includes, among other things, names, addresses, telephone numbers, social security numbers, and birth dates that are derived in whole or in part from information provided to a financial institution by a customer.

A registered person who discloses nonpublic personal information about a customer, and causes his or her member firm to violate Regulation S-P, violates FINRA Rule 2010, which requires registered persons to observe high standards of commercial honor and just and equitable principles of trade.

While he was still registered through an association with Lincoln, and in anticipation of moving to the New Firm, Knox printed his Lincoln customer list and gave it to the New Firm. This list included non-public personal information for more than 300 Lincoln customers, including, among other information, social security numbers and birth dates, which was information provided to Lincoln by the customers. Knox improperly removed the customers' nonpublic personal information and gave it to the New Firm without Lincoln's or the customers' knowledge or consent.

By virtue of the foregoing, Knox caused Lincoln to violate Regulation S-P, and in so doing, violated FINRA Rule 2010.

B.    Respondent also consents to the imposition of the following sanctions:

- A suspension from association with any FINRA member firm in any and all capacities for a period of ten business days; and

- A fine of $2,500.

Respondent agrees to pay the monetary sanction upon notice that this AWC has been accepted and that such payment is due and payable. Respondent has submitted an Election of Payment form showing the method by which he proposes to pay the fine

2

*imposed.*

Respondent specifically and voluntarily waives any right to claim an inability to pay, now or at any time hereafter, the monetary sanction imposed in this matter.

Respondent understands that if he is barred or suspended from associating with any FINRA member, he becomes subject to a statutory disqualification as that term is defined in Article III, Section 4 of FINRA's By-Laws, incorporating Section 3(a)(39) of the Securities Exchange Act of 1934. Accordingly, he may not be associated with any FINRA member in any capacity, including clerical or ministerial functions, during the period of the bar or suspension. See FINRA Rules 8310 and 8311.

The sanctions imposed herein shall be effective on a date set by FINRA staff.

## II.

### WAIVER OF PROCEDURAL RIGHTS

Respondent specifically and voluntarily waives the following rights granted under FINRA's Code of Procedure:

A.   To have a Complaint issued specifying the allegations against him;

B.   To be notified of the Complaint and have the opportunity to answer the allegations in writing;

C.   To defend against the allegations in a disciplinary hearing before a hearing panel, to have a written record of the hearing made and to have a written decision issued; and

D.   To appeal any such decision to the National Adjudicatory Council (NAC) and then to the U.S. Securities and Exchange Commission and a U.S. Court of Appeals.

Further, Respondent specifically and voluntarily waives any right to claim bias or prejudgment of the Chief Legal Officer, the NAC, or any member of the NAC, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including acceptance or rejection of this AWC.

Respondent further specifically and voluntarily waives any right to claim that a person violated the ex parte prohibitions of FINRA Rule 9143 or the separation of functions prohibitions of FINRA Rule 9144, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including its acceptance or rejection.

3

III.

## OTHER MATTERS

Respondent understands that:

A.   Submission of this AWC is voluntary and will not resolve this matter unless and until it has been reviewed and accepted by the NAC, a Review Subcommittee of the NAC, or the Office of Disciplinary Affairs (ODA), pursuant to FINRA Rule 9216;

B.   If this AWC is not accepted, its submission will not be used as evidence to prove any of the allegations against Respondent; and

C.   If accepted:

1.   this AWC will become part of Respondent's permanent disciplinary record and may be considered in any future action brought by FINRA or any other regulator against Respondent;

2.   this AWC will be made available through FINRA's public disclosure program in accordance with FINRA Rule 8313;

3.   FINRA may make a public announcement concerning this agreement and the subject matter thereof in accordance with FINRA Rule 8313; and

4.   Respondent may not take any action or make or permit to be made any public statement, including in regulatory filings or otherwise, denying, directly or indirectly, any finding in this AWC or create the impression that the AWC is without factual basis. Respondent may not take any position in any proceeding brought by or on behalf of FINRA, or to which FINRA is a party, that is inconsistent with any part of this AWC. Nothing in this provision affects Respondent's: (i) testimonial obligations; or (ii) right to take legal or factual positions in litigation or other legal proceedings in which FINRA is not a party.

D.   Respondent may attach a Corrective Action Statement to this AWC that is a statement of demonstrable corrective steps taken to prevent future misconduct. Respondent understands that he may not deny the charges or make any statement that is inconsistent with the AWC in this Statement. This Statement does not constitute factual or legal findings by FINRA, nor does it reflect the views of FINRA or its staff.

Respondent certifies that he has read and understands all of the provisions of this AWC and has been given a full opportunity to ask questions about it; Respondent has agreed to the AWC's provisions voluntarily; and no offer, threat, inducement, or promise of any

4

kind, other than the terms set forth herein and the prospect of avoiding the issuance of a
Complaint, has been made to induce him to submit this AWC.

8/28/2020
_____
Date

_____
Patrick J. Knox
Respondent

Reviewed by:

_____
Christopher C. Coss
Counsel for Respondent
Coss & Momjian, LLP
114 Presidential Blvd., Suite 214
Bala Cynwyd, PA 19004

Accepted by FINRA:

09/09/2020
_____
Date

Signed on behalf of the
Director of ODA, by delegated authority

_____
Matthew M. Ryan
Principal Counsel
FINRA
Department of Enforcement
1601 Market St., Suite 2700
Philadelphia, PA 19103-2339

5

September 9, 2020
Page 2

If you have any questions concerning this matter, please call Matthew M. Ryan, Principal
Counsel at (215) 209-7094.

Matthew M. Ryan
Principal Counsel

Enclosure(s)

cc:      Patrick J. Knox
         140 Bishops Gate Lane
         Doylestown, PA 18901

         Christopher C. Coss,Esq.
         Coss & Momjian, LLP
         114 Presidential Blvd. Suite 214
         Bala Cynwyd, PA 19004

# Exhibit B

# FEDERMAN & SHERWOOD

(AN ASSOCIATION OF ATTORNEYS AND PROFESSIONAL CORPORATIONS)

10205 N. PENNSYLVANIA AVENUE
OKLAHOMA CITY, OKLAHOMA 73120
TELEHONE: (405) 235-1560
FACSIMILE: (405) 239-2112

212 W. SPRING VALLEY ROAD
RICHARDSON, TEXAS 75081
TELEPHONE: (214) 696-1100
FACSIMILE: (214) 740-0112

**REPLY TO: OKLAHOMA CITY, OK**

September 22, 2020

**VIA FEDERAL EXPRESS**

Spencer F. Smith
McAfee & Taft
Tenth Floor, Two Leadership Square
211 North Robinson Avenue
Oklahoma City, Oklahoma 73102
Telephone: (405) 235-9621
Facsimile: (405) 235-0439

Re:     *Your Demand Letter to Mr. Alan Niemann*

Dear Mr. Smith:

We received your letter dated September 15, 2020 (the **"Demand Letter"**). From even a cursory review of the facts and applicable documents, it is clear the basis of your allegations is that Mr. Niemann allegedly took an action that he was not entitled to. Your basis is unfounded and unsupportable. As further discussed below, the Demand Letter seems to be meant to harass our client. To be upfront – and we do not say this lightly – your client, Royal Alliance, is operating in bad faith and your firm either knowingly or mistakenly alleged erroneous facts that have not been adequately researched.

*Royal Alliance's September 4th Termination Letter to Mr. Niemann*

Apparently, you have not been given or have failed to consider the termination letter attached hereto as **Exhibit A** (the **"Termination Letter"**) dated September 4, 2020 from Royal Alliance to Mr. Niemann. Look four lines down in the first paragraph, under the section titled "Client Accounts" and you will see that your client gives Mr. Niemann the clear directive to "…transfer *your* customer accounts to your new firm within ninety (90) days of your termination" (emphasis added). Only fourteen words later your client states that "[i]f transfer has not been initiated within this period, *your* accounts may be re-assigned" (emphasis added). This language is unambiguous. Royal Alliance's Termination Letter recognizes whose "customers" Mr. Niemann is dealing with and gives Mr. Niemann the right to contact *his* customers, who fall under the umbrella of *his* Office of Supervisory Jurisdiction (**"OSJ"**). Your disparaging letter and remarks aside, this is all Mr. Niemann has done. His actions are permissible and directly supported by the Termination Letter. They are also supported by the plain language of the Independent Contractor Agreement attached hereto as **Exhibit B** (the **"ICA"**) between Royal Alliance and Mr. Niemann, which seems to have been misread and/or misunderstood by your client, despite their having

authored it.

*As Known and Confirmed by Your Client, the Customers Contacted by Mr. Niemann are Mr. Niemann's Customers, not Royal Alliance's and, as such, Mr. Niemann Did Not Breach the ICA*

The ICA defines "confidential information" in Section 5.1 as including

> *all information and data provided by the Broker-Dealer and any of its affiliates to Representative, or acquired or used by Representative pursuant to this ICA,* including the Broker-Dealer's business and proprietary information, *actual or potential customers,* customer lists, business partnerships, plans, reports, analyses, studies, models, sales data, marketing materials (including, without limitations, illustrations, disclosures and customer advertising), or any other secret or confidential work, knowledge, know-how, trade secret or business information of the Broker-Dealer or its affiliates, any information, whether in written, electronic, or oral form, received, collected, provided to, processed, used or stored by Representative, pursuant to this ICA, including, without limitation, customer applicant, contract or policy owner information, such as names, addresses, e-mail addresses, account numbers, and financial and health information. *Confidential information does not include information which is or becomes (a) generally available to the public at the time of disclosure, or (b) independently developed by Representative* (emphasis added).

Importantly, "confidential information" is defined as information and data (including actual or potential customers) provided by Royal Alliance to Mr. Niemann or acquired or used by Mr. Niemann pursuant to the ICA. However, Royal Alliance never provided customers to Mr. Niemann or Rockgate and Mr. Niemann never acquired customers pursuant to the ICA. All "confidential information," including customer information, owned by Mr. Niemann and Rockgate before the Signator merger with Royal Alliance is information that falls under Subsection 5.3(b) as independently developed by Mr. Niemann, thus falling outside the scope of "confidential information" as defined in the ICA. The consideration given by Mr. Niemann for these accounts contemplated the acquisition of the clients and the respective cash flow, but did not contemplate transferring the customers to the advisors as no advisors gave Mr. Niemann any consideration for the ownership of the client base of Rockgate. As such, all customers referenced in your Demand Letter are mischaracterized as customers of Royal Alliance. These are Mr. Niemann's customers. This mischaracterization demonstrates an obvious lack of understanding on your Client's part as to the business relationship of the parties and the history behind that relationship. It also demonstrates an incapability of, or plain disinterest in, reading and applying simple rules of contract language.

Furthermore, Section 17.3 of the ICA, which is inexplicably left out of your Demand Letter, states the following:

Federman & Sherwood
September 22, 2020
Page 3

> During the term of this ICA and for two (2) years thereafter, Representative agrees not to (i) recruit, solicit or induce any non-clerical employee, registered principal or registered representative of the Broker-Dealer, *other than registered representatives under the supervision or assigned to the Representative*, to terminate his/her affiliation with the Broker-Dealer; (ii) use confidential information of the Broker-Dealer (which shall include information as to customers, clients and registered representatives, provided that if Representative terminates his/her affiliation with Broker-Dealer, Representative *may use such information as permitted in (i) above*) to solicit or induce any *customer or client of Broker-Dealer, other than Representative's customers or clients, or those of the registered representatives under Representative's supervision or assigned to Representative*…(emphasis added).

Again, the ICA clearly permits Mr. Niemann to recruit his representatives and their customers or clients. Since Mr. Niemann only contacted his customers and representatives, which customers and representatives he independently developed, Mr. Niemann committed no breach of contract and Royal Alliance's accusations are unfounded. The fact that certain of Mr. Niemann's representatives elected to stay with Royal Alliance is irrelevant, as the ICA allows recruitment and solicitation of these representatives under Section 17.3(i) and Royal Alliance approved and confirmed such recruitment and solicitation.

*Mr. Niemann's Letter to his Clients, Which Royal Alliance Contends was Improper, was Actually Pre-Approved by Royal Alliance*

Attached hereto as **Exhibit C** is a screenshot taken by Mr. Niemann of Royal Alliance's Service-Net Ticket based system, equally available to your client, and hence to you. The screenshot is a depiction of Royal Alliance's August 20, 2020 pre-approval of the same letter to which it now takes umbrage. And not only was the letter pre-approved by Royal Alliance, but it was also escalated internally to a higher level of compliance review and received more scrutiny than is normally given by Royal Alliance. Clearly, you cannot allege, in good faith, that Mr. Niemann egregiously sent that same letter to *his* clients after your client not only approved the letter, but then sent Mr. Niemann the Termination Letter directing him to transfer *his* customer accounts within ninety days of termination.

Additionally, we are sure you noted that the letter makes no mention of Cambridge Investment Research, Inc. ("Cambridge"). Nor has Mr. Niemann sent client or customer information to Cambridge without their consent. He has been extremely cautious in both regards. But even if the letter did make mention of Cambridge, this is completely irrelevant due to (i) Royal Alliance's meticulous review and pre-approval of the letter, and (ii) the fact that the letter was sent to Mr. Niemann's customers, as permitted by the ICA. Mr. Niemann was never in breach of the ICA.

It is deeply troubling that Royal Alliance is using your law firm to advance such clearly misleading and dishonest allegations. Royal Alliance pre-approved the letter used by Mr. Niemann to "egregiously" contact *his* customers and representatives. We invite you and your client to engage in a more thorough and hands on investigation before making any other blatantly false allegations against our client, as these false allegations resemble defamation per se under Oklahoma law. As you know, it is settled law that one who is liable for a per se libel or slander is liable for both general and special damages, including punitive damages, which Mr. Niemann will seek if these false allegations are pursued by you and your client. Even if your client's false allegations were found to amount only to defamation per quod, it is likely they would still be liable for both general and specific damages, as your client's plainly false and dishonest allegations are made out of malice toward Mr. Niemann. "[T]imely objections were made to instructions on punitive damages, apparently on the theory that punitive damages are not recoverable for defamations not actionable per se ... We have found no case or comment to the effect that punitive damages are not recoverable in defamations per quod in the discretion of the jury based upon a specific finding of malice and special damages." M.F. Patterson Dental Supply Co. v. Wadley, 401 F.2d 167, 172-73 (10th Cir. 1968) (citations omitted).

## *Mr. Niemann Owes no Fiduciary Duty to Royal Alliance*

Your argument that Mr. Niemann breached a fiduciary duty owed to Royal Alliance is inapposite as Mr. Niemann, an OSJ, owes no fiduciary duty to Royal Alliance. And even if he did, his actions do not come close to even a resemblance of a breach of fiduciary duty. The cases you cite are inapplicable to the situation at hand. Mr. Niemann is an independent contractor and has never managed Royal Alliance's investment banking or securities business. He was only responsible to supervise the activities of the representatives within his OSJ. Supervision of his own branch of business does not equate to a fiduciary duty owed to Royal Alliance.

Not to mention, Mr. Niemann acquired most of his book of business years before the merger of Signator with Royal Alliance, and Royal Alliance never gave Mr. Niemann any consideration for this book of business. Thus, the case law you cite is wholly inapplicable. *See, e.g., Butcher v. McGinn*, 1985 OK 58, 706 P.2d 878, 881 (*employee* "will not be permitted to secure for himself that which is his duty to obtain for his principal"); *see also Superior Oil Co. v. Renfroe*, 67 F. Supp. 277, 281 (W.D. Okla. 1946) ("defendant has no right to use any of the information of a confidential nature, *which he acquired while employed by the plaintiff*, in competition with the plaintiff...). Because Mr. Niemann is an independent contractor, and because the client information at issue here was acquired by Mr. Niemann long before entering into the ICA with Royal Alliance and is not "confidential information," Mr. Niemann's act of contacting *his* clients does not constitute a violation of any fiduciary duty, if one even exists at all.

## *Mr. Niemann's Responses to Royal Alliance's Demands*

Mr. Niemann therefore responds to Royal Alliance's demands as follows:

> 1. None of Mr. Niemann's clients and customers belong to Royal Alliance. All are Mr. Niemann's, as explained above. As such, this demand is inapplicable.

2. None of Mr. Niemann's clients and customers belong to Royal Alliance. All are Mr. Niemann's, as explained above. As such, this demand is inapplicable.

3. Royal Alliance has all this information on their server from electronic submission. As such, this demand is inapplicable.

4. There is no need for Mr. Niemann to certify that he does not possess or have access to and will not use confidential information belonging to Royal Alliance because the representatives, customers, and clients under his OSJ did not fall within the scope of "confidential information" as defined by Section 5.1 of the ICA. As such, this demand is inapplicable.

*Mr. Niemann's Demands Upon Royal Alliance*

Mr. Niemann hereby demands that:

1. Royal Alliance provide Mr. Niemann with a full release and that it immediately cease making false accusations against him, including those included in the Demand Letter.

2. Royal Alliance provide a written withdrawal of the false allegations made against Mr. Niemann in the Demand Letter, along with a list of the names of all persons with whom Royal Alliance shared the Demand Letter.

3. Royal Alliance conduct an accurate investigation of the facts alleged in the Demand Letter, and that such investigation be conducted with people who are honest and willing to provide complete and accurate information regarding these issues.

4. Royal Alliance and McAfee & Taft immediately confirm that they have preserved all documents and electronically stored information in their possession, custody or control that may contain evidence pertinent to this dispute including the false allegations and the persons who received a draft or final copy of the letter, and that such preservation include all documents and electronically stored information dated as of November 2018.

*Conclusion*

Royal Alliance's haste to send a harassing demand letter without even a modicum of truth to support the allegations violates various rules of conduct and, if it persists into arbitration, we will have no choice but to file a Rule 11(b) type of motion. Our client intends to vigorously contest these false allegations and we intend to defend him against Royal Alliance and anyone who aids Royal Alliance in the assertion of blatantly false facts. You should have had, and now certainly do have, a wealth of documents at your disposal. We strongly encourage you to share the documents

Federman & Sherwood
September 22, 2020
Page 6

with your client and their in-house counsel. These documents emphatically contradict your client's false allegations. Please provide this letter to your client since it also contains our settlement counteroffer.

Sincerely,

Tyler J. Bean

TJB/rkh

Enclosures

Exhibit A

 Royal Alliance

September 4, 2020

ALAN NIEMANN

**RE: TERMINATION OF AFFILIATION**

Dear Alan,

Please accept this letter as notification of your termination of affiliation with Royal Alliance Associates, Inc. ("RAA") as of **August 31, 2020.** Enclosed is a copy of your Form U5 Termination Notice, which we have filed with FINRA confirming termination.

**Client Accounts**
In order to comply with industry policy, we must ensure that an active Associate is assigned to accounts. We therefore require that you transfer your customer accounts to your new firm within ninety (90) days of your termination. **Any individual contract that you may have with your OSJ/MFA may supersede this policy.** If transfer has not been initiated within this period, your accounts may be re-assigned.

**Prohibited Practices**
On the effective date of your termination, you may no longer represent yourself as a registered representative or agent of RAA. You should immediately destroy all advertising material, business cards, and stationary that implies a relationship with RAA. When dealing with clients, any misrepresentation of your relationship with RAA could be a violation of securities regulations and potentially result in regulatory action or civil litigation.

**Trading Activity in Client Accounts**
Once your affiliation is terminated, your client accounts will be restricted to the execution of market liquidations and, if applicable, the closing of any open option positions. In addition, new purchases will not be permitted and any unexecuted open orders will be canceled. In order to facilitate the permissible trading activity as outlined above, the **client** may contact the Trading Desk to fulfill trade requests at (800) 743-7676.

**Debit Balance**
Your commission account may not currently have a debit account; however, should one occur, you will be required to remit full payment. Collection efforts will be made for non-payment of debit balances and additional fees may be assessed. Failure to satisfy this obligation will be reported to a credit bureau and may adversely affect your credit rating. In addition, your Form U5 will be amended with FINRA to indicate that a debit balance remains outstanding.

**Re-Registration**
Your securities licenses, for which you passed qualification exams, remain valid for two (2) years from the date of your termination. If you fail to register with another securities firm during this time, you will be required to re-qualify by examination for such licenses. The two-year period currently granted by the regulatory agencies is subject to change without notification.

**Technology Vision 2020/Net X Pro**
If applicable, systems and technological support available via RAA will be terminated as of your termination date.

**Signature Guarantee Stamp**
If you have a Signature Guarantee Stamp, you are prohibited from utilizing it beyond your termination date. Please return your Signature Guarantee Stamp immediately in order to avoid any derogatory statement on your form U5 for failing to comply with this request. RAA may assess a $250 fee should you fail to comply with this request within thirty (30) calendar days. You are required to return your Signature Guarantee Stamp to the Home Office to the attention of the Registration Department.

**REDACTED**

**Record Retention Requirements (for OSJ Managers)**

Under state and federal securities regulations, RAA has the responsibility to maintain access to certain records relating to its business for various times periods. RAA requires its offices of supervisory jurisdiction to maintain and retain certain records to comply with these requirements. OSJ Managers must adhere to this requirement based on their contractual obligations with RAA. OSJ Managers are obligated to maintain the records for the requisite period (s) of time and make them available to RAA upon request. Or, at the OSJ Manager's election and expense, the OSJ Manager can provide original or copies of the records to RAA upon disassociation with the firm.

Maintaining records relating to your securities business is also important to you if there is a customer complaint, arbitration, litigation or even regulatory action. In some instances, customers have filed a claim or complaint ten or more years after the purchase of their investment. Depending on the nature of the claim, a statue of limitations defense may not be applicable.

Following is a list of specific records that must be maintained or returned to RAA upon the OSJ Manager's termination:

- Customer Account Forms, Investment Applications, Subscription Agreements and related forms (copies of checks, 1035 exchange forms, etc.)
- Explanation of Investment Forms
- Switch Letters
- Signature Guarantee Log and File
- Securities Received and Delivered Log
- Seminar File
- Outgoing Correspondence File with all correspondence, including e-mail
- Incoming Correspondence File, including e-mail
- Representative Files (including items relating to the OSJ Manager's background check of representatives)
- Third Party Money Manager (TPMM) documents (customer agreement with third party advisor)
- Rule 3040 Notification and Consent Form signed by OSJ Manager for representatives
- Copies of Satellite Branch Offices Examination Form
- Required customer disclosures for offices located in financial institutions
- Advertising Files (must include copies of advertising / sales literature as they were actually used)

Additionally, copies of documents forwarded to the Home Office, such as Customer Account Forms, TPMM contracts and documents evidencing supervision should be maintained and available to defend against possible complaints or for regulatory purposes.

**Errors and Omissions Insurance**

Please be aware that Errors and Omissions Insurance coverage provided through RAA will cease to cover future activities after the date on which your registration with RAA is terminated.

Please refer to the Sales Practice Manual and/or your Independent Contractor Agreement for specific details relating to any of the aforementioned items. Should you have any questions regarding your termination, please contact your OSJ or the Regional Management Department.

Sincerely,

Ann Holland
Registration/Licensing Dept.


cc:

Exhibit B



10 Exchange Place
Suite 1410
Jersey City, NJ 07399

## INDEPENDENT CONTRACTOR AGREEMENT
(OSJ/Manager)

This Independent Contractor Agreement ("ICA") is entered into between **Royal Alliance Associates, Inc.** ("the Broker-Dealer") and the undersigned as an OSJ/Manager ("Representative"). The Broker-Dealer and Representative are collectively referred to as "the Parties."

In consideration of the mutual covenants and agreements contained herein, the Parties agree as follows:

**1. Scope of the ICA**

1.1. This ICA and any attachments and addendums attached hereto and/or incorporated herein by reference govern the relationship between the Broker-Dealer and Representative in connection with the Representative:

1.1.1. effecting securities transactions and providing such incidental advice about securities in Representative's capacity as a securities registered representative;

1.1.2. providing investment advice in the capacity of a registered investment adviser representative under the Broker-Dealer's corporate investment adviser registration (the Broker-Dealer being a Registered Investment Adviser under the Investment Advisers Act of 1940) or as independent registered investment adviser and/or registered investment adviser representative under a state or federal registration independent of the Broker-Dealer's corporate investment adviser registration;

1.1.3. effecting insurance sales in the capacity of a licensed insurance agent where such transactions, commissions or production credits are credited/processed through the Broker-Dealer under the Broker-Dealer's producer insurance license; and

1.1.4 Any other activities that Broker-Dealer authorizes Representative to engage in.

1.2 The term Representative as used herein means "registered representative", "investment adviser representative", "financial advisor", "advisor", "OSJ Manager", and/or "insurance agent", as appropriate.

1.3 The term "customer" and "client" as used in the ICA shall mean a person and any entity utilizing Representative's services.

1.4 Additional terms applying to Representative's activities not contained within the body of this ICA may be contained in addenda. Such addenda, when fully executed, will be considered part of this ICA. The Broker-Dealer may revise, from time-to-time, a list of addenda which may be included in this ICA as Attachment A. Revisions to Attachment A shall be deemed revisions within the meaning of Section 18 of this ICA.

1.5 This ICA supersedes any prior ICA executed between the Broker-Dealer and Representative. Any addendum or attachment executed between the Broker-Dealer and Representative that was incorporated by reference in a prior ICA will be void unless such addendum or attachment is specifically provided for in this ICA when this ICA is executed. In the event any terms in a prior addendum or attachment conflict with this ICA, this ICA will control.

**2. The Broker-Dealer**

2.1 In accordance with the paragraph herein titled "Compensation" the Broker-Dealer will pay to Representative or in the case of an investment advisor representative associated with an independent investment advisor entity, to the independent investment advisor entity, commissions and fees earned from customers for transactions in securities and insurance products and the furnishing of investment advisory services. The Broker-Dealer may pay such other compensation it deems appropriate. Payment of commissions, fees, or other types of

compensation to Representative from Broker-Dealer shall be in accordance with schedules or policies adopted by Broker-Dealer as revised from time-to-time.

## 3. Representative

3.1    Applicable to all Products and Services;

3.1.1    Representative will offer, solicit offers, and sell such products and services that have been expressly approved in advance by the Broker-Dealer, at Representative's sole risk and expense as an **INDEPENDENT CONTRACTOR** and not as an employee of the Broker-Dealer. In no way is this agreement intended to create a franchise relationship between Representative and Broker-Dealer.

3.1.2    Representative will offer for sale and sell only products and services that have been expressly approved in advance by the Broker-Dealer, and for which the Broker-Dealer has executed an underwriting or selling agreement with the sponsor.

3.1.3    In connection with each sale or solicitation of offers to buy securities or insurance products or to provide investment advisory services, Representative will deliver or cause to be delivered to the customer, in accordance with all applicable securities, investment advisory and insurance laws, rules and regulations, a current prospectus, offering memorandum, applicable Form ADV or such other documents that may be in effect and are required to be disclosed and Representative will make no representations to customers except as are contained in such prospectus, offering memorandum or other disclosure documents. In addition, Representative will furnish to the customer and prospective customers such other disclosure forms as required by the Broker-Dealer's policies and procedures. Representative will fully explain the items and conditions of the purchase or sale of securities and insurance products and investment advisory services to the customer or prospective customer. Representative will not make untrue statements, interpretations or misrepresentations, nor will Representative omit or neglect to disclose material facts relating to each such purchase or sale.

3.2.    Applicable to Securities Products and Services:

3.2.1    Representative understands and agrees that a separate agreement regarding overrides must be negotiated between Representative as an OSJ Manager and any representatives working with or assigned to Representative's office, as to the allocation of commissions, fees and expenses between Representative as an OSJ and his/her representatives.

3.3    Applicable to Investment Advisory Products and Services:

3.3.1    Representative will conduct his or her actions as a registered investment adviser and/or investment adviser representative under the Investment Adviser's Act of 1940 (the "40 Act") and any other applicable federal or state laws or self-regulatory organization rules and in accordance with the policies and procedures adopted from time to time by the Broker-Dealer and its approved vendors.

3.3.2    Representative, when acting in the capacity of an Investment Adviser Representative ("IAR") of the corporate Registered Investment Advisor ("RIA") authorizes the Broker-Dealer, as Registered Investment Adviser, to receive any investment advisory fees the Representative may charge clients for advisory services approved by the Broker-Dealer. Representative, when acting in the capacity of an IAR of an independent RIA, authorizes the Broker-Dealer to receive investment advisory fees, other than those specifically exempted by the Broker-Dealer (e.g., financial planning fees and non-discretionary investment advisory fees), the Representative may charge clients for advisory services approved by the Broker-Dealer.

3.3.3    Representative agrees that advisory fees shall be processed through the Broker-Dealer, as set forth in 3.3.2, and the Broker-Dealer shall remit Representative's portion of such fees in accordance with the Advisory Fee Payout Schedule or Investment Advisory Fee Override Agreement, as applicable, which shall be incorporated herein by reference.

3.3.4   Representative agrees that in no event will the Broker-Dealer be liable to Representative for nonpayment of management fees and expenses related to Representative's advisory services.

3.3.5   Representative warrants that investment advisory services offered by Representative do not and will not constitute an investment company within the meaning of the Investment Company Act of 1940 (the "Investment Company Act"), that neither Representative nor such accounts are required to be registered under the Investment Company Act, and that Representative will comply with all regulations promulgated by federal and state regulatory agencies regarding investment advisory services.

3.3.6   Representative agrees that, should Representative's affiliation with the Broker-Dealer terminate during a period in which investment advisory fees have been billed and paid by clients in advance of such services being rendered, Broker-Dealer is authorized to credit customers in the amount of unearned advisory fees, and Representative shall refund all such fees to the Broker-Dealer.

3.3.7   Representative, if providing investment advisory services, will cause to be delivered to customers and prospective customers the applicable Form ADV and such other disclosures as are required by federal and state laws and regulations and the Broker-Dealer's policies and procedures relating to investment advisory services.

3.3.8   Representative will not exercise discretion in any investment advisory account without written authorization from the client.

3.4  Applicable to Insurance Products and Services:

3.4.1   In connection with the sale or solicitation of offers to buy insurance, Representative agrees not to perform any unauthorized act on behalf of the Broker-Dealer or any of its approved insurance carriers including, but not limited to, the following:

3.4.1.1   make, waive, alter, modify or change any contract on behalf of the Broker-Dealer or an insurance carrier;

3.4.1.2   accept any check made payable to Representative or any other entity not entitled to receive such funds;

3.4.1.3   endorse any check made payable to the Broker-Dealer or an insurance carrier;

3.4.1.4   accept any premium after the initial premium;

3.4.1.5   waive or modify any policy or application provision, condition, or obligation;

3.4.1.6   extend time for payment of any premium or to accept payment of any past due premium;

3.4.1.7   approve evidence of insurability;

3.4.1.8   bind or otherwise commit the Broker-Dealer or an insurance carrier to any risk; or

3.4.1.9   deliver any policy where the health of the insured, to Representative's knowledge, is other than as stated in the application for insurance.

## 4.   Compliance

4.1   Representative will comply with all applicable laws, rules, regulations and statements of policy of federal and state governmental or regulatory agencies including, but not limited to, the United States Securities and Exchange Commission ("SEC"), the By-Laws and Rules of the Financial Institution Regulatory Authority ("FINRA"), any other self-regulatory organization, and the state securities, investment advisory and insurance regulatory agencies.

4.2   Representative agrees to immediately notify the Broker-Dealer of any:

4.2.1   verbal or written communication that is, or has the potential to become, a customer complaint in accordance with the Broker-Dealer's policies and procedures;

4.2.2   arrests, charges, information, indictment or other proceedings filed or commenced, investment-related civil actions, disciplinary actions or any investigations, inquiries or document requests by federal or state regulatory authorities, agencies or self-regulatory organizations;

4.2.3   legal or regulatory proceeding or inquiry by an attorney, or by any federal or state agency related to the Broker-Dealer, or any matter covered by this agreement; or

4.2.4   action or decision involving a judgment, lien, garnishment or award involving Representative in any manner, including entities in which Representative may have any interest.

4.3   Representative will comply with all applicable policies and procedures of all approved securities and insurance product underwriters and sponsors for products sold through the Broker-Dealer.

4.4   Representative will read, understand and conduct Representative's business in accordance with the published policies and procedures and such instructions, directives, notices or other communications issued by the Broker-Dealer, including, but not limited to, the Broker-Dealer's Sales Practice Manual and Written Supervisory Procedures Manual.

4.5   Representative will offer for sale and sell only products and services that are expressly authorized by Broker-Dealer, and for which Representative is licensed or registered to sell by all applicable regulatory and self-regulatory organizations. Broker-Dealer reserves the right to revise its list of approved products/services at any time at its sole discretion.

4.6   Representative hereby agrees to fulfill both the regulatory element and firm element continuing education within the deadlines set by the Broker-Dealer. If at any time Representative should be deemed inactive for failure to complete Representative's continuing education, Representative understands that Representative is not entitled to any commission from the sale of securities products during the inactive period. Representative further understands that Representative is not able to act as a Registered Representative of the Broker-Dealer in any capacity until such time that Representative's continuing education has been satisfied.

4.7   Representative will advise all customers and prospective customers that Representative is acting as a registered representative of the Broker-Dealer and that any order for sale or purchase of products or services will be effected solely through the Broker-Dealer. Representative understands that Representative has no authority to act, and Representative will not act, for any customer in any dealings in securities or investment products except as a registered representative of the Broker-Dealer.

4.8   Representative will not accept, directly or indirectly, remuneration in any form from any person or business on account of any dealings in securities products without express prior written approval of the Broker-Dealer. Further, Representative will not accept or retain any affiliation or employment, directly or indirectly, with any dealer, underwriter, syndicator, broker or dealer of securities or investment advisor without the Broker-Dealer's written approval.

4.9   Representative will notify the Broker-Dealer in writing of any outside business activity prior to engaging in such activity. Representative will not engage in any conduct which conflicts with the business of the Broker-Dealer, nor will Representative engage in any conduct that is not the business of the Broker-Dealer at the location where Representative conducts the business of the Broker-Dealer without advising the Broker-Dealer in advance of such business activity, in writing and in such form as the Broker-Dealer may specify. Representative will not accept or retain employment or compensation from any person or business or as a self-employed person as a result of business activity outside the scope of Representative's affiliation with the Broker-Dealer without advising the Broker-Dealer in advance in writing of such employment or compensation. Representative agrees to make any and all books and records with respect to Representative's outside business activities available to the Broker-Dealer upon request. Such books and records shall include, without limitation, the financial records of such business activity. Representative agrees to conduct all outside business activities in accordance with all laws.

4.10   Representative will establish and maintain on behalf of the Broker-Dealer, and in such manner as the Broker-Dealer shall prescribe, all records required to be maintained by sections 17(a)(3) and 17(a)(4) of the Securities Exchange Act of 1934, by Rule 204-2 of the Investment Advisors Act of 1940, by FINRA, by other self-regulatory organizations, and by relevant state regulatory agencies for the securities and insurance businesses and investment advisory services conducted by Representative and for such business and services conducted by Representatives working out of or assigned to Representative's office. Representative agrees that any and all such records are property of the Broker-Dealer, and may be removed by the Broker-Dealer at any time.

## 5.   Confidential Information and Privacy Obligations

5.1   Confidential information ("confidential information") includes all information and data provided by the Broker-Dealer and any of its affiliates to Representative, or acquired or used by Representative pursuant to this ICA, including the Broker-Dealer's business and proprietary information, actual or potential customers, customer lists, business partnerships, plans, reports, analyses, studies, models, sales data, marketing materials (including, without limitations, illustrations, disclosures and customer advertising), or any other secret or confidential work, knowledge, know-how, trade secret or business information of the Broker-Dealer or its affiliates, any information, whether in written, electronic, or oral form, received, collected, provided to, processed, used or stored by Representative, pursuant to this ICA, including, without limitation, customer, applicant, contract or policy owner information, such as names, addresses, e-mail addresses, account numbers, and financial and health information. Confidential information does not include information which is or becomes (a) generally available to the public at the time of disclosure, or (b) independently developed by Representative.

5.2   Representative agrees to use confidential information solely for the purposes of this ICA and not to disclose such confidential information to any third party in any form without the prior written consent of the Broker-Dealer, or as may be allowed by applicable law. Representative will advise and cause its respective employees, directors, officers, accountants, attorneys, agents, and representatives (collectively referred to as "Representative's Agents") who will have access to confidential information not to use or disclose any confidential information for any purpose other than for the purposes set forth in this ICA or as required by law and any such use or disclosure shall be at all times and in all events on the terms of and in compliance with the restrictions of this ICA.

5.3   Representative agrees to indemnify the Broker-Dealer and its affiliates, shareholders, directors, officers, employees, from any and all damages and losses, costs or expenses incurred as a result of the failure of Representative or Representative's Agents to perform their confidentiality obligations hereunder.

5.4   In the event Representative becomes legally compelled to disclose any confidential information or take any action prohibited by this ICA, Representative will provide the Broker-Dealer with prompt written notice for the purpose of enabling the Broker-Dealer to seek a protective order or other appropriate remedy, or waive compliance with the provisions of this ICA. In the event that such protective order or other remedy is not obtained within such time required to provide the confidential information, or if no such time period is specified, within thirty (30) days of such written notice to the Broker-Dealer, Representative so legally compelled will furnish only that portion of the confidential information or take such action which is, in the opinion of Representative's counsel, legally required, and will exercise reasonable efforts to obtain reliable assurance that confidential treatment will be accorded to any confidential information so furnished.

5.5   Representative shall maintain security procedures to protect against improper disclosure or use of confidential information, and shall comply in full with the privacy and security requirements of the Gramm-Leach-Bliley Act, Regulation S-P, the Health Insurance Portability and Accountability Act as may be applicable and any other federal and state laws and regulations governing the use and disclosure of confidential and private information. To the extent that any applicable federal, state or regulatory authority's requirements are more stringent, Representative's use and disclosure of confidential information shall be in accordance with such requirements. Except to the extent otherwise required or specifically permitted by law, Representative's use and/or disclosure of confidential information shall be limited solely to the purposes for which such information is disclosed to Representative to perform his or her obligations under this ICA.

5.6   Representative shall maintain appropriate administrative, technical and physical safeguards to assure that confidential information is not used or disclosed other than as provided by this ICA or as allowed by law.

Representative expressly warrants that all of Representative's Agents with access to confidential information will be advised of, and appropriately trained regarding the confidentiality and privacy obligations under this ICA and by law, and will comply in all respects with such obligations.

5.7     Representative agrees to report to the Broker-Dealer in writing within twenty-four (24) hours of discovering any use or disclosure of confidential information not provided for in this ICA or for a purpose not expressly permitted by law. To the extent such unauthorized use or disclosure occurs, Representative agrees to mitigate, to the greatest extent possible, any harmful effect thereof.

5.8     Representative agrees to abide by the limitations of the Broker-Dealer's and its affiliates' current privacy policies as published by the Broker-Dealer and its affiliates and as reasonably communicated to Representative from time to time.

5.9     Representative agrees to abide by the procedures and policies set forth in the Broker-Dealer's Code of Conduct and its Anti-Corruption Policy, and acknowledges receiving copies of these documents.

**6.    Offsets/Amounts Owed the Broker-Dealer**

6.1     If at any time Representative becomes indebted or otherwise liable to the Broker-Dealer, the Broker-Dealer shall be entitled to retain and apply toward the liquidation of any such indebtedness or liability any and all commissions, special compensation or other amounts otherwise due Representative. Any such compensation or other assets shall be a first lien upon amounts due hereunder. For the purpose of such lien and claim, Representative assigns to the Broker-Dealer, to the extent permitted by law, all commissions, or other amounts due or that become due at any time subsequent to the lien.

6.2     Any and all indebtedness or amounts due from Representative to the Broker-Dealer including, but not limited to, charge backs, rebated investment advisory fees paid in advance, debit balances, errors and omissions insurance premiums and deductibles, administrative charges, fines, penalties or advances and draws over and above the amount then actually due and payable from the Broker-Dealer to Representative, shall constitute a loan from the Broker-Dealer to Representative, repayable at any time upon the Broker-Dealer's demand, unless otherwise agreed to in writing between the Broker-Dealer and Representative. Any such loan shall bear interest at the maximum legal rate from date of termination of Representative's affiliation with the Broker-Dealer until paid in full.

6.3     Representative further understands and acknowledges that, upon the termination of his/her supervised representatives' affiliation with the Broker-Dealer, it is the practice of the Broker-Dealer to collect monies owed by such representatives from their OSJ Managers and that the Broker-Dealer may do so as provided in this ICA.

6.4.    The liens and assignments, as well as any indebtedness or amounts due from Representative to the Broker-Dealer, whether accrued before or after termination of this ICA, shall survive the termination of this ICA.

6.5     Representative agrees to pay all costs and expenses incurred by the Broker-Dealer in the collection of any indebtedness or amounts due from Representative to the Broker-Dealer including, but not limited to, investigative costs, attorneys' fees, collection agency fees, expert witness fees, arbitration fees and related travel expenses.

6.6     Representative authorizes the Broker-Dealer to release pertinent information concerning Representative's earnings and indebtedness to any government agency, self-regulatory organization, credit bureau or similar organization.

**7.    Investigation**

7.1     Representative authorizes the Broker-Dealer to prepare or obtain a consumer report or investigative credit report at any time regarding Representative and/or Representative's business and financial circumstances, including sources and amounts of income and assets. This information may be required by the Broker-Dealer in order to determine Representative's compliance with federal, State or local laws and regulations, the rules of a self-regulatory organization, any of Broker-Dealer's policies or such other authorized purposes. Representative

further authorizes and understands that the Broker-Dealer may share information regarding Representative, including personal information such as Representative's social security number, with its affiliates. If the Broker-Dealer requires an investigative consumer report, Representative authorizes the Broker-Dealer to proceed with an investigation, and releases any such person, or business associate from any and all liability of whatever nature by reason of furnishing such information to the Broker-Dealer or any agent acting on its behalf. Additional information concerning the nature and scope of this report has been provided in a separate document entitled "Fair Credit Reporting Act Disclosure and Authorization".

7.2     Representative acknowledges and agrees that the Broker-Dealer may, at any time, demand delivery of or otherwise physically secure all Books and Records maintained by Representative, with or without notice.

7.3     Representative certifies that all statements made by Representative, in connection with Representative's application to become or continue to be affiliated with Broker-Dealer as a Representative in any capacity, are true and complete to the best of Representative's knowledge and that Representative has withheld nothing that would, if disclosed, materially affect Representative's affiliation with the Broker-Dealer. Representative agrees to promptly disclose any material changes in information contained in Representative's application or otherwise provided by Representative to the Broker-Dealer. Representative understands that false, misleading or omitted information may constitute cause for rejection of Representative's application or termination from association with the Broker-Dealer.

## 8.   Sanctions

8.1     In the event that Representative fails to comply with the provisions of any applicable federal, state or other governmental law, rule or regulation or any self-regulatory organization's rules or regulations, or the Broker-Dealer's published procedures or policies, including periodic updates thereto, the Broker-Dealer shall have the option, in its sole discretion, to take such disciplinary or other actions as it deems appropriate including, but not limited to, assessing administrative charges, fines, penalties, limitations on activities or terminating affiliation with the Representative.

## 9.   Registration Fees and Other Expenses

9.1     Representative will pay the costs of Representative's registration or renewal with FINRA or any other applicable regulatory authority, examination fees, fees for appointments, bonding requirements, errors and omissions insurance premiums, termination fees, notification filing fees, continuing education fees, and any administrative fees or costs which may be incurred or imposed from time to time by the Broker-Dealer. Representative understands and agrees that such fees and costs are non-refundable if Representative's affiliation with the Broker-Dealer is terminated for any reason.

9.2     Representative will pay all of Representative's self-employment taxes and all other related governmental obligations including, but not limited to, social security, income and unemployment taxes, and any local fees or taxes on income, gross receipts, or otherwise.

9.3     The Broker-Dealer is not responsible for any expenses or charges incurred by Representative or anyone working on Representative's behalf in the conduct of Representative's business. Representative agrees that any person or persons with whom Representative contracts or designates to assist Representative in the performance of Representative's duties hereunder shall be considered Representative's employee/s or independent contractors, as the case may be, and shall not be employees or agents of the Broker-Dealer.

9.4     Representative further agrees that in the event of a dispute, arbitration, litigation or claim of any kind between or among the OSJ Manager and any of its affiliated representatives, or any of Representative's current or former employees, independent contractors (including but not limited to other Broker-Dealer Representatives), shareholders, partners, and/or other agents of any entity with which Representative is involved. Representative will indemnify and hold the Broker-Dealer harmless from all incurred obligations, costs, fees, losses, liabilities, claims, judgments, settlements paid, actions, damages and expenses including, but not limited to, attorneys' and expert witness fees.

## 10. Customer Issues

10.1  Representative will be liable and fully responsible for any loss, cost or expense which the Broker-Dealer sustains as a result of any transaction entered into involving Representative's customer or customer account(s) in which Representative was involved including, but not limited to, all costs incurred due to a client reneging, failures to comply with margin calls, and all other matters which involve the failure of a customer to meet his or her financial responsibility, unless the error giving rise to such loss is caused by the Broker-Dealer. Representative will indemnify the Broker-Dealer for any and all such losses including, but not limited to, the Broker-Dealer's attorneys' fees and other related legal fees and costs resulting from such customer transactions.

10.2  Representative acknowledges and understands that client information may be subject to and protected by privacy laws. Representative shall not use client information that is not otherwise available from public sources in any way that violates the client's privacy rights without first obtaining the client's permission. Furthermore, Representative will not, in affiliating with the Broker-Dealer, use client or other information which is the subject of any agreement in a manner that violates the terms of such agreement or any policy, procedure law or regulation. Representative understands that if the Broker-Dealer is named in any action involving the purported misuse of client information or proprietary information by reason of Representative's actions, Representative will defend and indemnify the Broker-Dealer in accordance with the indemnity provisions in this ICA.

10.3  If the Broker-Dealer determines, in its sole discretion, that a complaint in any way involves or may impact the Broker-Dealer or its principals, then the Broker-Dealer is authorized to direct and control the strategy to be employed with respect to such complaint, including whether to offer settlement and the amount of or other particulars with respect to such settlement, and may otherwise resolve the complaint in such a manner as the Broker-Dealer deems appropriate.

## 11. Compensation

11.1  For sales of securities and insurance products offered by and/or through the Broker-Dealer and effected by Representative, Representative will receive a percentage of Representative's individual production of gross dealer concession or commission as agreed upon in the agreement regarding overrides.

11.2  At any time, and at its sole discretion, the Broker-Dealer may reject any application for products transmitted to the Broker-Dealer by the Representative, and refund to customers any payments made by customers in connection with any product (including, but not limited to, any refund by the Broker-Dealer of monies to a customer in settlement of a dispute, complaint, or as a result of any regulatory action). If Representative has received compensation on any payments refunded to a customer, Representative agrees to repay the Broker-Dealer such compensation immediately, and in this regard, the Broker-Dealer is authorized to deduct the amount due the Broker-Dealer from any compensation due and payable from the Broker-Dealer to the Representative. The Broker-Dealer's election to deduct any amount due the Broker-Dealer from such compensation due to Representative is not an exclusive election and the Broker-Dealer may pursue collection of owed amounts by any additional means it deems appropriate.

11.3  The agreement regarding overrides may be modified at any time as agreed upon between OSJ Manager and any representatives working with or assigned to Representative's office, by giving the Broker-Dealer written notice. The effective date of any modification of the agreement regarding overrides will be the next available commission cycle date following the date that written notice was received by the Broker-Dealer.

11.4  Representative understands and agrees that upon termination of association or of the ICA, Representative's commissions may be held for a period up to ninety (90) days to allow for any charge backs, debit balances or other amounts owed to the Broker-Dealer to be assessed to Representative's commission account. The Broker-Dealer may hold Representative's commissions for any additional period of time if there are pending or threatened customer complaints, arbitrations, litigations or regulatory proceedings. The Broker-Dealer shall charge and deduct from Representative's commission account any amounts owed to the Broker-Dealer.

11.5  It is Representative's responsibility to notify Representative's customers and product sponsors of Representative's termination of affiliation from the Broker-Dealer and of any new broker-dealer affiliation. The Broker-Dealer will not be responsible for Representative's inaction or delay in connection with such notification.

11.6    Representative acknowledges:

    11.6.1    The Broker-Dealer shall not pay any commissions, fees, or other such payments to Representative until such time as the Broker-Dealer is in actual receipt of them, and Representative waives the right to receive any such payment until the Broker-Dealer has received it.

    11.6.2    The Broker-Dealer will not pay Representative any commissions earned on any transaction where the transaction date, defined as the date designated by the product sponsor, occurs after Representative's termination date, regardless of when Representative submitted the transaction.

    11.6.3    The Broker-Dealer is not obligated to credit or pay the Representative any 12b-1 fees, renewal fees, trails, continuing commissions, overrides or any other similar compensation paid to the Broker-Dealer by product sponsors, including but not limited to compensation from variable insurance products, after the date of Representative's termination of affiliation.

    11.6.4    In the event of Representative's retirement, disability or death:

        11.6.4.1    the Broker-Dealer agrees to pay to Representative, Representative's surviving spouse or other designated beneficiary, any commission which is due and payable by the Broker-Dealer from the sale of securities and insurance products with a transaction date prior to the date of Representative's retirement, disability or death, to the extent permissible under applicable rules and regulations;

        11.6.4.2    subject to any other rights of the Broker-Dealer set forth herein, the Broker-Dealer agrees to continue paying commissions and/or other compensation to a successor of Representative under a Succession or Buy/Sell Agreement which has previously been fully executed by Representative and Representative's successor prior to the time of Representative's retirement, disability or death; provided that the Broker-Dealer has previously approved such Agreement, and further provided that such successor is fully licensed with the Broker-Dealer and qualified to service the clients and business covered under such Agreement.

11.7    Representative agrees that, should Representative's affiliation with the Broker-Dealer terminate during a period in which investment advisory fees have been billed and paid by clients in advance of such services being rendered, Broker-Dealer is authorized to credit customers in the amount of unearned advisory fees, and Representative shall refund all such fees to the Broker-Dealer.

11.8    Representative understands that Representative may participate in special compensation declared payable by the Broker-Dealer, should Representative be eligible under the terms, conditions and qualifications of such special compensation program. Should the Broker-Dealer declare special compensation in the form of an annual bonus, unless otherwise agreed in writing between the Broker-Dealer and Representative, payment of such bonus is contingent on Representative being affiliated with the Broker-Dealer at the time the bonus is in fact paid. Representative understands and agrees that the Broker-Dealer reserves the right to discontinue or modify any special compensation that may now or in future be in effect.

11.9    Except for clerical error and undisclosed material facts, the regular compensation statement the Broker-Dealer issues to Representative is considered to be an accurate and complete record of all amounts the Broker-Dealer owes Representative. Settlement on the basis of these regular statements constitutes full satisfaction and agreement between Representative and the Broker-Dealer concerning the amounts reflected therein. The only exception occurs in the case of a claim to the contrary made within 60 days after the statement is issued, clerical error or undisclosed material fact.

11.10    Any additional provisions relating to compensation paid for providing investment advisory services not otherwise addressed above will be found in Section 3.3.

## 12. Authority

12.1   Representative's authority to act as a Representative of the Broker-Dealer is strictly limited and Representative has no authority or power to bind or obligate the Broker-Dealer by any statement, promise, representation, conduct, agreement or contract of any kind, or to waive any of the Broker-Dealer's rights or requirements unless specifically authorized by the Broker-Dealer in writing. Representative will not attempt to bind or obligate the Broker-Dealer, nor will Representative hold Representative out or represent to others, in any way, that Representative has such authority to bind or obligate the Broker-Dealer.

12.2   Representative will use Representative's own judgment as to the time, place and means of exercising Representative's limited authority under the terms of this ICA, subject to and in compliance with, among other things, any applicable laws, rules, and regulations of federal and state governmental and regulatory agencies, the rules, regulations and policies of FINRA and other self-regulatory organizations and the policies and procedures of approved product underwriters and sponsors.

12.3   Representative will be treated and will act solely as an independent contractor and not as an employee of the Broker-Dealer, including for purposes of federal, state, or local taxation of income or any other matter. As an independent contractor, Representative understands that Representative is not eligible for any benefits that may be made available to the Broker-Dealer's employees.

## 13. Indemnity

13.1   Representative will defend, indemnify and hold the Broker-Dealer harmless from any and all obligations, costs, fees, losses, liabilities, claims, judgments, settlements paid, actions, damages and expenses including, but not limited to, those at any time or from time to time paid, suffered, incurred or sustained by the Broker-Dealer which arise out of or are related to:

13.1.1   Representative's alleged or actual errors, omissions, negligence, intentional wrongdoing, breach of duty and/or any violation or alleged violation of any applicable laws, rules and regulations of any federal and state governmental and regulatory agency, self-regulatory organization or the policies and procedures of approved underwriters and product sponsors;

13.1.2   any activity by Representative outside the scope of Representative's affiliation with the Broker-Dealer, which affiliation Representative acknowledges is limited solely to the sale or purchase of securities and insurance products approved by the Broker-Dealer, or the furnishing of investment advisory services;

13.1.3   any dispute, claim, litigation or arbitration filed against the Broker-Dealer arising out of any agreement or alleged policy violation by Representative relating to changing broker-dealer affiliation; and

13.1.4   any dispute, claim, litigation or arbitration involving Representative and any party with whom Representative has entered into a Buy/Sell or Succession Agreement as referred to herein, or involving Representative and any individual employed or retained by Representative.

## 14. Errors and Omissions

14.1   Representative understands that Errors and Omissions (E&O) coverage includes a deductible that is payable to the Broker-Dealer upon notification by the Broker-Dealer that the Representative and/or the Broker-Dealer are involved in a customer dispute, arbitration or civil action arising out of actions involving the Representative. Representative agrees to pay to the Broker-Dealer upon demand the full amount of the deductible within 30 days of said demand. Failure to promptly pay the deductible by the date due will subject the Representative to the deductible being paid from any commissions and fees due and payable or through such other means, including legal collection efforts, as the Broker-Dealer deems appropriate.

## 15. Termination of ICA

15.1   This ICA may be terminated at any time by either party, and for any reason whatsoever, by written notice, which notice shall specify the effective date of termination.

15.2 Upon termination, Representative will immediately deliver to the Broker-Dealer's home office all funds, property, books and records and supplies of every kind belonging to the Broker-Dealer, including but not limited to: investment applications/subscription agreements and related forms, *e.g.*, copies of checks, 1035 exchange forms, etc., explanation of investment forms, switch letters, checks and securities received and delivered logs, seminar files, outgoing correspondence files with all correspondence (including e-mail), incoming correspondence files (including e-mail), the Broker-Dealer's investment advisory services documents, *e.g.*, customer agreement with third party advisor, copies of branch office examination forms, required customer disclosures for offices located in financial institutions, and advertising files. Without limitation the foregoing may be collectively referred to as the "Books and Records" and such term refers to records in whatever medium they are maintained. Representative further acknowledges and agrees that the Books and Records are required to be maintained by the Broker-Dealer pursuant to state and federal laws, rules and regulations, that all such Books and Records are the property of the Broker-Dealer, and that Representative will maintain and provide the Books and Records to the Broker-Dealer immediately upon request, either prior to or after termination of Representative's affiliation with the Broker-Dealer. The Broker-Dealer and the Representative agree that the Representative will, in the ordinary course of business, provide the Broker-Dealer with the foregoing documents on an ongoing basis. The Representative agrees to provide supplements to the documents previously provided to the extent necessary to allow the Broker-Dealer to fulfill its legal and regulatory obligations. The Broker-Dealer and the Representative agree to accomplish this supplemental provision of documents in a reasonable but prompt fashion and under reasonable conditions which allow for the prompt completion of the Broker-Dealer's possession of the Books and Records.

15.3 Upon termination of affiliation from the Broker-Dealer, Representative will cease holding Representative out in any capacity as a Representative of the Broker-Dealer.

15.4 Representative understands that it is a violation of the Broker-Dealer's policy to leave the Broker-Dealer with any debit in Representative's account and unpaid balance for any promissory note or other obligation. Representative agrees that upon termination of affiliation from the Broker-Dealer, any and all outstanding obligations to the Broker-Dealer and any current debit balances shall be immediately due and payable and that any debit balances that become due thereafter shall be paid within fourteen (14) days after notification by the Broker-Dealer. Representative understands, accepts and agrees that failure to pay such balances may result in the Broker-Dealer taking such action it deems appropriate to collect said debts and obligations.

15.5 Upon termination of the ICA, Representative acknowledges that he/she will have no claim for profits, anticipated profits or future earnings. Representative will also have no claim for a refund or reimbursement of any funds that Representative has advanced or expenses paid or incurred in connection with Representative's responsibilities under this ICA or for any other reason. The only exception will occur if the Broker-Dealer specifically authorizes reimbursement in writing before termination of this ICA.

## 16. Claims/Disputes between the Parties

16.1 Excepting any action by the Broker-Dealer to collect on a debit or debt owed by Representative which Broker-Dealer may at its election pursue by arbitration, civil action or use of a collection agency or any combination of the foregoing, any other claim or dispute between the Parties shall be resolved by a FINRA arbitration panel in the city and/or county where the Broker-Dealer's principal office is located in accordance with the then current rules of FINRA. If FINRA does not agree to hear the dispute for any reason or if Representative is no longer subject to FINRA jurisdiction or if the Parties mutually agree that the FINRA arbitration venue is not the proper venue, then such dispute may be resolved either through arbitration in accordance with the rules and regulations of the American Arbitration Association or civil court in the city and/or county where the Broker-Dealer's principal office is located. Any award by an arbitration panel shall be final and not subject to appeal, and judgment upon the award may be entered in any court having jurisdiction. The prevailing party shall be entitled to reimbursement from the losing party of all costs and expenses including, but not limited to, attorneys' fees, expert witness fees, forum fees, mediation fees and travel expenses. Representative agrees that if Representative is the losing party, such costs and expenses may be offset against any compensation or commissions due Representative.

## 17. Additional Terms

17.1   As an OSJ Manager, Representative will supervise registered representatives assigned to Representative's OSJ in accordance with the laws, rules and regulations of federal and state governmental and regulatory agencies, self-regulatory organizations, and the Broker-Dealer's policies and procedures.

17.2   Representative understands that the Broker-Dealer may, in its sole discretion, hold a Representative who is an OSJ Manager responsible for any unpaid fees and costs which may be incurred or imposed from time-to-time by the Broker-Dealer against registered representatives under the supervision of such OSJ Manager, including, but not limited to charges, charge backs, debit balances, fees involving registration, continuing education, terminations, bonding requirements, errors and insurance premiums and deductibles payable, and other losses, liabilities, judgments, settlements and damages.

17.3   During the term of this ICA and for two (2) years thereafter, Representative agrees not to (i) recruit, solicit or induce any non-clerical employee, registered principal or registered representative of the Broker-Dealer, other than registered representatives under the supervision or assigned to the Representative, to terminate his/her affiliation with the Broker-Dealer; (ii) use confidential information of the Broker-Dealer (which shall include information as to customers, clients and registered representatives, provided that if Representative terminates his/her affiliation with Broker-Dealer, Representative may use such information as permitted in (i) above) to solicit or induce any customer or client of Broker-Dealer, other than Representative's customers or clients, or those of the registered representatives under Representative's supervision or assigned to Representative who leave the Broker-Dealer with Representative, to terminate or otherwise cease, reduce or diminish in any way client's or customer's relationship with the Broker-Dealer; or (iii) use or disclose any confidential information except as permitted in (i) or (ii) above or as required to comply with applicable legal process. If any such restriction is found to be unenforceable because it extends for too long a period of time or over too great a range of activities or in too broad a geographic area, it shall be interpreted to extend over the maximum period of time, range of activities or geographic area to which it may be enforceable. In the event of a reach or potential breach of such restrictions, Representative acknowledges that the Broker-Dealer will be caused irreparable harm and that money damages may not be an adequate remedy. Accordingly, Representative acknowledges that the Broker-Dealer shall be entitled to injunctive relief (in addition to other remedies at law) to have such provisions enforced without posting any bond.

## 18. Entire ICA /Amendment

18.1   This ICA contains the entire understanding of the Parties relating to the subject matter of this ICA and supersedes all prior and collateral agreements, understandings, statements and negotiations of the Parties. All addendums and attachments referred to in this ICA are incorporated herein by reference.

18.2   No representation, inducement or commitment other than as expressly set forth in this ICA has been made or relied upon by the Representative. If a conflict exists between this ICA and any other agreement, addendum or written commitment, the terms of this ICA shall take precedence unless such other agreement, addendum or commitment signed by the Parties to this ICA specifically states otherwise, so long as those conflicting terms do not materially impair the application, operation and enforcement of this ICA.

18.3   This ICA shall be subject to the policies, procedures, rules and regulations of the Broker-Dealer as such may be in effect from time to time. Such policies, procedures, rules and regulations of the Broker-Dealer shall control in the event of any inconsistency between this ICA and such policies, procedures, rules and regulations.

18.4   This ICA may only be modified or amended in writing signed by the Broker-Dealer and Representative, except that the Broker-Dealer may make minor non-material revisions as it deems appropriate and implement such changes by way of negative consent notification to Representative.

18.5   This ICA and any amendments must be signed by an officer of the Broker-Dealer or a person designated as an authorized agent if such agent is provided for within the Broker-Dealer's by-laws.

## 19. No Waiver

19.1 The failure or delay of the Broker-Dealer to declare a breach or termination of this ICA because of any violation of its terms shall not be deemed to be a waiver of any subsequent violation of this ICA.

## 20. Severability

20.1 This ICA shall be severable. Should any term, condition or provision of this ICA be determined by an arbitration panel or court of competent jurisdiction to be invalid or ineffective for any reason, all of the remaining terms and conditions of this ICA shall remain in full force and effect.

## 21. Binding on Successors/Assigns

21.1 This ICA is not assignable by Representative; the ICA shall be assignable by the Broker-Dealer, provided that any such assignee shall assume this ICA in a writing delivered to Representative. This ICA shall be binding upon and inure to the benefit of the Parties and their respective successors-in-interest and permitted assigns.

## 22. Notice

22.1 Notice shall be deemed given upon transmission via facsimile, email with or without attachments or by placement of such written notice in the U.S. mail, postage prepaid, addressed to the other party hereto, either at Representative's last known address as contained in the Broker-Dealer's records or to the Broker-Dealer at its principal place of business.

## 23. Effective Date

23.1 This ICA Agreement is made and entered into as of the date executed by an authorized officer of the Broker-Dealer.

## 24. Agreement Non-Violative/Choice of Law

24.1 Nothing herein shall be violative of any applicable law, rule or regulation and this ICA Agreement shall be governed by and construed in accordance with the laws of the state of Delaware.

## 25. Separate Authorization and Approval

25.1 Representative understands that execution of this ICA by the Parties does not constitute automatic approval for Representative to engage in such securities, investment advisory or insurance activities if the Broker-Dealer's policies and procedures require additional and separate approval to engage in specific activities.

## 26. Electronic Signatures

26.1 This ICA and any amendments may be executed by electronic signature provided that such electronic signature is facilitated through an electronic medium/process approved by the Broker-Dealer.

October 22, 2018

*ALAN NIEMANN*

Date_____

By:_____
(Signature of OSJ/Manager)

Name: Alan P Niemann_____
(Please Print)

Date_____

By:_____
(Signature of OSJ/Manager, if applicable)

Name:_____
(Please Print)

Date___10/19/2018_____

**Royal Alliance Associates, Inc.**

By:_____
(Signature)

Dmitry Goldin
President and CEO

Rev. 7.18.18

# Exhibit C



Exhibit C

# FEDERMAN & SHERWOOD

(AN ASSOCIATION OF ATTORNEYS AND PROFESSIONAL CORPORATIONS)

10205 N. PENNSYLVANIA AVENUE
OKLAHOMA CITY, OKLAHOMA 73120
TELEHONE: (405) 235-1560
FACSIMILE: (405) 239-2112

212 W. SPRING VALLEY ROAD
RICHARDSON, TEXAS 75081
TELEPHONE: (214) 696-1100
FACSIMILE: (214) 740-0112

**REPLY TO: OKLAHOMA CITY, OK**

October 5, 2020

**VIA ELECTRONIC MAIL**
spencer.smith@mcafeetaft.com

Spencer F. Smith
McAfee & Taft
Tenth Floor, Two Leadership Square
211 North Robinson Avenue
Oklahoma City, Oklahoma 73102

> Re:   *Mr. Alan Niemann's September 22, 2020 Response Letter to Royal Alliance's September 15, 2020 Demand Letter*

Dear Mr. Smith:

We have not heard back from you regarding the letter sent by Mr. Niemann on September 22, 2020 (attached hereto as **Exhibit A**) in response to your client, Royal Alliance's, September 15, 2020 letter (attached hereto as **Exhibit B**). As such, we request that your client respond to Mr. Niemann's September 22, 2020 letter by Friday, October 9, 2020 at 5:00 p.m. with a written statement certifying, under oath, that it has complied with the demands made by Mr. Niemann, and that any and all proof of such compliance be attached to the response letter. If this certified statement is not received by the October 9th deadline, Mr. Niemann will assume your client intends to continue acting in violation of its obligations to him, in which case he will take steps to protect his interests from further irreparable harm.

We look forward to your prompt cooperation.

Sincerely,

Tyler J. Bean

TJB/rkh

Enclosures

# Exhibit A

# FEDERMAN & SHERWOOD

(AN ASSOCIATION OF ATTORNEYS AND PROFESSIONAL CORPORATIONS)

10205 N. PENNSYLVANIA AVENUE
OKLAHOMA CITY, OKLAHOMA 73120
TELEHONE: (405) 235-1560
FACSIMILE: (405) 239-2112

212 W. SPRING VALLEY ROAD
RICHARDSON, TEXAS 75081
TELEPHONE: (214) 696-1100
FACSIMILE: (214) 740-0112

**REPLY TO: OKLAHOMA CITY, OK**

September 22, 2020

**VIA FEDERAL EXPRESS**

Spencer F. Smith
McAfee & Taft
Tenth Floor, Two Leadership Square
211 North Robinson Avenue
Oklahoma City, Oklahoma 73102
Telephone: (405) 235-9621
Facsimile: (405) 235-0439

   Re: *Your Demand Letter to Mr. Alan Niemann*

Dear Mr. Smith:

   We received your letter dated September 15, 2020 (the **"Demand Letter"**). From even a cursory review of the facts and applicable documents, it is clear the basis of your allegations is that Mr. Niemann allegedly took an action that he was not entitled to. Your basis is unfounded and unsupportable. As further discussed below, the Demand Letter seems to be meant to harass our client. To be upfront – and we do not say this lightly – your client, Royal Alliance, is operating in bad faith and your firm either knowingly or mistakenly alleged erroneous facts that have not been adequately researched.

*Royal Alliance's September 4th Termination Letter to Mr. Niemann*

   Apparently, you have not been given or have failed to consider the termination letter attached hereto as **Exhibit A** (the **"Termination Letter"**) dated September 4, 2020 from Royal Alliance to Mr. Niemann. Look four lines down in the first paragraph, under the section titled "Client Accounts" and you will see that your client gives Mr. Niemann the clear directive to "…transfer *your* customer accounts to your new firm within ninety (90) days of your termination" (emphasis added). Only fourteen words later your client states that "[i]f transfer has not been initiated within this period, *your* accounts may be re-assigned" (emphasis added). This language is unambiguous. Royal Alliance's Termination Letter recognizes whose "customers" Mr. Niemann is dealing with and gives Mr. Niemann the right to contact *his* customers, who fall under the umbrella of *his* Office of Supervisory Jurisdiction (**"OSJ"**). Your disparaging letter and remarks aside, this is all Mr. Niemann has done. His actions are permissible and directly supported by the Termination Letter. They are also supported by the plain language of the Independent Contractor Agreement attached hereto as **Exhibit B** (the **"ICA"**) between Royal Alliance and Mr. Niemann, which seems to have been misread and/or misunderstood by your client, despite their having

Federman & Sherwood
September 22, 2020
Page 2

authored it.

*As Known and Confirmed by Your Client, the Customers Contacted by Mr. Niemann are Mr. Niemann's Customers, not Royal Alliance's and, as such, Mr. Niemann Did Not Breach the ICA*

The ICA defines "confidential information" in Section 5.1 as including

> **all information and data provided by the Broker-Dealer and any of its affiliates to Representative, or acquired or used by Representative pursuant to this ICA,** including the Broker-Dealer's business and proprietary information, **actual or potential customers**, customer lists, business partnerships, plans, reports, analyses, studies, models, sales data, marketing materials (including, without limitations, illustrations, disclosures and customer advertising), or any other secret or confidential work, knowledge, know-how, trade secret or business information of the Broker-Dealer or its affiliates, any information, whether in written, electronic, or oral form, received, collected, provided to, processed, used or stored by Representative, pursuant to this ICA, including, without limitation, customer applicant, contract or policy owner information, such as names, addresses, e-mail addresses, account numbers, and financial and health information. **Confidential information does not include information which is or becomes (a) generally available to the public at the time of disclosure, or (b) independently developed by Representative** (emphasis added).

Importantly, "confidential information" is defined as information and data (including actual or potential customers) provided by Royal Alliance to Mr. Niemann or acquired or used by Mr. Niemann pursuant to the ICA. However, Royal Alliance never provided customers to Mr. Niemann or Rockgate and Mr. Niemann never acquired customers pursuant to the ICA. All "confidential information," including customer information, owned by Mr. Niemann and Rockgate before the Signator merger with Royal Alliance is information that falls under Subsection 5.3(b) as independently developed by Mr. Niemann, thus falling outside the scope of "confidential information" as defined in the ICA. The consideration given by Mr. Niemann for these accounts contemplated the acquisition of the clients and the respective cash flow, but did not contemplate transferring the customers to the advisors as no advisors gave Mr. Niemann any consideration for the ownership of the client base of Rockgate. As such, all customers referenced in your Demand Letter are mischaracterized as customers of Royal Alliance. These are Mr. Niemann's customers. This mischaracterization demonstrates an obvious lack of understanding on your Client's part as to the business relationship of the parties and the history behind that relationship. It also demonstrates an incapability of, or plain disinterest in, reading and applying simple rules of contract language.

Furthermore, Section 17.3 of the ICA, which is inexplicably left out of your Demand Letter, states the following:

Federman & Sherwood
September 22, 2020
Page 3

> During the term of this ICA and for two (2) years thereafter, Representative agrees not to (i) recruit, solicit or induce any non-clerical employee, registered principal or registered representative of the Broker-Dealer, *other than registered representatives under the supervision or assigned to the Representative*, to terminate his/her affiliation with the Broker-Dealer; (ii) use confidential information of the Broker-Dealer (which shall include information as to customers, clients and registered representatives, provided that if Representative terminates his/her affiliation with Broker-Dealer, Representative *may use such information as permitted in (i) above*) to solicit or induce any *customer or client of Broker-Dealer, other than Representative's customers or clients, or those of the registered representatives under Representative's supervision or assigned to Representative*…(emphasis added).

Again, the ICA clearly permits Mr. Niemann to recruit his representatives and their customers or clients. Since Mr. Niemann only contacted his customers and representatives, which customers and representatives he independently developed, Mr. Niemann committed no breach of contract and Royal Alliance's accusations are unfounded. The fact that certain of Mr. Niemann's representatives elected to stay with Royal Alliance is irrelevant, as the ICA allows recruitment and solicitation of these representatives under Section 17.3(i) and Royal Alliance approved and confirmed such recruitment and solicitation.

*Mr. Niemann's Letter to his Clients, Which Royal Alliance Contends was Improper, was Actually Pre-Approved by Royal Alliance*

Attached hereto as **Exhibit C** is a screenshot taken by Mr. Niemann of Royal Alliance's Service-Net Ticket based system, equally available to your client, and hence to you. The screenshot is a depiction of Royal Alliance's August 20, 2020 pre-approval of the same letter to which it now takes umbrage. And not only was the letter pre-approved by Royal Alliance, but it was also escalated internally to a higher level of compliance review and received more scrutiny than is normally given by Royal Alliance. Clearly, you cannot allege, in good faith, that Mr. Niemann egregiously sent that same letter to *his* clients after your client not only approved the letter, but then sent Mr. Niemann the Termination Letter directing him to transfer *his* customer accounts within ninety days of termination.

Additionally, we are sure you noted that the letter makes no mention of Cambridge Investment Research, Inc. ("Cambridge"). Nor has Mr. Niemann sent client or customer information to Cambridge without their consent. He has been extremely cautious in both regards. But even if the letter did make mention of Cambridge, this is completely irrelevant due to (i) Royal Alliance's meticulous review and pre-approval of the letter, and (ii) the fact that the letter was sent to Mr. Niemann's customers, as permitted by the ICA. Mr. Niemann was never in breach of the ICA.

Federman & Sherwood
September 22, 2020
Page 4

It is deeply troubling that Royal Alliance is using your law firm to advance such clearly misleading and dishonest allegations. Royal Alliance pre-approved the letter used by Mr. Niemann to "egregiously" contact *his* customers and representatives. We invite you and your client to engage in a more thorough and hands on investigation before making any other blatantly false allegations against our client, as these false allegations resemble defamation per se under Oklahoma law. As you know, it is settled law that one who is liable for a per se libel or slander is liable for both general and special damages, including punitive damages, which Mr. Niemann will seek if these false allegations are pursued by you and your client. Even if your client's false allegations were found to amount only to defamation per quod, it is likely they would still be liable for both general and specific damages, as your client's plainly false and dishonest allegations are made out of malice toward Mr. Niemann. "[T]imely objections were made to instructions on punitive damages, apparently on the theory that punitive damages are not recoverable for defamations not actionable per se ... We have found no case or comment to the effect that punitive damages are not recoverable in defamations per quod in the discretion of the jury based upon a specific finding of malice and special damages." M.F. Patterson Dental Supply Co. v. Wadley, 401 F.2d 167, 172-73 (10th Cir. 1968) (citations omitted).

*Mr. Niemann Owes no Fiduciary Duty to Royal Alliance*

Your argument that Mr. Niemann breached a fiduciary duty owed to Royal Alliance is inapposite as Mr. Niemann, an OSJ, owes no fiduciary duty to Royal Alliance. And even if he did, his actions do not come close to even a resemblance of a breach of fiduciary duty. The cases you cite are inapplicable to the situation at hand. Mr. Niemann is an independent contractor and has never managed Royal Alliance's investment banking or securities business. He was only responsible to supervise the activities of the representatives within his OSJ. Supervision of his own branch of business does not equate to a fiduciary duty owed to Royal Alliance.

Not to mention, Mr. Niemann acquired most of his book of business years before the merger of Signator with Royal Alliance, and Royal Alliance never gave Mr. Niemann any consideration for this book of business. Thus, the case law you cite is wholly inapplicable. *See, e.g., Butcher v. McGinn*, 1985 OK 58, 706 P.2d 878, 881 (*employee* "will not be permitted to secure for himself that which is his duty to obtain for his principal"); *see also Superior Oil Co. v. Renfroe*, 67 F. Supp. 277, 281 (W.D. Okla. 1946) ("defendant has no right to use any of the information of a confidential nature, *which he acquired while employed by the plaintiff*, in competition with the plaintiff...). Because Mr. Niemann is an independent contractor, and because the client information at issue here was acquired by Mr. Niemann long before entering into the ICA with Royal Alliance and is not "confidential information," Mr. Niemann's act of contacting *his* clients does not constitute a violation of any fiduciary duty, if one even exists at all.

*Mr. Niemann's Responses to Royal Alliance's Demands*

Mr. Niemann therefore responds to Royal Alliance's demands as follows:

    1. None of Mr. Niemann's clients and customers belong to Royal Alliance. All are
       Mr. Niemann's, as explained above. As such, this demand is inapplicable.

2.  None of Mr. Niemann's clients and customers belong to Royal Alliance. All are Mr. Niemann's, as explained above. As such, this demand is inapplicable.

3.  Royal Alliance has all this information on their server from electronic submission. As such, this demand is inapplicable.

4.  There is no need for Mr. Niemann to certify that he does not possess or have access to and will not use confidential information belonging to Royal Alliance because the representatives, customers, and clients under his OSJ did not fall within the scope of "confidential information" as defined by Section 5.1 of the ICA. As such, this demand is inapplicable.

*Mr. Niemann's Demands Upon Royal Alliance*

Mr. Niemann hereby demands that:

1.  Royal Alliance provide Mr. Niemann with a full release and that it immediately cease making false accusations against him, including those included in the Demand Letter.

2.  Royal Alliance provide a written withdrawal of the false allegations made against Mr. Niemann in the Demand Letter, along with a list of the names of all persons with whom Royal Alliance shared the Demand Letter.

3.  Royal Alliance conduct an accurate investigation of the facts alleged in the Demand Letter, and that such investigation be conducted with people who are honest and willing to provide complete and accurate information regarding these issues.

4.  Royal Alliance and McAfee & Taft immediately confirm that they have preserved all documents and electronically stored information in their possession, custody or control that may contain evidence pertinent to this dispute including the false allegations and the persons who received a draft or final copy of the letter, and that such preservation include all documents and electronically stored information dated as of November 2018.

*Conclusion*

Royal Alliance's haste to send a harassing demand letter without even a modicum of truth to support the allegations violates various rules of conduct and, if it persists into arbitration, we will have no choice but to file a Rule 11(b) type of motion. Our client intends to vigorously contest these false allegations and we intend to defend him against Royal Alliance and anyone who aids Royal Alliance in the assertion of blatantly false facts. You should have had, and now certainly do have, a wealth of documents at your disposal. We strongly encourage you to share the documents

**Federman & Sherwood**
September 22, 2020
Page 6

with your client and their in-house counsel. These documents emphatically contradict your client's false allegations. Please provide this letter to your client since it also contains our settlement counteroffer.

Sincerely,

Tyler J. Bean

TJB/rkh

Enclosures

Exhibit A



September 4, 2020

ALAN NIEMANN

██████████████

## RE: TERMINATION OF AFFILIATION

Dear Alan,

Please accept this letter as notification of your termination of affiliation with Royal Alliance Associates, Inc. ("RAA") as of **August 31, 2020.** Enclosed is a copy of your Form U5 Termination Notice, which we have filed with FINRA confirming termination.

### Client Accounts
In order to comply with industry policy, we must ensure that an active Associate is assigned to accounts. We therefore require that you transfer your customer accounts to your new firm within ninety (90) days of your termination. **Any individual contract that you may have with your OSJ/MFA may supersede this policy.** If transfer has not been initiated within this period, your accounts may be re-assigned.

### Prohibited Practices
On the effective date of your termination, you may no longer represent yourself as a registered representative or agent of RAA. You should immediately destroy all advertising material, business cards, and stationary that implies a relationship with RAA. When dealing with clients, any misrepresentation of your relationship with RAA could be a violation of securities regulations and potentially result in regulatory action or civil litigation.

### Trading Activity in Client Accounts
Once your affiliation is terminated, your client accounts will be restricted to the execution of market liquidations and, if applicable, the closing of any open option positions. In addition, new purchases will not be permitted and any unexecuted open orders will be canceled. In order to facilitate the permissible trading activity as outlined above, the **client** may contact the Trading Desk to fulfill trade requests at (800) 743-7676.

### Debit Balance
Your commission account may not currently have a debit account; however, should one occur, you will be required to remit full payment. Collection efforts will be made for non-payment of debit balances and additional fees may be assessed. Failure to satisfy this obligation will be reported to a credit bureau and may adversely affect your credit rating. In addition, your Form U5 will be amended with FINRA to indicate that a debit balance remains outstanding.

### Re-Registration
Your securities licenses, for which you passed qualification exams, remain valid for two (2) years from the date of your termination. If you fail to register with another securities firm during this time, you will be required to re-qualify by examination for such licenses. The two-year period currently granted by the regulatory agencies is subject to change without notification.

### Technology Vision 2020/Net X Pro
If applicable, systems and technological support available via RAA will be terminated as of your termination date.

### Signature Guarantee Stamp
If you have a Signature Guarantee Stamp, you are prohibited from utilizing it beyond your termination date. Please return your Signature Guarantee Stamp immediately in order to avoid any derogatory statement on your form U5 for failing to comply with this request. RAA may assess a $250 fee should you fail to comply with this request within thirty (30) calendar days. You are required to return your Signature Guarantee Stamp to the Home Office to the attention of the Registration Department.

**REDACTED**

**Record Retention Requirements (for OSJ Managers)**

Under state and federal securities regulations, RAA has the responsibility to maintain access to certain records relating to its business for various times periods. RAA requires its offices of supervisory jurisdiction to maintain and retain certain records to comply with these requirements. OSJ Managers must adhere to this requirement based on their contractual obligations with RAA. OSJ Managers are obligated to maintain the records for the requisite period (s) of time and make them available to RAA upon request. Or, at the OSJ Manager's election and expense, the OSJ Manager can provide original or copies of the records to RAA upon disassociation with the firm.

Maintaining records relating to your securities business is also important to you if there is a customer complaint, arbitration, litigation or even regulatory action. In some instances, customers have filed a claim or complaint ten or more years after the purchase of their investment. Depending on the nature of the claim, a statue of limitations defense may not be applicable.

Following is a list of specific records that must be maintained or returned to RAA upon the OSJ Manager's termination:

- Customer Account Forms, Investment Applications, Subscription Agreements and related forms (copies of checks, 1035 exchange forms, etc.)
- Explanation of Investment Forms
- Switch Letters
- Signature Guarantee Log and File
- Securities Received and Delivered Log
- Seminar File
- Outgoing Correspondence File with all correspondence, including e-mail
- Incoming Correspondence File, including e-mail
- Representative Files (including items relating to the OSJ Manager's background check of representatives)
- Third Party Money Manager (TPMM) documents (customer agreement with third party advisor)
- Rule 3040 Notification and Consent Form signed by OSJ Manager for representatives
- Copies of Satellite Branch Offices Examination Form
- Required customer disclosures for offices located in financial institutions
- Advertising Files (must include copies of advertising / sales literature as they were actually used)

Additionally, copies of documents forwarded to the Home Office, such as Customer Account Forms, TPMM contracts and documents evidencing supervision should be maintained and available to defend against possible complaints or for regulatory purposes.

**Errors and Omissions Insurance**

Please be aware that Errors and Omissions Insurance coverage provided through RAA will cease to cover future activities after the date on which your registration with RAA is terminated.

Please refer to the Sales Practice Manual and/or your Independent Contractor Agreement for specific details relating to any of the aforementioned items. Should you have any questions regarding your termination, please contact your OSJ or the Regional Management Department.

Sincerely,

Ann Holland
Registration/Licensing Dept.

cc:

Exhibit B



10 Exchange Place
Suite 1410
Jersey City, NJ 07399

## INDEPENDENT CONTRACTOR AGREEMENT
(OSJ/Manager)

This Independent Contractor Agreement ("ICA") is entered into between **Royal Alliance Associates, Inc.** ("the Broker-Dealer") and the undersigned as an OSJ/Manager ("Representative"). The Broker-Dealer and Representative are collectively referred to as "the Parties."

In consideration of the mutual covenants and agreements contained herein, the Parties agree as follows:

### 1.  Scope of the ICA

1.1.   This ICA and any attachments and addendums attached hereto and/or incorporated herein by reference govern the relationship between the Broker-Dealer and Representative in connection with the Representative:

1.1.1.   effecting securities transactions and providing such incidental advice about securities in Representative's capacity as a securities registered representative;

1.1.2.   providing investment advice in the capacity of a registered investment adviser representative under the Broker-Dealer's corporate investment adviser registration (the Broker-Dealer being a Registered Investment Adviser under the Investment Advisers Act of 1940) or as independent registered investment adviser and/or registered investment adviser representative under a state or federal registration independent of the Broker-Dealer's corporate investment adviser registration;

1.1.3.   effecting insurance sales in the capacity of a licensed insurance agent where such transactions, commissions or production credits are credited/processed through the Broker-Dealer under the Broker-Dealer's producer insurance license; and

1.1.4   Any other activities that Broker-Dealer authorizes Representative to engage in.

1.2   The term Representative as used herein means "registered representative", "investment adviser representative", "financial advisor", "advisor", "OSJ Manager", and/or "insurance agent", as appropriate.

1.3   The term "customer" and "client" as used in the ICA shall mean a person and any entity utilizing Representative's services.

1.4   Additional terms applying to Representative's activities not contained within the body of this ICA may be contained in addenda. Such addenda, when fully executed, will be considered part of this ICA. The Broker-Dealer may revise, from time-to-time, a list of addenda which may be included in this ICA as Attachment A. Revisions to Attachment A shall be deemed revisions within the meaning of Section 18 of this ICA.

1.5   This ICA supersedes any prior ICA executed between the Broker-Dealer and Representative. Any addendum or attachment executed between the Broker-Dealer and Representative that was incorporated by reference in a prior ICA will be void unless such addendum or attachment is specifically provided for in this ICA when this ICA is executed. In the event any terms in a prior addendum or attachment conflict with this ICA, this ICA will control.

### 2.  The Broker-Dealer

2.1   In accordance with the paragraph herein titled "Compensation" the Broker-Dealer will pay to Representative or in the case of an investment advisor representative associated with an independent investment advisor entity, to the independent investment advisor entity, commissions and fees earned from customers for transactions in securities and insurance products and the furnishing of investment advisory services. The Broker-Dealer may pay such other compensation it deems appropriate. Payment of commissions, fees, or other types of

compensation to Representative from Broker-Dealer shall be in accordance with schedules or policies adopted by Broker-Dealer as revised from time-to-time.

## 3. Representative

3.1   Applicable to all Products and Services;

3.1.1   Representative will offer, solicit offers, and sell such products and services that have been expressly approved in advance by the Broker-Dealer, at Representative's sole risk and expense as an **INDEPENDENT CONTRACTOR** and not as an employee of the Broker-Dealer. In no way is this agreement intended to create a franchise relationship between Representative and Broker-Dealer.

3.1.2   Representative will offer for sale and sell only products and services that have been expressly approved in advance by the Broker-Dealer, and for which the Broker-Dealer has executed an underwriting or selling agreement with the sponsor.

3.1.3   In connection with each sale or solicitation of offers to buy securities or insurance products or to provide investment advisory services, Representative will deliver or cause to be delivered to the customer, in accordance with all applicable securities, investment advisory and insurance laws, rules and regulations, a current prospectus, offering memorandum, applicable Form ADV or such other documents that may be in effect and are required to be disclosed and Representative will make no representations to customers except as are contained in such prospectus, offering memorandum or other disclosure documents. In addition, Representative will furnish to the customer and prospective customers such other disclosure forms as required by the Broker-Dealer's policies and procedures. Representative will fully explain the items and conditions of the purchase or sale of securities and insurance products and investment advisory services to the customer or prospective customer. Representative will not make untrue statements, interpretations or misrepresentations, nor will Representative omit or neglect to disclose material facts relating to each such purchase or sale.

3.2. Applicable to Securities Products and Services:

3.2.1 Representative understands and agrees that a separate agreement regarding overrides must be negotiated between Representative as an OSJ Manager and any representatives working with or assigned to Representative's office, as to the allocation of commissions, fees and expenses between Representative as an OSJ and his/her representatives.

3.3   Applicable to Investment Advisory Products and Services:

3.3.1   Representative will conduct his or her actions as a registered investment adviser and/or investment adviser representative under the Investment Adviser's Act of 1940 (the "40 Act") and any other applicable federal or state laws or self-regulatory organization rules and in accordance with the policies and procedures adopted from time to time by the Broker-Dealer and its approved vendors.

3.3.2   Representative, when acting in the capacity of an Investment Adviser Representative ("IAR") of the corporate Registered Investment Advisor ("RIA") authorizes the Broker-Dealer, as Registered Investment Adviser, to receive any investment advisory fees the Representative may charge clients for advisory services approved by the Broker-Dealer. Representative, when acting in the capacity of an IAR of an independent RIA, authorizes the Broker-Dealer to receive investment advisory fees, other than those specifically exempted by the Broker-Dealer (e.g., financial planning fees and non-discretionary investment advisory fees), the Representative may charge clients for advisory services approved by the Broker-Dealer.

3.3.3   Representative agrees that advisory fees shall be processed through the Broker-Dealer, as set forth in 3.3.2, and the Broker-Dealer shall remit Representative's portion of such fees in accordance with the Advisory Fee Payout Schedule or Investment Advisory Fee Override Agreement, as applicable, which shall be incorporated herein by reference.

3.3.4 Representative agrees that in no event will the Broker-Dealer be liable to Representative for nonpayment of management fees and expenses related to Representative's advisory services.

3.3.5 Representative warrants that investment advisory services offered by Representative do not and will not constitute an investment company within the meaning of the Investment Company Act of 1940 (the "Investment Company Act"), that neither Representative nor such accounts are required to be registered under the Investment Company Act, and that Representative will comply with all regulations promulgated by federal and state regulatory agencies regarding investment advisory services.

3.3.6 Representative agrees that, should Representative's affiliation with the Broker-Dealer terminate during a period in which investment advisory fees have been billed and paid by clients in advance of such services being rendered, Broker-Dealer is authorized to credit customers in the amount of unearned advisory fees, and Representative shall refund all such fees to the Broker-Dealer.

3.3.7 Representative, if providing investment advisory services, will cause to be delivered to customers and prospective customers the applicable Form ADV and such other disclosures as are required by federal and state laws and regulations and the Broker-Dealer's policies and procedures relating to investment advisory services.

3.3.8 Representative will not exercise discretion in any investment advisory account without written authorization from the client.

3.4 Applicable to Insurance Products and Services:

3.4.1 In connection with the sale or solicitation of offers to buy insurance, Representative agrees not to perform any unauthorized act on behalf of the Broker-Dealer or any of its approved insurance carriers including, but not limited to, the following:

3.4.1.1 make, waive, alter, modify or change any contract on behalf of the Broker-Dealer or an insurance carrier;

3.4.1.2 accept any check made payable to Representative or any other entity not entitled to receive such funds;

3.4.1.3 endorse any check made payable to the Broker-Dealer or an insurance carrier;

3.4.1.4 accept any premium after the initial premium;

3.4.1.5 waive or modify any policy or application provision, condition, or obligation;

3.4.1.6 extend time for payment of any premium or to accept payment of any past due premium;

3.4.1.7 approve evidence of insurability;

3.4.1.8 bind or otherwise commit the Broker-Dealer or an insurance carrier to any risk; or

3.4.1.9 deliver any policy where the health of the insured, to Representative's knowledge, is other than as stated in the application for insurance.

## 4. Compliance

4.1 Representative will comply with all applicable laws, rules, regulations and statements of policy of federal and state governmental or regulatory agencies including, but not limited to, the United States Securities and Exchange Commission ("SEC"), the By-Laws and Rules of the Financial Institution Regulatory Authority ("FINRA"), any other self-regulatory organization, and the state securities, investment advisory and insurance regulatory agencies.

4.2 Representative agrees to immediately notify the Broker-Dealer of any:

4.2.1     verbal or written communication that is, or has the potential to become, a customer complaint in accordance with the Broker-Dealer's policies and procedures;

4.2.2     arrests, charges, information, indictment or other proceedings filed or commenced, investment-related civil actions, disciplinary actions or any investigations, inquiries or document requests by federal or state regulatory authorities, agencies or self-regulatory organizations;

4.2.3     legal or regulatory proceeding or inquiry by an attorney, or by any federal or state agency related to the Broker-Dealer, or any matter covered by this agreement; or

4.2.4     action or decision involving a judgment, lien, garnishment or award involving Representative in any manner, including entities in which Representative may have any interest.

4.3     Representative will comply with all applicable policies and procedures of all approved securities and insurance product underwriters and sponsors for products sold through the Broker-Dealer.

4.4     Representative will read, understand and conduct Representative's business in accordance with the published policies and procedures and such instructions, directives, notices or other communications issued by the Broker-Dealer, including, but not limited to, the Broker-Dealer's Sales Practice Manual and Written Supervisory Procedures Manual.

4.5     Representative will offer for sale and sell only products and services that are expressly authorized by Broker-Dealer, and for which Representative is licensed or registered to sell by all applicable regulatory and self-regulatory organizations. Broker-Dealer reserves the right to revise its list of approved products/services at any time at its sole discretion.

4.6     Representative hereby agrees to fulfill both the regulatory element and firm element continuing education within the deadlines set by the Broker-Dealer. If at any time Representative should be deemed inactive for failure to complete Representative's continuing education, Representative understands that Representative is not entitled to any commission from the sale of securities products during the inactive period. Representative further understands that Representative is not able to act as a Registered Representative of the Broker-Dealer in any capacity until such time that Representative's continuing education has been satisfied.

4.7     Representative will advise all customers and prospective customers that Representative is acting as a registered representative of the Broker-Dealer and that any order for sale or purchase of products or services will be effected solely through the Broker-Dealer. Representative understands that Representative has no authority to act, and Representative will not act, for any customer in any dealings in securities or investment products except as a registered representative of the Broker-Dealer.

4.8     Representative will not accept, directly or indirectly, remuneration in any form from any person or business on account of any dealings in securities products without express prior written approval of the Broker-Dealer. Further, Representative will not accept or retain any affiliation or employment, directly or indirectly, with any dealer, underwriter, syndicator, broker or dealer of securities or investment advisor without the Broker-Dealer's written approval.

4.9     Representative will notify the Broker-Dealer in writing of any outside business activity prior to engaging in such activity. Representative will not engage in any conduct which conflicts with the business of the Broker-Dealer, nor will Representative engage in any conduct that is not the business of the Broker-Dealer at the location where Representative conducts the business of the Broker-Dealer without advising the Broker-Dealer in advance of such business activity, in writing and in such form as the Broker-Dealer may specify. Representative will not accept or retain employment or compensation from any person or business or as a self-employed person as a result of business activity outside the scope of Representative's affiliation with the Broker-Dealer without advising the Broker-Dealer in advance in writing of such employment or compensation. Representative agrees to make any and all books and records with respect to Representative's outside business activities available to the Broker-Dealer upon request. Such books and records shall include, without limitation, the financial records of such business activity. Representative agrees to conduct all outside business activities in accordance with all laws.

4.10    Representative will establish and maintain on behalf of the Broker-Dealer, and in such manner as the Broker-Dealer shall prescribe, all records required to be maintained by sections 17(a)(3) and 17(a)(4) of the Securities Exchange Act of 1934, by Rule 204-2 of the Investment Advisors Act of 1940, by FINRA, by other self-regulatory organizations, and by relevant state regulatory agencies for the securities and insurance businesses and investment advisory services conducted by Representative and for such business and services conducted by Representatives working out of or assigned to Representative's office. Representative agrees that any and all such records are property of the Broker-Dealer, and may be removed by the Broker-Dealer at any time.

## 5.   Confidential Information and Privacy Obligations

5.1    Confidential information ("confidential information") includes all information and data provided by the Broker-Dealer and any of its affiliates to Representative, or acquired or used by Representative pursuant to this ICA, including the Broker-Dealer's business and proprietary information, actual or potential customers, customer lists, business partnerships, plans, reports, analyses, studies, models, sales data, marketing materials (including, without limitations, illustrations, disclosures and customer advertising), or any other secret or confidential work, knowledge, know-how, trade secret or business information of the Broker-Dealer or its affiliates, any information, whether in written, electronic, or oral form, received, collected, provided to, processed, used or stored by Representative, pursuant to this ICA, including, without limitation, customer, applicant, contract or policy owner information, such as names, addresses, e-mail addresses, account numbers, and financial and health information. Confidential information does not include information which is or becomes (a) generally available to the public at the time of disclosure, or (b) independently developed by Representative.

5.2    Representative agrees to use confidential information solely for the purposes of this ICA and not to disclose such confidential information to any third party in any form without the prior written consent of the Broker-Dealer, or as may be allowed by applicable law. Representative will advise and cause its respective employees, directors, officers, accountants, attorneys, agents, and representatives (collectively referred to as "Representative's Agents") who will have access to confidential information not to use or disclose any confidential information for any purpose other than for the purposes set forth in this ICA or as required by law and any such use or disclosure shall be at all times and in all events on the terms of and in compliance with the restrictions of this ICA.

5.3    Representative agrees to indemnify the Broker-Dealer and its affiliates, shareholders, directors, officers, employees, from any and all damages and losses, costs or expenses incurred as a result of the failure of Representative or Representative's Agents to perform their confidentiality obligations hereunder.

5.4    In the event Representative becomes legally compelled to disclose any confidential information or take any action prohibited by this ICA, Representative will provide the Broker-Dealer with prompt written notice for the purpose of enabling the Broker-Dealer to seek a protective order or other appropriate remedy, or waive compliance with the provisions of this ICA. In the event that such protective order or other remedy is not obtained within such time required to provide the confidential information, or if no such time period is specified, within thirty (30) days of such written notice to the Broker-Dealer, Representative so legally compelled will furnish only that portion of the confidential information or take such action which is, in the opinion of Representative's counsel, legally required, and will exercise reasonable efforts to obtain reliable assurance that confidential treatment will be accorded to any confidential information so furnished.

5.5    Representative shall maintain security procedures to protect against improper disclosure or use of confidential information, and shall comply in full with the privacy and security requirements of the Gramm-Leach-Bliley Act, Regulation S-P, the Health Insurance Portability and Accountability Act as may be applicable and any other federal and state laws and regulations governing the use and disclosure of confidential and private information. To the extent that any applicable federal, state or regulatory authority's requirements are more stringent, Representative's use and disclosure of confidential information shall be in accordance with such requirements. Except to the extent otherwise required or specifically permitted by law, Representative's use and/or disclosure of confidential information shall be limited solely to the purposes for which such information is disclosed to Representative to perform his or her obligations under this ICA.

5.6    Representative shall maintain appropriate administrative, technical and physical safeguards to assure that confidential information is not used or disclosed other than as provided by this ICA or as allowed by law.

Representative expressly warrants that all of Representative's Agents with access to confidential information will be advised of, and appropriately trained regarding the confidentiality and privacy obligations under this ICA and by law, and will comply in all respects with such obligations.

5.7    Representative agrees to report to the Broker-Dealer in writing within twenty-four (24) hours of discovering any use or disclosure of confidential information not provided for in this ICA or for a purpose not expressly permitted by law. To the extent such unauthorized use or disclosure occurs, Representative agrees to mitigate, to the greatest extent possible, any harmful effect thereof.

5.8    Representative agrees to abide by the limitations of the Broker-Dealer's and its affiliates' current privacy policies as published by the Broker-Dealer and its affiliates and as reasonably communicated to Representative from time to time.

5.9    Representative agrees to abide by the procedures and policies set forth in the Broker-Dealer's Code of Conduct and its Anti-Corruption Policy, and acknowledges receiving copies of these documents.

6.    **Offsets/Amounts Owed the Broker-Dealer**

6.1    If at any time Representative becomes indebted or otherwise liable to the Broker-Dealer, the Broker-Dealer shall be entitled to retain and apply toward the liquidation of any such indebtedness or liability any and all commissions, special compensation or other amounts otherwise due Representative. Any such compensation or other assets shall be a first lien upon amounts due hereunder. For the purpose of such lien and claim, Representative assigns to the Broker-Dealer, to the extent permitted by law, all commissions, or other amounts due or that become due at any time subsequent to the lien.

6.2    Any and all indebtedness or amounts due from Representative to the Broker-Dealer including, but not limited to, charge backs, rebated investment advisory fees paid in advance, debit balances, errors and omissions insurance premiums and deductibles, administrative charges, fines, penalties or advances and draws over and above the amount then actually due and payable from the Broker-Dealer to Representative, shall constitute a loan from the Broker-Dealer to Representative, repayable at any time upon the Broker-Dealer's demand, unless otherwise agreed to in writing between the Broker-Dealer and Representative. Any such loan shall bear interest at the maximum legal rate from date of termination of Representative's affiliation with the Broker-Dealer until paid in full.

6.3    Representative further understands and acknowledges that, upon the termination of his/her supervised representatives' affiliation with the Broker-Dealer, it is the practice of the Broker-Dealer to collect monies owed by such representatives from their OSJ Managers and that the Broker-Dealer may do so as provided in this ICA.

6.4.    The liens and assignments, as well as any indebtedness or amounts due from Representative to the Broker-Dealer, whether accrued before or after termination of this ICA, shall survive the termination of this ICA.

6.5    Representative agrees to pay all costs and expenses incurred by the Broker-Dealer in the collection of any indebtedness or amounts due from Representative to the Broker-Dealer including, but not limited to, investigative costs, attorneys' fees, collection agency fees, expert witness fees, arbitration fees and related travel expenses.

6.6    Representative authorizes the Broker-Dealer to release pertinent information concerning Representative's earnings and indebtedness to any government agency, self-regulatory organization, credit bureau or similar organization.

7.    **Investigation**

7.1    Representative authorizes the Broker-Dealer to prepare or obtain a consumer report or investigative credit report at any time regarding Representative and/or Representative's business and financial circumstances, including sources and amounts of income and assets. This information may be required by the Broker-Dealer in order to determine Representative's compliance with federal, State or local laws and regulations, the rules of a self-regulatory organization, any of Broker-Dealer's policies or such other authorized purposes. Representative

further authorizes and understands that the Broker-Dealer may share information regarding Representative, including personal information such as Representative's social security number, with its affiliates. If the Broker-Dealer requires an investigative consumer report, Representative authorizes the Broker-Dealer to proceed with an investigation, and releases any such person, or business associate from any and all liability of whatever nature by reason of furnishing such information to the Broker-Dealer or any agent acting on its behalf. Additional information concerning the nature and scope of this report has been provided in a separate document entitled "Fair Credit Reporting Act Disclosure and Authorization".

7.2    Representative acknowledges and agrees that the Broker-Dealer may, at any time, demand delivery of or otherwise physically secure all Books and Records maintained by Representative, with or without notice.

7.3    Representative certifies that all statements made by Representative, in connection with Representative's application to become or continue to be affiliated with Broker-Dealer as a Representative in any capacity, are true and complete to the best of Representative's knowledge and that Representative has withheld nothing that would, if disclosed, materially affect Representative's affiliation with the Broker-Dealer. Representative agrees to promptly disclose any material changes in information contained in Representative's application or otherwise provided by Representative to the Broker-Dealer. Representative understands that false, misleading or omitted information may constitute cause for rejection of Representative's application or termination from association with the Broker-Dealer.

## 8.   Sanctions

8.1    In the event that Representative fails to comply with the provisions of any applicable federal, state or other governmental law, rule or regulation or any self-regulatory organization's rules or regulations, or the Broker-Dealer's published procedures or policies, including periodic updates thereto, the Broker-Dealer shall have the option, in its sole discretion, to take such disciplinary or other actions as it deems appropriate including, but not limited to, assessing administrative charges, fines, penalties, limitations on activities or terminating affiliation with the Representative.

## 9.   Registration Fees and Other Expenses

9.1    Representative will pay the costs of Representative's registration or renewal with FINRA or any other applicable regulatory authority, examination fees, fees for appointments, bonding requirements, errors and omissions insurance premiums, termination fees, notification filing fees, continuing education fees, and any administrative fees or costs which may be incurred or imposed from time to time by the Broker-Dealer. Representative understands and agrees that such fees and costs are non-refundable if Representative's affiliation with the Broker-Dealer is terminated for any reason.

9.2    Representative will pay all of Representative's self-employment taxes and all other related governmental obligations including, but not limited to, social security, income and unemployment taxes, and any local fees or taxes on income, gross receipts, or otherwise.

9.3    The Broker-Dealer is not responsible for any expenses or charges incurred by Representative or anyone working on Representative's behalf in the conduct of Representative's business. Representative agrees that any person or persons with whom Representative contracts or designates to assist Representative in the performance of Representative's duties hereunder shall be considered Representative's employee/s or independent contractors, as the case may be, and shall not be employees or agents of the Broker-Dealer.

9.4    Representative further agrees that in the event of a dispute, arbitration, litigation or claim of any kind between or among the OSJ Manager and any of its affiliated representatives, or any of Representative's current or former employees, independent contractors (including but not limited to other Broker-Dealer Representatives), shareholders, partners, and/or other agents of any entity with which Representative is involved, Representative will indemnify and hold the Broker-Dealer harmless from all incurred obligations, costs, fees, losses, liabilities, claims, judgments, settlements paid, actions, damages and expenses including, but not limited to, attorneys' and expert witness fees.

## 10. Customer Issues

10.1  Representative will be liable and fully responsible for any loss, cost or expense which the Broker-Dealer sustains as a result of any transaction entered into involving Representative's customer or customer account(s) in which Representative was involved including, but not limited to, all costs incurred due to a client reneging, failures to comply with margin calls, and all other matters which involve the failure of a customer to meet his or her financial responsibility, unless the error giving rise to such loss is caused by the Broker-Dealer. Representative will indemnify the Broker-Dealer for any and all such losses including, but not limited to, the Broker-Dealer's attorneys' fees and other related legal fees and costs resulting from such customer transactions.

10.2  Representative acknowledges and understands that client information may be subject to and protected by privacy laws. Representative shall not use client information that is not otherwise available from public sources in any way that violates the client's privacy rights without first obtaining the client's permission. Furthermore, Representative will not, in affiliating with the Broker-Dealer, use client or other information which is the subject of any agreement in a manner that violates the terms of such agreement or any policy, procedure law or regulation. Representative understands that if the Broker-Dealer is named in any action involving the purported misuse of client information or proprietary information by reason of Representative's actions, Representative will defend and indemnify the Broker-Dealer in accordance with the indemnity provisions in this ICA.

10.3  If the Broker-Dealer determines, in its sole discretion, that a complaint in any way involves or may impact the Broker-Dealer or its principals, then the Broker-Dealer is authorized to direct and control the strategy to be employed with respect to such complaint, including whether to offer settlement and the amount of or other particulars with respect to such settlement, and may otherwise resolve the complaint in such a manner as the Broker-Dealer deems appropriate.

## 11. Compensation

11.1  For sales of securities and insurance products offered by and/or through the Broker-Dealer and effected by Representative, Representative will receive a percentage of Representative's individual production of gross dealer concession or commission as agreed upon in the agreement regarding overrides.

11.2  At any time, and at its sole discretion, the Broker-Dealer may reject any application for products transmitted to the Broker-Dealer by the Representative, and refund to customers any payments made by customers in connection with any product (including, but not limited to, any refund by the Broker-Dealer of monies to a customer in settlement of a dispute, complaint, or as a result of any regulatory action). If Representative has received compensation on any payments refunded to a customer, Representative agrees to repay the Broker-Dealer such compensation immediately, and in this regard, the Broker-Dealer is authorized to deduct the amount due the Broker-Dealer from any compensation due and payable from the Broker-Dealer to the Representative. The Broker-Dealer's election to deduct any amount due the Broker-Dealer from such compensation due to Representative is not an exclusive election and the Broker-Dealer may pursue collection of owed amounts by any additional means it deems appropriate.

11.3  The agreement regarding overrides may be modified at any time as agreed upon between OSJ Manager and any representatives working with or assigned to Representative's office, by giving the Broker-Dealer written notice. The effective date of any modification of the agreement regarding overrides will be the next available commission cycle date following the date that written notice was received by the Broker-Dealer.

11.4  Representative understands and agrees that upon termination of association or of the ICA, Representative's commissions may be held for a period up to ninety (90) days to allow for any charge backs, debit balances or other amounts owed to the Broker-Dealer to be assessed to Representative's commission account. The Broker-Dealer may hold Representative's commissions for any additional period of time if there are pending or threatened customer complaints, arbitrations, litigations or regulatory proceedings. The Broker-Dealer shall charge and deduct from Representative's commission account any amounts owed to the Broker-Dealer.

11.5  It is Representative's responsibility to notify Representative's customers and product sponsors of Representative's termination of affiliation from the Broker-Dealer and of any new broker-dealer affiliation. The Broker-Dealer will not be responsible for Representative's inaction or delay in connection with such notification.

11.6   Representative acknowledges:

    11.6.1   The Broker-Dealer shall not pay any commissions, fees, or other such payments to Representative until such time as the Broker-Dealer is in actual receipt of them, and Representative waives the right to receive any such payment until the Broker-Dealer has received it.

    11.6.2   The Broker-Dealer will not pay Representative any commissions earned on any transaction where the transaction date, defined as the date designated by the product sponsor, occurs after Representative's termination date, regardless of when Representative submitted the transaction.

    11.6.3   The Broker-Dealer is not obligated to credit or pay the Representative any 12b-1 fees, renewal fees, trails, continuing commissions, overrides or any other similar compensation paid to the Broker-Dealer by product sponsors, including but not limited to compensation from variable insurance products, after the date of Representative's termination of affiliation.

    11.6.4   In the event of Representative's retirement, disability or death:

        11.6.4.1   the Broker-Dealer agrees to pay to Representative, Representative's surviving spouse or other designated beneficiary, any commission which is due and payable by the Broker-Dealer from the sale of securities and insurance products with a transaction date prior to the date of Representative's retirement, disability or death, to the extent permissible under applicable rules and regulations;

        11.6.4.2   subject to any other rights of the Broker-Dealer set forth herein, the Broker-Dealer agrees to continue paying commissions and/or other compensation to a successor of Representative under a Succession or Buy/Sell Agreement which has previously been fully executed by Representative and Representative's successor prior to the time of Representative's retirement, disability or death; provided that the Broker-Dealer has previously approved such Agreement, and further provided that such successor is fully licensed with the Broker-Dealer and qualified to service the clients and business covered under such Agreement.

11.7   Representative agrees that, should Representative's affiliation with the Broker-Dealer terminate during a period in which investment advisory fees have been billed and paid by clients in advance of such services being rendered, Broker-Dealer is authorized to credit customers in the amount of unearned advisory fees, and Representative shall refund all such fees to the Broker-Dealer.

11.8   Representative understands that Representative may participate in special compensation declared payable by the Broker-Dealer, should Representative be eligible under the terms, conditions and qualifications of such special compensation program. Should the Broker-Dealer declare special compensation in the form of an annual bonus, unless otherwise agreed in writing between the Broker-Dealer and Representative, payment of such bonus is contingent on Representative being affiliated with the Broker-Dealer at the time the bonus is in fact paid. Representative understands and agrees that the Broker-Dealer reserves the right to discontinue or modify any special compensation that may now or in future be in effect.

11.9   Except for clerical error and undisclosed material facts, the regular compensation statement the Broker-Dealer issues to Representative is considered to be an accurate and complete record of all amounts the Broker-Dealer owes Representative. Settlement on the basis of these regular statements constitutes full satisfaction and agreement between Representative and the Broker-Dealer concerning the amounts reflected therein. The only exception occurs in the case of a claim to the contrary made within 60 days after the statement is issued, clerical error or undisclosed material fact.

11.10   Any additional provisions relating to compensation paid for providing investment advisory services not otherwise addressed above will be found in Section 3.3.

## 12. Authority

12.1    Representative's authority to act as a Representative of the Broker-Dealer is strictly limited and Representative has no authority or power to bind or obligate the Broker-Dealer by any statement, promise, representation, conduct, agreement or contract of any kind, or to waive any of the Broker-Dealer's rights or requirements unless specifically authorized by the Broker-Dealer in writing. Representative will not attempt to bind or obligate the Broker-Dealer, nor will Representative hold Representative out or represent to others, in any way, that Representative has such authority to bind or obligate the Broker-Dealer.

12.2    Representative will use Representative's own judgment as to the time, place and means of exercising Representative's limited authority under the terms of this ICA, subject to and in compliance with, among other things, any applicable laws, rules, and regulations of federal and state governmental and regulatory agencies, the rules, regulations and policies of FINRA and other self-regulatory organizations and the policies and procedures of approved product underwriters and sponsors.

12.3    Representative will be treated and will act solely as an independent contractor and not as an employee of the Broker-Dealer, including for purposes of federal, state, or local taxation of income or any other matter. As an independent contractor, Representative understands that Representative is not eligible for any benefits that may be made available to the Broker-Dealer's employees.

## 13. Indemnity

13.1    Representative will defend, indemnify and hold the Broker-Dealer harmless from any and all obligations, costs, fees, losses, liabilities, claims, judgments, settlements paid, actions, damages and expenses including, but not limited to, those at any time or from time to time paid, suffered, incurred or sustained by the Broker-Dealer which arise out of or are related to:

13.1.1    Representative's alleged or actual errors, omissions, negligence, intentional wrongdoing, breach of duty and/or any violation or alleged violation of any applicable laws, rules and regulations of any federal and state governmental and regulatory agency, self-regulatory organization or the policies and procedures of approved underwriters and product sponsors;

13.1.2    any activity by Representative outside the scope of Representative's affiliation with the Broker-Dealer, which affiliation Representative acknowledges is limited solely to the sale or purchase of securities and insurance products approved by the Broker-Dealer, or the furnishing of investment advisory services;

13.1.3    any dispute, claim, litigation or arbitration filed against the Broker-Dealer arising out of any agreement or alleged policy violation by Representative relating to changing broker-dealer affiliation; and

13.1.4    any dispute, claim, litigation or arbitration involving Representative and any party with whom Representative has entered into a Buy/Sell or Succession Agreement as referred to herein, or involving Representative and any individual employed or retained by Representative.

## 14. Errors and Omissions

14.1    Representative understands that Errors and Omissions (E&O) coverage includes a deductible that is payable to the Broker-Dealer upon notification by the Broker-Dealer that the Representative and/or the Broker-Dealer are involved in a customer dispute, arbitration or civil action arising out of actions involving the Representative. Representative agrees to pay to the Broker-Dealer upon demand the full amount of the deductible within 30 days of said demand. Failure to promptly pay the deductible by the date due will subject the Representative to the deductible being paid from any commissions and fees due and payable or through such other means, including legal collection efforts, as the Broker-Dealer deems appropriate.

## 15. Termination of ICA

15.1    This ICA may be terminated at any time by either party, and for any reason whatsoever, by written notice, which notice shall specify the effective date of termination.

15.2   Upon termination, Representative will immediately deliver to the Broker-Dealer's home office all funds, property, books and records and supplies of every kind belonging to the Broker-Dealer, including but not limited to: investment applications/subscription agreements and related forms, *e.g.*, copies of checks, 1035 exchange forms, etc., explanation of investment forms, switch letters, checks and securities received and delivered logs, seminar files, outgoing correspondence files with all correspondence (including e-mail), incoming correspondence files (including e-mail), the Broker-Dealer's investment advisory services documents, *e.g.*, customer agreement with third party advisor, copies of branch office examination forms, required customer disclosures for offices located in financial institutions, and advertising files. Without limitation the foregoing may be collectively referred to as the "Books and Records" and such term refers to records in whatever medium they are maintained. Representative further acknowledges and agrees that the Books and Records are required to be maintained by the Broker-Dealer pursuant to state and federal laws, rules and regulations, that all such Books and Records are the property of the Broker-Dealer, and that Representative will maintain and provide the Books and Records to the Broker-Dealer immediately upon request, either prior to or after termination of Representative's affiliation with the Broker-Dealer. The Broker-Dealer and the Representative agree that the Representative will, in the ordinary course of business, provide the Broker-Dealer with the foregoing documents on an ongoing basis. The Representative agrees to provide supplements to the documents previously provided to the extent necessary to allow the Broker-Dealer to fulfill its legal and regulatory obligations. The Broker-Dealer and the Representative agree to accomplish this supplemental provision of documents in a reasonable but prompt fashion and under reasonable conditions which allow for the prompt completion of the Broker-Dealer's possession of the Books and Records.

15.3   Upon termination of affiliation from the Broker-Dealer, Representative will cease holding Representative out in any capacity as a Representative of the Broker-Dealer.

15.4   Representative understands that it is a violation of the Broker-Dealer's policy to leave the Broker-Dealer with any debit in Representative's account and unpaid balance for any promissory note or other obligation. Representative agrees that upon termination of affiliation from the Broker-Dealer, any and all outstanding obligations to the Broker-Dealer and any current debit balances shall be immediately due and payable and that any debit balances that become due thereafter shall be paid within fourteen (14) days after notification by the Broker-Dealer. Representative understands, accepts and agrees that failure to pay such balances may result in the Broker-Dealer taking such action it deems appropriate to collect said debts and obligations.

15.5   Upon termination of the ICA, Representative acknowledges that he/she will have no claim for profits, anticipated profits or future earnings. Representative will also have no claim for a refund or reimbursement of any funds that Representative has advanced or expenses paid or incurred in connection with Representative's responsibilities under this ICA or for any other reason. The only exception will occur if the Broker-Dealer specifically authorizes reimbursement in writing before termination of this ICA.

## 16. Claims/Disputes between the Parties

16.1   Excepting any action by the Broker-Dealer to collect on a debit or debt owed by Representative which Broker-Dealer may at its election pursue by arbitration, civil action or use of a collection agency or any combination of the foregoing, any other claim or dispute between the Parties shall be resolved by a FINRA arbitration panel in the city and/or county where the Broker-Dealer's principal office is located in accordance with the then current rules of FINRA. If FINRA does not agree to hear the dispute for any reason or if Representative is no longer subject to FINRA jurisdiction or if the Parties mutually agree that the FINRA arbitration venue is not the proper venue, then such dispute may be resolved either through arbitration in accordance with the rules and regulations of the American Arbitration Association or civil court in the city and/or county where the Broker-Dealer's principal office is located. Any award by an arbitration panel shall be final and not subject to appeal, and judgment upon the award may be entered in any court having jurisdiction. The prevailing party shall be entitled to reimbursement from the losing party of all costs and expenses including, but not limited to, attorneys' fees, expert witness fees, forum fees, mediation fees and travel expenses. Representative agrees that if Representative is the losing party, such costs and expenses may be offset against any compensation or commissions due Representative.

## 17. Additional Terms

17.1    As an OSJ Manager, Representative will supervise registered representatives assigned to Representative's OSJ in accordance with the laws, rules and regulations of federal and state governmental and regulatory agencies, self-regulatory organizations, and the Broker-Dealer's policies and procedures.

17.2    Representative understands that the Broker-Dealer may, in its sole discretion, hold a Representative who is an OSJ Manager responsible for any unpaid fees and costs which may be incurred or imposed from time-to-time by the Broker-Dealer against registered representatives under the supervision of such OSJ Manager, including, but not limited to charges, charge backs, debit balances, fees involving registration, continuing education, terminations, bonding requirements, errors and insurance premiums and deductibles payable, and other losses, liabilities, judgments, settlements and damages.

17.3    During the term of this ICA and for two (2) years thereafter, Representative agrees not to (i) recruit, solicit or induce any non-clerical employee, registered principal or registered representative of the Broker-Dealer, other than registered representatives under the supervision or assigned to the Representative, to terminate his/her affiliation with the Broker-Dealer; (ii) use confidential information of the Broker-Dealer (which shall include information as to customers, clients and registered representatives, provided that if Representative terminates his/her affiliation with Broker-Dealer, Representative may use such information as permitted in (i) above) to solicit or induce any customer or client of Broker-Dealer, other than Representative's customers or clients, or those of the registered representatives under Representative's supervision or assigned to Representative who leave the Broker-Dealer with Representative, to terminate or otherwise cease, reduce or diminish in any way client's or customer's relationship with the Broker-Dealer; or (iii) use or disclose any confidential information except as permitted in (i) or (ii) above or as required to comply with applicable legal process. If any such restriction is found to be unenforceable because it extends for too long a period of time or over too great a range of activities or in too broad a geographic area, it shall be interpreted to extend over the maximum period of time, range of activities or geographic area to which it may be enforceable. In the event of a reach or potential breach of such restrictions, Representative acknowledges that the Broker-Dealer will be caused irreparable harm and that money damages may not be an adequate remedy. Accordingly, Representative acknowledges that the Broker-Dealer shall be entitled to injunctive relief (in addition to other remedies at law) to have such provisions enforced without posting any bond.

## 18. Entire ICA /Amendment

18.1    This ICA contains the entire understanding of the Parties relating to the subject matter of this ICA and supersedes all prior and collateral agreements, understandings, statements and negotiations of the Parties. All addendums and attachments referred to in this ICA are incorporated herein by reference.

18.2    No representation, inducement or commitment other than as expressly set forth in this ICA has been made or relied upon by the Representative. If a conflict exists between this ICA and any other agreement, addendum or written commitment, the terms of this ICA shall take precedence unless such other agreement, addendum or commitment signed by the Parties to this ICA specifically states otherwise, so long as those conflicting terms do not materially impair the application, operation and enforcement of this ICA.

18.3    This ICA shall be subject to the policies, procedures, rules and regulations of the Broker-Dealer as such may be in effect from time to time. Such policies, procedures, rules and regulations of the Broker-Dealer shall control in the event of any inconsistency between this ICA and such policies, procedures, rules and regulations.

18.4    This ICA may only be modified or amended in writing signed by the Broker-Dealer and Representative, except that the Broker-Dealer may make minor non-material revisions as it deems appropriate and implement such changes by way of negative consent notification to Representative.

18.5    This ICA and any amendments must be signed by an officer of the Broker-Dealer or a person designated as an authorized agent if such agent is provided for within the Broker-Dealer's by-laws.

## 19. No Waiver

19.1 The failure or delay of the Broker-Dealer to declare a breach or termination of this ICA because of any violation of its terms shall not be deemed to be a waiver of any subsequent violation of this ICA.

## 20. Severability

20.1 This ICA shall be severable. Should any term, condition or provision of this ICA be determined by an arbitration panel or court of competent jurisdiction to be invalid or ineffective for any reason, all of the remaining terms and conditions of this ICA shall remain in full force and effect.

## 21. Binding on Successors/Assigns

21.1 This ICA is not assignable by Representative; the ICA shall be assignable by the Broker-Dealer, provided that any such assignee shall assume this ICA in a writing delivered to Representative. This ICA shall be binding upon and inure to the benefit of the Parties and their respective successors-in-interest and permitted assigns.

## 22. Notice

22.1 Notice shall be deemed given upon transmission via facsimile, email with or without attachments or by placement of such written notice in the U.S. mail, postage prepaid, addressed to the other party hereto, either at Representative's last known address as contained in the Broker-Dealer's records or to the Broker-Dealer at its principal place of business.

## 23. Effective Date

23.1 This ICA Agreement is made and entered into as of the date executed by an authorized officer of the Broker-Dealer.

## 24. Agreement Non-Violative/Choice of Law

24.1 Nothing herein shall be violative of any applicable law, rule or regulation and this ICA Agreement shall be governed by and construed in accordance with the laws of the state of Delaware.

## 25. Separate Authorization and Approval

25.1 Representative understands that execution of this ICA by the Parties does not constitute automatic approval for Representative to engage in such securities, investment advisory or insurance activities if the Broker-Dealer's policies and procedures require additional and separate approval to engage in specific activities.

## 26. Electronic Signatures

26.1 This ICA and any amendments may be executed by electronic signature provided that such electronic signature is facilitated through an electronic medium/process approved by the Broker-Dealer.

October 22, 2018

*ALAN NIEMANN*

Date_____

By:_____
(Signature of OSJ/Manager)

Name: Alan P Niemann
(Please Print)

Date_____

By:_____
          (Signature of OSJ/Manager, if applicable)

Name:_____
              (Please Print)

Date___10/19/2018_____

**Royal Alliance Associates, Inc.**

By:_____
          (Signature)

Dmitry Goldin
President and CEO

Rev. 7.18.18

Exhibit C



# Exhibit B



MCAFEE&TAFT
A PROFESSIONAL CORPORATION

SPENCER F. SMITH
ATTORNEY AT LAW

10TH FLOOR • TWO LEADERSHIP SQUARE
211 NORTH ROBINSON • OKLAHOMA CITY, OK 73102-7103
(405) 235-9621 • FAX (405) 235-0439
www.mcafeetaft.com

WRITER DIRECT
(405) 552-2334
FAX (405) 228-7334
spencer.smith@mcafeetaft.com

September 15, 2020

***Via Federal Express***
Mr. Alan P. Niemann
Rockgate Financial Partners
700 Cedar Lake Boulevard
Oklahoma City, OK 73114

    Re:    <u>Your Improper Solicitation of Royal Alliance Customers</u>

Dear Mr. Niemann:

    I am counsel for Royal Alliance Associates, Inc. ("Royal Alliance"). This letter concerns what appear to be unlawful activities on your part in violation of, at a minimum, the Independent Contractor Agreement (OSJ/Manager) ("ICA Agreement") that you signed with Royal Alliance on October 22, 2018. A copy of the ICA Agreement is attached hereto as <u>Exhibit</u> A.

    Specifically, Royal Alliance has learned that you have unlawfully contacted clients of advisors who did not follow you to Cambridge Investment Research ("Cambridge"). Not only have you sent letters to such clients, but you emailed targeted clients and requested that they DocuSign a form authorizing the transfer of their accounts from Royal Alliance to Cambridge, even though their advisor remains at Royal Alliance.

    Royal Alliance's position is based on the following facts. If any of these facts are untrue, I invite you to so advise me.

    The ICA Agreement defines "confidential information" as including

> all information and data provided by the Broker-Dealer and any of its affiliates to Representative, or acquired or used by Representative pursuant to this ICA, including the Broker-Dealer's business and proprietary information, actual or potential customers, customer lists, business partnerships, plans, reports, analyses, studies, models, sales data, marketing materials (including, without limitations, illustrations, disclosures and customer advertising), or any other secret or confidential work, knowledge, know-how, trade secret or business information of the

Broker-Dealer or its affiliates, any information, whether in written, electronic, or oral form, received, collected, provided to, processed, used or stored by Representative, pursuant to this ICA, including, without limitation, customer, applicant, contract or policy owner information, such as names, addresses, e-mail addresses, account numbers, and financial and health information. Confidential information does not include information which is or becomes (a) generally available to the public at the time of disclosure, or (b) independently developed by Representative.

Exhibit A, ¶5.1.

You also agreed to certain post-employment obligations. In particular, you agreed expressly that, for two years after leaving Royal Alliance, you would not:

> … (ii) ***use confidential information*** of the Broker-Dealer (which shall include information as to customers, clients and registered representatives, provided that if Representative terminates his/her affiliation with Broker-Dealer, Representative may use such information as permitted in (i) above) ***to solicit or induce any customer or client of Broker-Dealer, other than Representative's customers or clients, or those of the registered representatives under Representative's supervision or assigned to Representative who leave the Broker-Dealer with Representative***, to terminate or otherwise cease, reduce or diminish in any way client's or customer's relationship with the Broker-Dealer; or (iii) use or disclose any confidential information except as permitted in (i) or (ii) above or as required to comply with applicable legal process.

Id. , ¶17.3 (emphasis added).

On September 1, 2020, you changed broker-dealers, moving from Royal Alliance to Cambridge. Some, but not all, of the Royal Alliance registered representatives you supervised as Royal Alliance's OSJ moved to Cambridge with you.

Even before you moved to Cambridge, you sent a letter to Royal Alliance clients of other registered representatives, *including representatives that you no longer supervised.* That correspondence, on "Adaptation Financial" letterhead, states, in part:

> Beyond that, we are making important operational enhancements to better serve you. One of the changes we are making to serve you better is updating our internal data management system. We will be using a consultant to help with this process, meaning they have been vetted by our firm to make certain your information remains protected.

> The protection of your data is of the utmost importance to us so we want to provide you with the ability to opt out of this process if you deem necessary. Please check the box on the following page if you disagree with moving your data to an enhanced system and send this letter back to us within the next week to opt out.

Again, 2020 has brought all of us new challenges; please know we are here at Adaptation Financial to help you adapt to an ever-changing world. We take the privilege of working with you very seriously and look forward to visiting with you soon!

This letter was written at a time that you knew you would be moving to Cambridge. There is no valid reason generally, let alone in the context of your impending broker-dealer switch, why you or Rockgate/Adaptation should have been sending such a communication to clients of representatives whom you no longer supervised, or would soon no longer supervise.

Your conduct since the move to Cambridge has been even more egregious. We understand that you recently emailed clients serviced by *representatives who elected to remain at Royal Alliance*. Such solicitation is expressly prohibited by the terms of the ICA. *See* Exhibit A, ¶17.3. Nevertheless, the email advised that, "it has become necessary to change broker dealers in order to continue to serve you, and to grow our business. Effective today, I am registered with Cambridge Investment Research, a broker dealer based in Fairfield, Iowa." Remarkably, the email goes on to request that those clients – of *representatives who elected to remain at Royal Alliance* – DocuSign a form authorizing the transfer of their accounts from Royal Alliance to Cambridge: "You will be receiving a follow up encrypted email from Cambridge on behalf of myself, requesting your electronic signature, to initiate the new account paperwork, in order to re-register your account under Cambridge."

These statements demonstrate that, not only have you improperly used Royal Alliance's confidential information, you improperly shared that information with Cambridge, in contravention of your promise in the ICA "to use confidential information solely for the purposes of this ICA and *not to disclose such confidential information to any third party* in any form without the prior written consent of the Broker-Dealer, or as may be allowed by applicable law." Exhibit A, ¶5.2 (emphasis added).

In addition to contractual breaches, your conduct to date constitutes a breach of your fiduciary duty to Royal Alliance. As an OSJ for Royal Alliance, you were acting on Royal Alliance's behalf. *See, e.g.*, FINRA Rule 1021(b) (defining "Principal" as, "[p]ersons associated with a member[,] who are actively engaged in the *management of the member's investment banking or securities business*") (emphasis added); FINRA Rule 3110(f)(1) (defining an OSJ as an "office of a member" where delineated supervisory functions take place, including "*responsibility for supervising the activities of persons associated with the member* at one or more other branch *offices of the member*") (emphasis added). Indeed, maintaining Branch Offices and appointing Principals and OSJs are essential components of the "Supervisory System" imposed by FINRA Rules upon broker-dealers like Royal Alliance. Each such member must set up a system to supervise all associated persons and that system includes supervision by Principals who are charged "with authority to carry out the *supervisory responsibilities assigned to that office by the member*." FINRA Rule 3110(a)(4) (emphasis added); *see also* Rule 3110(a)(2) and (a)(5).

As an OSJ, you had access to confidential information concerning Royal Alliance registered representatives only because you were licensed and appointed an OSJ for Royal Alliance. You abused that access to confidential information by, among other things, disclosing

it to a third-party competitor, Cambridge. You first did so in connection with preparing written "Retention Packages" to Royal Alliance registered representatives to convince them to move with you to Cambridge. Notably, the letterhead you used for those "Retention Packages" was approved by Royal Alliance, yet you were trying to convince the targeted representatives that the "grass would be greener" at Cambridge.

You later used Royal Alliance confidential information in an attempt to poach clients of those Royal Alliance registered representatives who chose not to move to Cambridge with you. Such conduct is a textbook example of a breach of fiduciary duty. *See, e.g., Butcher v. McGinn*, 1985 OK 58, 706 P.2d 878, 881 (employee "will not be permitted to secure for himself that which is his duty to obtain for his principal."); *see also Superior Oil Co. v. Renfroe*, 67 F. Supp. 277, 281 (W.D. Okla. 1946) ("defendant has no right to use any of the information of a confidential nature, which he acquired while employed by the plaintiff, in competition with the plaintiff in any manner"); Restatement (Second) of Agency§ 387 ("Unless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency.").

Finally, to the extent that you shared client information with Cambridge without Royal Alliance's or its customers' knowledge or consent, you violated SEC Regulation S-P and FINRA Rule 2010. *See, e.g.*, FINRA Letter of Acceptance, Waiver and Consent No. 2019062346201 (re Patrick J. Knox), a copy of which is attached hereto as Exhibit B. In that matter, the respondent agreed that he did the following:

> While he was still registered through an association with Lincoln, and in anticipation of moving to the New Firm, Knox printed his Lincoln customer list and gave it to the New Firm. This list included non-public personal information for more than 300 Lincoln customers, including, among other information, social security numbers and birth dates, which was information provided to Lincoln by the customers. Knox improperly removed the customers' nonpublic personal information and gave it to the New Firm without Lincoln's or the customers' knowledge or consent.

Although we do not yet know all the facts, your conduct to date, including collaborating with Cambridge to move representatives and customers to Cambridge, appears very similar to, if not well beyond, that of Mr. Knox.

Royal Alliance therefore demands that:

1.   You immediately cease and desist from contacting any Royal Alliance client or customer who was not directly serviced by you or by a registered representative who joined you at Cambridge.

2.   You immediately instruct Cambridge to cease contacting any Royal Alliance client or customer who was not directly serviced by you or by a registered representative who joined you at Cambridge.

3.   On or before September 23, 2020, (a) you return to Royal Alliance any and all customer information that is in your (or Rockgate Financial's) possession,

custody or control where the client is serviced by a registered representative not under your current supervision, and (b) you certify under oath that you have returned all such information.

4.   On or before September 23, 2020, you certify in a writing signed under oath that you do not possess (or have access to), and will not in any way use, confidential information belonging to Royal Alliance, including but not limited to information about (a) Royal Alliance registered representatives who did not move to Cambridge, and (b) any customers whose advisors did not move to Cambridge.

If Royal Alliance does not receive confirmation that you have done the above, it will assume that you intend to continue acting in violation of your obligations to Royal Alliance. In that event, Royal Alliance will take steps to protect its interests from further irreparable harm. I look forward to your prompt cooperation.

Very truly yours,

Spencer F. Smith

Enclosures



10 Exchange Place
Suite 1410
Jersey City, NJ 07399

## INDEPENDENT CONTRACTOR AGREEMENT
(OSJ/Manager)

This Independent Contractor Agreement ("ICA") is entered into between **Royal Alliance Associates, Inc.** ("the Broker-Dealer") and the undersigned as an OSJ/Manager ("Representative"). The Broker-Dealer and Representative are collectively referred to as "the Parties."

In consideration of the mutual covenants and agreements contained herein, the Parties agree as follows:

1.  **Scope of the ICA**

    1.1. This ICA and any attachments and addendums attached hereto and/or incorporated herein by reference govern the relationship between the Broker-Dealer and Representative in connection with the Representative:

    1.1.1. effecting securities transactions and providing such incidental advice about securities in Representative's capacity as a securities registered representative;

    1.1.2. providing investment advice in the capacity of a registered investment adviser representative under the Broker-Dealer's corporate investment adviser registration (the Broker-Dealer being a Registered Investment Adviser under the Investment Advisers Act of 1940) or as independent registered investment adviser and/or registered investment adviser representative under a state or federal registration independent of the Broker-Dealer's corporate investment adviser registration;

    1.1.3. effecting insurance sales in the capacity of a licensed insurance agent where such transactions, commissions or production credits are credited/processed through the Broker-Dealer under the Broker-Dealer's producer insurance license; and

    1.1.4 Any other activities that Broker-Dealer authorizes Representative to engage in.

    1.2 The term Representative as used herein means "registered representative", "investment adviser representative", "financial advisor", "advisor", "OSJ Manager", and/or "insurance agent", as appropriate.

    1.3 The term "customer" and "client" as used in the ICA shall mean a person and any entity utilizing Representative's services.

    1.4 Additional terms applying to Representative's activities not contained within the body of this ICA may be contained in addenda. Such addenda, when fully executed, will be considered part of this ICA. The Broker-Dealer may revise, from time-to-time, a list of addenda which may be included in this ICA as Attachment A. Revisions to Attachment A shall be deemed revisions within the meaning of Section 18 of this ICA.

    1.5 This ICA supersedes any prior ICA executed between the Broker-Dealer and Representative. Any addendum or attachment executed between the Broker-Dealer and Representative that was incorporated by reference in a prior ICA will be void unless such addendum or attachment is specifically provided for in this ICA when this ICA is executed. In the event any terms in a prior addendum or attachment conflict with this ICA, this ICA will control.

2.  **The Broker-Dealer**

    2.1 In accordance with the paragraph herein titled "Compensation" the Broker-Dealer will pay to Representative or in the case of an investment advisor representative associated with an independent investment advisor entity, to the independent investment advisor entity, commissions and fees earned from customers for transactions in securities and insurance products and the furnishing of investment advisory services. The Broker-Dealer may pay such other compensation it deems appropriate. Payment of commissions, fees, or other types of

*Royal Alliance Associates, Inc., Member FINRA and SIPC*

EXHIBIT A

compensation to Representative from Broker-Dealer shall be in accordance with schedules or policies adopted by Broker-Dealer as revised from time-to-time.

3. **Representative**

3.1 Applicable to all Products and Services;

3.1.1 Representative will offer, solicit offers, and sell such products and services that have been expressly approved in advance by the Broker-Dealer, at Representative's sole risk and expense as an **INDEPENDENT CONTRACTOR** and not as an employee of the Broker-Dealer. In no way is this agreement intended to create a franchise relationship between Representative and Broker-Dealer.

3.1.2 Representative will offer for sale and sell only products and services that have been expressly approved in advance by the Broker-Dealer, and for which the Broker-Dealer has executed an underwriting or selling agreement with the sponsor.

3.1.3 In connection with each sale or solicitation of offers to buy securities or insurance products or to provide investment advisory services, Representative will deliver or cause to be delivered to the customer, in accordance with all applicable securities, investment advisory and insurance laws, rules and regulations, a current prospectus, offering memorandum, applicable Form ADV or such other documents that may be in effect and are required to be disclosed and Representative will make no representations to customers except as are contained in such prospectus, offering memorandum or other disclosure documents. In addition, Representative will furnish to the customer and prospective customers such other disclosure forms as required by the Broker-Dealer's policies and procedures. Representative will fully explain the items and conditions of the purchase or sale of securities and insurance products and investment advisory services to the customer or prospective customer. Representative will not make untrue statements, interpretations or misrepresentations, nor will Representative omit or neglect to disclose material facts relating to each such purchase or sale.

3.2. Applicable to Securities Products and Services:

3.2.1 Representative understands and agrees that a separate agreement regarding overrides must be negotiated between Representative as an OSJ Manager and any representatives working with or assigned to Representative's office, as to the allocation of commissions, fees and expenses between Representative as an OSJ and his/her representatives.

3.3 Applicable to Investment Advisory Products and Services:

3.3.1 Representative will conduct his or her actions as a registered investment adviser and/or investment adviser representative under the Investment Adviser's Act of 1940 (the "40 Act") and any other applicable federal or state laws or self-regulatory organization rules and in accordance with the policies and procedures adopted from time to time by the Broker-Dealer and its approved vendors.

3.3.2 Representative, when acting in the capacity of an Investment Adviser Representative ("IAR") of the corporate Registered Investment Advisor ("RIA") authorizes the Broker-Dealer, as Registered Investment Adviser, to receive any investment advisory fees the Representative may charge clients for advisory services approved by the Broker-Dealer. Representative, when acting in the capacity of an IAR of an independent RIA, authorizes the Broker-Dealer to receive investment advisory fees, other than those specifically exempted by the Broker-Dealer (e.g., financial planning fees and non-discretionary investment advisory fees), the Representative may charge clients for advisory services approved by the Broker-Dealer.

3.3.3 Representative agrees that advisory fees shall be processed through the Broker-Dealer, as set forth in 3.3.2, and the Broker-Dealer shall remit Representative's portion of such fees in accordance with the Advisory Fee Payout Schedule or Investment Advisory Fee Override Agreement, as applicable, which shall be incorporated herein by reference.

3.3.4   Representative agrees that in no event will the Broker-Dealer be liable to Representative for nonpayment of management fees and expenses related to Representative's advisory services.

3.3.5   Representative warrants that investment advisory services offered by Representative do not and will not constitute an investment company within the meaning of the Investment Company Act of 1940 (the "Investment Company Act"), that neither Representative nor such accounts are required to be registered under the Investment Company Act, and that Representative will comply with all regulations promulgated by federal and state regulatory agencies regarding investment advisory services.

3.3.6   Representative agrees that, should Representative's affiliation with the Broker-Dealer terminate during a period in which investment advisory fees have been billed and paid by clients in advance of such services being rendered, Broker-Dealer is authorized to credit customers in the amount of unearned advisory fees, and Representative shall refund all such fees to the Broker-Dealer.

3.3.7   Representative, if providing investment advisory services, will cause to be delivered to customers and prospective customers the applicable Form ADV and such other disclosures as are required by federal and state laws and regulations and the Broker-Dealer's policies and procedures relating to investment advisory services.

3.3.8   Representative will not exercise discretion in any investment advisory account without written authorization from the client.

3.4   Applicable to Insurance Products and Services:

3.4.1   In connection with the sale or solicitation of offers to buy insurance, Representative agrees not to perform any unauthorized act on behalf of the Broker-Dealer or any of its approved insurance carriers including, but not limited to, the following:

3.4.1.1   make, waive, alter, modify or change any contract on behalf of the Broker-Dealer or an insurance carrier;

3.4.1.2   accept any check made payable to Representative or any other entity not entitled to receive such funds;

3.4.1.3   endorse any check made payable to the Broker-Dealer or an insurance carrier;

3.4.1.4   accept any premium after the initial premium;

3.4.1.5   waive or modify any policy or application provision, condition, or obligation;

3.4.1.6   extend time for payment of any premium or to accept payment of any past due premium;

3.4.1.7   approve evidence of insurability;

3.4.1.8   bind or otherwise commit the Broker-Dealer or an insurance carrier to any risk; or

3.4.1.9   deliver any policy where the health of the insured, to Representative's knowledge, is other than as stated in the application for insurance.

4.   **Compliance**

4.1   Representative will comply with all applicable laws, rules, regulations and statements of policy of federal and state governmental or regulatory agencies including, but not limited to, the United States Securities and Exchange Commission ("SEC"), the By-Laws and Rules of the Financial Institution Regulatory Authority ("FINRA"), any other self-regulatory organization, and the state securities, investment advisory and insurance regulatory agencies.

4.2   Representative agrees to immediately notify the Broker-Dealer of any:

4.2.1   verbal or written communication that is, or has the potential to become, a customer complaint in accordance with the Broker-Dealer's policies and procedures;

4.2.2   arrests, charges, information, indictment or other proceedings filed or commenced, investment-related civil actions, disciplinary actions or any investigations, inquiries or document requests by federal or state regulatory authorities, agencies or self-regulatory organizations;

4.2.3   legal or regulatory proceeding or inquiry by an attorney, or by any federal or state agency related to the Broker-Dealer, or any matter covered by this agreement; or

4.2.4   action or decision involving a judgment, lien, garnishment or award involving Representative in any manner, including entities in which Representative may have any interest.

4.3   Representative will comply with all applicable policies and procedures of all approved securities and insurance product underwriters and sponsors for products sold through the Broker-Dealer.

4.4   Representative will read, understand and conduct Representative's business in accordance with the published policies and procedures and such instructions, directives, notices or other communications issued by the Broker-Dealer, including, but not limited to, the Broker-Dealer's Sales Practice Manual and Written Supervisory Procedures Manual.

4.5   Representative will offer for sale and sell only products and services that are expressly authorized by Broker-Dealer, and for which Representative is licensed or registered to sell by all applicable regulatory and self-regulatory organizations. Broker-Dealer reserves the right to revise its list of approved products/services at any time at its sole discretion.

4.6   Representative hereby agrees to fulfill both the regulatory element and firm element continuing education within the deadlines set by the Broker-Dealer. If at any time Representative should be deemed inactive for failure to complete Representative's continuing education, Representative understands that Representative is not entitled to any commission from the sale of securities products during the inactive period. Representative further understands that Representative is not able to act as a Registered Representative of the Broker-Dealer in any capacity until such time that Representative's continuing education has been satisfied.

4.7   Representative will advise all customers and prospective customers that Representative is acting as a registered representative of the Broker-Dealer and that any order for sale or purchase of products or services will be effected solely through the Broker-Dealer. Representative understands that Representative has no authority to act, and Representative will not act, for any customer in any dealings in securities or investment products except as a registered representative of the Broker-Dealer.

4.8   Representative will not accept, directly or indirectly, remuneration in any form from any person or business on account of any dealings in securities products without express prior written approval of the Broker-Dealer. Further, Representative will not accept or retain any affiliation or employment, directly or indirectly, with any dealer, underwriter, syndicator, broker or dealer of securities or investment advisor without the Broker-Dealer's written approval.

4.9   Representative will notify the Broker-Dealer in writing of any outside business activity prior to engaging in such activity. Representative will not engage in any conduct which conflicts with the business of the Broker-Dealer, nor will Representative engage in any conduct that is not the business of the Broker-Dealer at the location where Representative conducts the business of the Broker-Dealer without advising the Broker-Dealer in advance of such business activity, in writing and in such form as the Broker-Dealer may specify. Representative will not accept or retain employment or compensation from any person or business or as a self-employed person as a result of business activity outside the scope of Representative's affiliation with the Broker-Dealer without advising the Broker-Dealer in advance in writing of such employment or compensation. Representative agrees to make any and all books and records with respect to Representative's outside business activities available to the Broker-Dealer upon request. Such books and records shall include, without limitation, the financial records of such business activity. Representative agrees to conduct all outside business activities in accordance with all laws.

4.10   Representative will establish and maintain on behalf of the Broker-Dealer, and in such manner as the Broker-Dealer shall prescribe, all records required to be maintained by sections 17(a)(3) and 17(a)(4) of the Securities Exchange Act of 1934, by Rule 204-2 of the Investment Advisors Act of 1940, by FINRA, by other self-regulatory organizations, and by relevant state regulatory agencies for the securities and insurance businesses and investment advisory services conducted by Representative and for such business and services conducted by Representatives working out of or assigned to Representative's office. Representative agrees that any and all such records are property of the Broker-Dealer, and may be removed by the Broker-Dealer at any time.

## 5.   Confidential Information and Privacy Obligations

5.1   Confidential information ("confidential information") includes all information and data provided by the Broker-Dealer and any of its affiliates to Representative, or acquired or used by Representative pursuant to this ICA, including the Broker-Dealer's business and proprietary information, actual or potential customers, customer lists, business partnerships, plans, reports, analyses, studies, models, sales data, marketing materials (including, without limitations, illustrations, disclosures and customer advertising), or any other secret or confidential work, knowledge, know-how, trade secret or business information of the Broker-Dealer or its affiliates, any information, whether in written, electronic, or oral form, received, collected, provided to, processed, used or stored by Representative, pursuant to this ICA, including, without limitation, customer, applicant, contract or policy owner information, such as names, addresses, e-mail addresses, account numbers, and financial and health information. Confidential information does not include information which is or becomes (a) generally available to the public at the time of disclosure, or (b) independently developed by Representative.

5.2   Representative agrees to use confidential information solely for the purposes of this ICA and not to disclose such confidential information to any third party in any form without the prior written consent of the Broker-Dealer, or as may be allowed by applicable law. Representative will advise and cause its respective employees, directors, officers, accountants, attorneys, agents, and representatives (collectively referred to as "Representative's Agents") who will have access to confidential information not to use or disclose any confidential information for any purpose other than for the purposes set forth in this ICA or as required by law and any such use or disclosure shall be at all times and in all events on the terms of and in compliance with the restrictions of this ICA.

5.3   Representative agrees to indemnify the Broker-Dealer and its affiliates, shareholders, directors, officers, employees, from any and all damages and losses, costs or expenses incurred as a result of the failure of Representative or Representative's Agents to perform their confidentiality obligations hereunder.

5.4   In the event Representative becomes legally compelled to disclose any confidential information or take any action prohibited by this ICA, Representative will provide the Broker-Dealer with prompt written notice for the purpose of enabling the Broker-Dealer to seek a protective order or other appropriate remedy, or waive compliance with the provisions of this ICA. In the event that such protective order or other remedy is not obtained within such time required to provide the confidential information, or if no such time period is specified, within thirty (30) days of such written notice to the Broker-Dealer, Representative so legally compelled will furnish only that portion of the confidential information or take such action which is, in the opinion of Representative's counsel, legally required, and will exercise reasonable efforts to obtain reliable assurance that confidential treatment will be accorded to any confidential information so furnished.

5.5   Representative shall maintain security procedures to protect against improper disclosure or use of confidential information, and shall comply in full with the privacy and security requirements of the Gramm-Leach-Bliley Act, Regulation S-P, the Health Insurance Portability and Accountability Act as may be applicable and any other federal and state laws and regulations governing the use and disclosure of confidential and private information. To the extent that any applicable federal, state or regulatory authority's requirements are more stringent, Representative's use and disclosure of confidential information shall be in accordance with such requirements. Except to the extent otherwise required or specifically permitted by law, Representative's use and/or disclosure of confidential information shall be limited solely to the purposes for which such information is disclosed to Representative to perform his or her obligations under this ICA.

5.6   Representative shall maintain appropriate administrative, technical and physical safeguards to assure that confidential information is not used or disclosed other than as provided by this ICA or as allowed by law.

Representative expressly warrants that all of Representative's Agents with access to confidential information will be advised of, and appropriately trained regarding the confidentiality and privacy obligations under this ICA and by law, and will comply in all respects with such obligations.

5.7     Representative agrees to report to the Broker-Dealer in writing within twenty-four (24) hours of discovering any use or disclosure of confidential information not provided for in this ICA or for a purpose not expressly permitted by law. To the extent such unauthorized use or disclosure occurs, Representative agrees to mitigate, to the greatest extent possible, any harmful effect thereof.

5.8     Representative agrees to abide by the limitations of the Broker-Dealer's and its affiliates' current privacy policies as published by the Broker-Dealer and its affiliates and as reasonably communicated to Representative from time to time.

5.9     Representative agrees to abide by the procedures and policies set forth in the Broker-Dealer's Code of Conduct and its Anti-Corruption Policy, and acknowledges receiving copies of these documents.

6.   **Offsets/Amounts Owed the Broker-Dealer**

6.1     If at any time Representative becomes indebted or otherwise liable to the Broker-Dealer, the Broker-Dealer shall be entitled to retain and apply toward the liquidation of any such indebtedness or liability any and all commissions, special compensation or other amounts otherwise due Representative. Any such compensation or other assets shall be a first lien upon amounts due hereunder. For the purpose of such lien and claim, Representative assigns to the Broker-Dealer, to the extent permitted by law, all commissions, or other amounts due or that become due at any time subsequent to the lien.

6.2     Any and all indebtedness or amounts due from Representative to the Broker-Dealer including, but not limited to, charge backs, rebated investment advisory fees paid in advance, debit balances, errors and omissions insurance premiums and deductibles, administrative charges, fines, penalties or advances and draws over and above the amount then actually due and payable from the Broker-Dealer to Representative, shall constitute a loan from the Broker-Dealer to Representative, repayable at any time upon the Broker-Dealer's demand, unless otherwise agreed to in writing between the Broker-Dealer and Representative. Any such loan shall bear interest at the maximum legal rate from date of termination of Representative's affiliation with the Broker-Dealer until paid in full.

6.3     Representative further understands and acknowledges that, upon the termination of his/her supervised representatives' affiliation with the Broker-Dealer, it is the practice of the Broker-Dealer to collect monies owed by such representatives from their OSJ Managers and that the Broker-Dealer may do so as provided in this ICA.

6.4.    The liens and assignments, as well as any indebtedness or amounts due from Representative to the Broker-Dealer, whether accrued before or after termination of this ICA, shall survive the termination of this ICA.

6.5     Representative agrees to pay all costs and expenses incurred by the Broker-Dealer in the collection of any indebtedness or amounts due from Representative to the Broker-Dealer including, but not limited to, investigative costs, attorneys' fees, collection agency fees, expert witness fees, arbitration fees and related travel expenses.

6.6     Representative authorizes the Broker-Dealer to release pertinent information concerning Representative's earnings and indebtedness to any government agency, self-regulatory organization, credit bureau or similar organization.

7.   **Investigation**

7.1     Representative authorizes the Broker-Dealer to prepare or obtain a consumer report or investigative credit report at any time regarding Representative and/or Representative's business and financial circumstances, including sources and amounts of income and assets. This information may be required by the Broker-Dealer in order to determine Representative's compliance with federal, State or local laws and regulations, the rules of a self-regulatory organization, any of Broker-Dealer's policies or such other authorized purposes. Representative

further authorizes and understands that the Broker-Dealer may share information regarding Representative, including personal information such as Representative's social security number, with its affiliates. If the Broker-Dealer requires an investigative consumer report, Representative authorizes the Broker-Dealer to proceed with an investigation, and releases any such person, or business associate from any and all liability of whatever nature by reason of furnishing such information to the Broker-Dealer or any agent acting on its behalf. Additional information concerning the nature and scope of this report has been provided in a separate document entitled "Fair Credit Reporting Act Disclosure and Authorization".

7.2   Representative acknowledges and agrees that the Broker-Dealer may, at any time, demand delivery of or otherwise physically secure all Books and Records maintained by Representative, with or without notice.

7.3   Representative certifies that all statements made by Representative, in connection with Representative's application to become or continue to be affiliated with Broker-Dealer as a Representative in any capacity, are true and complete to the best of Representative's knowledge and that Representative has withheld nothing that would, if disclosed, materially affect Representative's affiliation with the Broker-Dealer. Representative agrees to promptly disclose any material changes in information contained in Representative's application or otherwise provided by Representative to the Broker-Dealer. Representative understands that false, misleading or omitted information may constitute cause for rejection of Representative's application or termination from association with the Broker-Dealer.

## 8. Sanctions

8.1   In the event that Representative fails to comply with the provisions of any applicable federal, state or other governmental law, rule or regulation or any self-regulatory organization's rules or regulations, or the Broker-Dealer's published procedures or policies, including periodic updates thereto, the Broker-Dealer shall have the option, in its sole discretion, to take such disciplinary or other actions as it deems appropriate including, but not limited to, assessing administrative charges, fines, penalties, limitations on activities or terminating affiliation with the Representative.

## 9. Registration Fees and Other Expenses

9.1   Representative will pay the costs of Representative's registration or renewal with FINRA or any other applicable regulatory authority, examination fees, fees for appointments, bonding requirements, errors and omissions insurance premiums, termination fees, notification filing fees, continuing education fees, and any administrative fees or costs which may be incurred or imposed from time to time by the Broker-Dealer. Representative understands and agrees that such fees and costs are non-refundable if Representative's affiliation with the Broker-Dealer is terminated for any reason.

9.2   Representative will pay all of Representative's self-employment taxes and all other related governmental obligations including, but not limited to, social security, income and unemployment taxes, and any local fees or taxes on income, gross receipts, or otherwise.

9.3   The Broker-Dealer is not responsible for any expenses or charges incurred by Representative or anyone working on Representative's behalf in the conduct of Representative's business. Representative agrees that any person or persons with whom Representative contracts or designates to assist Representative in the performance of Representative's duties hereunder shall be considered Representative's employee/s or independent contractors, as the case may be, and shall not be employees or agents of the Broker-Dealer.

9.4   Representative further agrees that in the event of a dispute, arbitration, litigation or claim of any kind between or among the OSJ Manager and any of its affiliated representatives, or any of Representative's current or former employees, independent contractors (including but not limited to other Broker-Dealer Representatives), shareholders, partners, and/or other agents of any entity with which Representative is involved, Representative will indemnify and hold the Broker-Dealer harmless from all incurred obligations, costs, fees, losses, liabilities, claims, judgments, settlements paid, actions, damages and expenses including, but not limited to, attorneys' and expert witness fees.

## 10. Customer Issues

10.1   Representative will be liable and fully responsible for any loss, cost or expense which the Broker-Dealer sustains as a result of any transaction entered into involving Representative's customer or customer account(s) in which Representative was involved including, but not limited to, all costs incurred due to a client reneging, failures to comply with margin calls, and all other matters which involve the failure of a customer to meet his or her financial responsibility, unless the error giving rise to such loss is caused by the Broker-Dealer. Representative will indemnify the Broker-Dealer for any and all such losses including, but not limited to, the Broker-Dealer's attorneys' fees and other related legal fees and costs resulting from such customer transactions.

10.2   Representative acknowledges and understands that client information may be subject to and protected by privacy laws. Representative shall not use client information that is not otherwise available from public sources in any way that violates the client's privacy rights without first obtaining the client's permission. Furthermore, Representative will not, in affiliating with the Broker-Dealer, use client or other information which is the subject of any agreement in a manner that violates the terms of such agreement or any policy, procedure law or regulation. Representative understands that if the Broker-Dealer is named in any action involving the purported misuse of client information or proprietary information by reason of Representative's actions, Representative will defend and indemnify the Broker-Dealer in accordance with the indemnity provisions in this ICA.

10.3   If the Broker-Dealer determines, in its sole discretion, that a complaint in any way involves or may impact the Broker-Dealer or its principals, then the Broker-Dealer is authorized to direct and control the strategy to be employed with respect to such complaint, including whether to offer settlement and the amount of or other particulars with respect to such settlement, and may otherwise resolve the complaint in such a manner as the Broker-Dealer deems appropriate.

## 11. Compensation

11.1   For sales of securities and insurance products offered by and/or through the Broker-Dealer and effected by Representative, Representative will receive a percentage of Representative's individual production of gross dealer concession or commission as agreed upon in the agreement regarding overrides.

11.2   At any time, and at its sole discretion, the Broker-Dealer may reject any application for products transmitted to the Broker-Dealer by the Representative, and refund to customers any payments made by customers in connection with any product (including, but not limited to, any refund by the Broker-Dealer of monies to a customer in settlement of a dispute, complaint, or as a result of any regulatory action). If Representative has received compensation on any payments refunded to a customer, Representative agrees to repay the Broker-Dealer such compensation immediately, and in this regard, the Broker-Dealer is authorized to deduct the amount due the Broker-Dealer from any compensation due and payable from the Broker-Dealer to the Representative. The Broker-Dealer's election to deduct any amount due the Broker-Dealer from such compensation due to Representative is not an exclusive election and the Broker-Dealer may pursue collection of owed amounts by any additional means it deems appropriate.

11.3   The agreement regarding overrides may be modified at any time as agreed upon between OSJ Manager and any representatives working with or assigned to Representative's office, by giving the Broker-Dealer written notice. The effective date of any modification of the agreement regarding overrides will be the next available commission cycle date following the date that written notice was received by the Broker-Dealer.

11.4   Representative understands and agrees that upon termination of association or of the ICA, Representative's commissions may be held for a period up to ninety (90) days to allow for any charge backs, debit balances or other amounts owed to the Broker-Dealer to be assessed to Representative's commission account. The Broker-Dealer may hold Representative's commissions for any additional period of time if there are pending or threatened customer complaints, arbitrations, litigations or regulatory proceedings. The Broker-Dealer shall charge and deduct from Representative's commission account any amounts owed to the Broker-Dealer.

11.5   It is Representative's responsibility to notify Representative's customers and product sponsors of Representative's termination of affiliation from the Broker-Dealer and of any new broker-dealer affiliation. The Broker-Dealer will not be responsible for Representative's inaction or delay in connection with such notification.

11.6   Representative acknowledges:

11.6.1   The Broker-Dealer shall not pay any commissions, fees, or other such payments to Representative until such time as the Broker-Dealer is in actual receipt of them, and Representative waives the right to receive any such payment until the Broker-Dealer has received it.

11.6.2   The Broker-Dealer will not pay Representative any commissions earned on any transaction where the transaction date, defined as the date designated by the product sponsor, occurs after Representative's termination date, regardless of when Representative submitted the transaction.

11.6.3   The Broker-Dealer is not obligated to credit or pay the Representative any 12b-1 fees, renewal fees, trails, continuing commissions, overrides or any other similar compensation paid to the Broker-Dealer by product sponsors, including but not limited to compensation from variable insurance products, after the date of Representative's termination of affiliation.

11.6.4   In the event of Representative's retirement, disability or death:

11.6.4.1   the Broker-Dealer agrees to pay to Representative, Representative's surviving spouse or other designated beneficiary, any commission which is due and payable by the Broker-Dealer from the sale of securities and insurance products with a transaction date prior to the date of Representative's retirement, disability or death, to the extent permissible under applicable rules and regulations;

11.6.4.2   subject to any other rights of the Broker-Dealer set forth herein, the Broker-Dealer agrees to continue paying commissions and/or other compensation to a successor of Representative under a Succession or Buy/Sell Agreement which has previously been fully executed by Representative and Representative's successor prior to the time of Representative's retirement, disability or death; provided that the Broker-Dealer has previously approved such Agreement, and further provided that such successor is fully licensed with the Broker-Dealer and qualified to service the clients and business covered under such Agreement.

11.7   Representative agrees that, should Representative's affiliation with the Broker-Dealer terminate during a period in which investment advisory fees have been billed and paid by clients in advance of such services being rendered, Broker-Dealer is authorized to credit customers in the amount of unearned advisory fees, and Representative shall refund all such fees to the Broker-Dealer.

11.8   Representative understands that Representative may participate in special compensation declared payable by the Broker-Dealer, should Representative be eligible under the terms, conditions and qualifications of such special compensation program. Should the Broker-Dealer declare special compensation in the form of an annual bonus, unless otherwise agreed in writing between the Broker-Dealer and Representative, payment of such bonus is contingent on Representative being affiliated with the Broker-Dealer at the time the bonus is in fact paid. Representative understands and agrees that the Broker-Dealer reserves the right to discontinue or modify any special compensation that may now or in future be in effect.

11.9   Except for clerical error and undisclosed material facts, the regular compensation statement the Broker-Dealer issues to Representative is considered to be an accurate and complete record of all amounts the Broker-Dealer owes Representative. Settlement on the basis of these regular statements constitutes full satisfaction and agreement between Representative and the Broker-Dealer concerning the amounts reflected therein. The only exception occurs in the case of a claim to the contrary made within 60 days after the statement is issued, clerical error or undisclosed material fact.

11.10   Any additional provisions relating to compensation paid for providing investment advisory services not otherwise addressed above will be found in Section 3.3.

## 12. Authority

12.1   Representative's authority to act as a Representative of the Broker-Dealer is strictly limited and Representative has no authority or power to bind or obligate the Broker-Dealer by any statement, promise, representation, conduct, agreement or contract of any kind, or to waive any of the Broker-Dealer's rights or requirements unless specifically authorized by the Broker-Dealer in writing. Representative will not attempt to bind or obligate the Broker-Dealer, nor will Representative hold Representative out or represent to others, in any way, that Representative has such authority to bind or obligate the Broker-Dealer.

12.2   Representative will use Representative's own judgment as to the time, place and means of exercising Representative's limited authority under the terms of this ICA, subject to and in compliance with, among other things, any applicable laws, rules, and regulations of federal and state governmental and regulatory agencies, the rules, regulations and policies of FINRA and other self-regulatory organizations and the policies and procedures of approved product underwriters and sponsors.

12.3   Representative will be treated and will act solely as an independent contractor and not as an employee of the Broker-Dealer, including for purposes of federal, state, or local taxation of income or any other matter. As an independent contractor, Representative understands that Representative is not eligible for any benefits that may be made available to the Broker-Dealer's employees.

## 13. Indemnity

13.1   Representative will defend, indemnify and hold the Broker-Dealer harmless from any and all obligations, costs, fees, losses, liabilities, claims, judgments, settlements paid, actions, damages and expenses including, but not limited to, those at any time or from time to time paid, suffered, incurred or sustained by the Broker-Dealer which arise out of or are related to:

13.1.1   Representative's alleged or actual errors, omissions, negligence, intentional wrongdoing, breach of duty and/or any violation or alleged violation of any applicable laws, rules and regulations of any federal and state governmental and regulatory agency, self-regulatory organization or the policies and procedures of approved underwriters and product sponsors;

13.1.2   any activity by Representative outside the scope of Representative's affiliation with the Broker-Dealer, which affiliation Representative acknowledges is limited solely to the sale or purchase of securities and insurance products approved by the Broker-Dealer, or the furnishing of investment advisory services;

13.1.3   any dispute, claim, litigation or arbitration filed against the Broker-Dealer arising out of any agreement or alleged policy violation by Representative relating to changing broker-dealer affiliation; and

13.1.4   any dispute, claim, litigation or arbitration involving Representative and any party with whom Representative has entered into a Buy/Sell or Succession Agreement as referred to herein, or involving Representative and any individual employed or retained by Representative.

## 14. Errors and Omissions

14.1   Representative understands that Errors and Omissions (E&O) coverage includes a deductible that is payable to the Broker-Dealer upon notification by the Broker-Dealer that the Representative and/or the Broker-Dealer are involved in a customer dispute, arbitration or civil action arising out of actions involving the Representative. Representative agrees to pay to the Broker-Dealer upon demand the full amount of the deductible within 30 days of said demand. Failure to promptly pay the deductible by the date due will subject the Representative to the deductible being paid from any commissions and fees due and payable or through such other means, including legal collection efforts, as the Broker-Dealer deems appropriate.

## 15. Termination of ICA

15.1   This ICA may be terminated at any time by either party, and for any reason whatsoever, by written notice, which notice shall specify the effective date of termination.

15.2   Upon termination, Representative will immediately deliver to the Broker-Dealer's home office all funds, property, books and records and supplies of every kind belonging to the Broker-Dealer, including but not limited to: investment applications/subscription agreements and related forms, *e.g.*, copies of checks, 1035 exchange forms, etc., explanation of investment forms, switch letters, checks and securities received and delivered logs, seminar files, outgoing correspondence files with all correspondence (including e-mail), incoming correspondence files (including e-mail), the Broker-Dealer's investment advisory services documents, *e.g.*, customer agreement with third party advisor, copies of branch office examination forms, required customer disclosures for offices located in financial institutions, and advertising files. Without limitation the foregoing may be collectively referred to as the "Books and Records" and such term refers to records in whatever medium they are maintained. Representative further acknowledges and agrees that the Books and Records are required to be maintained by the Broker-Dealer pursuant to state and federal laws, rules and regulations, that all such Books and Records are the property of the Broker-Dealer, and that Representative will maintain and provide the Books and Records to the Broker-Dealer immediately upon request, either prior to or after termination of Representative's affiliation with the Broker-Dealer. The Broker-Dealer and the Representative agree that the Representative will, in the ordinary course of business, provide the Broker-Dealer with the foregoing documents on an ongoing basis. The Representative agrees to provide supplements to the documents previously provided to the extent necessary to allow the Broker-Dealer to fulfill its legal and regulatory obligations. The Broker-Dealer and the Representative agree to accomplish this supplemental provision of documents in a reasonable but prompt fashion and under reasonable conditions which allow for the prompt completion of the Broker-Dealer's possession of the Books and Records.

15.3   Upon termination of affiliation from the Broker-Dealer, Representative will cease holding Representative out in any capacity as a Representative of the Broker-Dealer.

15.4   Representative understands that it is a violation of the Broker-Dealer's policy to leave the Broker-Dealer with any debit in Representative's account and unpaid balance for any promissory note or other obligation. Representative agrees that upon termination of affiliation from the Broker-Dealer, any and all outstanding obligations to the Broker-Dealer and any current debit balances shall be immediately due and payable and that any debit balances that become due thereafter shall be paid within fourteen (14) days after notification by the Broker-Dealer. Representative understands, accepts and agrees that failure to pay such balances may result in the Broker-Dealer taking such action it deems appropriate to collect said debts and obligations.

15.5   Upon termination of the ICA, Representative acknowledges that he/she will have no claim for profits, anticipated profits or future earnings. Representative will also have no claim for a refund or reimbursement of any funds that Representative has advanced or expenses paid or incurred in connection with Representative's responsibilities under this ICA or for any other reason. The only exception will occur if the Broker-Dealer specifically authorizes reimbursement in writing before termination of this ICA.

## 16.  Claims/Disputes between the Parties

16.1 Excepting any action by the Broker-Dealer to collect on a debit or debt owed by Representative which Broker-Dealer may at its election pursue by arbitration, civil action or use of a collection agency or any combination of the foregoing, any other claim or dispute between the Parties shall be resolved by a FINRA arbitration panel in the city and/or county where the Broker-Dealer's principal office is located in accordance with the then current rules of FINRA. If FINRA does not agree to hear the dispute for any reason or if Representative is no longer subject to FINRA jurisdiction or if the Parties mutually agree that the FINRA arbitration venue is not the proper venue, then such dispute may be resolved either through arbitration in accordance with the rules and regulations of the American Arbitration Association or civil court in the city and/or county where the Broker-Dealer's principal office is located. Any award by an arbitration panel shall be final and not subject to appeal, and judgment upon the award may be entered in any court having jurisdiction. The prevailing party shall be entitled to reimbursement from the losing party of all costs and expenses including, but not limited to, attorneys' fees, expert witness fees, forum fees, mediation fees and travel expenses. Representative agrees that if Representative is the losing party, such costs and expenses may be offset against any compensation or commissions due Representative.

## 17. Additional Terms

17.1 As an OSJ Manager, Representative will supervise registered representatives assigned to Representative's OSJ in accordance with the laws, rules and regulations of federal and state governmental and regulatory agencies, self-regulatory organizations, and the Broker-Dealer's policies and procedures.

17.2 Representative understands that the Broker-Dealer may, in its sole discretion, hold a Representative who is an OSJ Manager responsible for any unpaid fees and costs which may be incurred or imposed from time-to-time by the Broker-Dealer against registered representatives under the supervision of such OSJ Manager, including, but not limited to charges, charge backs, debit balances, fees involving registration, continuing education, terminations, bonding requirements, errors and insurance premiums and deductibles payable, and other losses, liabilities, judgments, settlements and damages.

17.3 During the term of this ICA and for two (2) years thereafter, Representative agrees not to (i) recruit, solicit or induce any non-clerical employee, registered principal or registered representative of the Broker-Dealer, other than registered representatives under the supervision or assigned to the Representative, to terminate his/her affiliation with the Broker-Dealer; (ii) use confidential information of the Broker-Dealer (which shall include information as to customers, clients and registered representatives, provided that if Representative terminates his/her affiliation with Broker-Dealer, Representative may use such information as permitted in (i) above) to solicit or induce any customer or client of Broker-Dealer, other than Representative's customers or clients, or those of the registered representatives under Representative's supervision or assigned to Representative who leave the Broker-Dealer with Representative, to terminate or otherwise cease, reduce or diminish in any way client's or customer's relationship with the Broker-Dealer; or (iii) use or disclose any confidential information except as permitted in (i) or (ii) above or as required to comply with applicable legal process. If any such restriction is found to be unenforceable because it extends for too long a period of time or over too great a range of activities or in too broad a geographic area, it shall be interpreted to extend over the maximum period of time, range of activities or geographic area to which it may be enforceable. In the event of a reach or potential breach of such restrictions, Representative acknowledges that the Broker-Dealer will be caused irreparable harm and that money damages may not be an adequate remedy. Accordingly, Representative acknowledges that the Broker-Dealer shall be entitled to injunctive relief (in addition to other remedies at law) to have such provisions enforced without posting any bond.

## 18. Entire ICA /Amendment

18.1 This ICA contains the entire understanding of the Parties relating to the subject matter of this ICA and supersedes all prior and collateral agreements, understandings, statements and negotiations of the Parties. All addendums and attachments referred to in this ICA are incorporated herein by reference.

18.2 No representation, inducement or commitment other than as expressly set forth in this ICA has been made or relied upon by the Representative. If a conflict exists between this ICA and any other agreement, addendum or written commitment, the terms of this ICA shall take precedence unless such other agreement, addendum or commitment signed by the Parties to this ICA specifically states otherwise, so long as those conflicting terms do not materially impair the application, operation and enforcement of this ICA.

18.3 This ICA shall be subject to the policies, procedures, rules and regulations of the Broker-Dealer as such may be in effect from time to time. Such policies, procedures, rules and regulations of the Broker-Dealer shall control in the event of any inconsistency between this ICA and such policies, procedures, rules and regulations.

18.4 This ICA may only be modified or amended in writing signed by the Broker-Dealer and Representative, except that the Broker-Dealer may make minor non-material revisions as it deems appropriate and implement such changes by way of negative consent notification to Representative.

18.5 This ICA and any amendments must be signed by an officer of the Broker-Dealer or a person designated as an authorized agent if such agent is provided for within the Broker-Dealer's by-laws.

**19. No Waiver**

19.1 The failure or delay of the Broker-Dealer to declare a breach or termination of this ICA because of any violation of its terms shall not be deemed to be a waiver of any subsequent violation of this ICA.

**20. Severability**

20.1 This ICA shall be severable. Should any term, condition or provision of this ICA be determined by an arbitration panel or court of competent jurisdiction to be invalid or ineffective for any reason, all of the remaining terms and conditions of this ICA shall remain in full force and effect.

**21. Binding on Successors/Assigns**

21.1 This ICA is not assignable by Representative; the ICA shall be assignable by the Broker-Dealer, provided that any such assignee shall assume this ICA in a writing delivered to Representative. This ICA shall be binding upon and inure to the benefit of the Parties and their respective successors-in-interest and permitted assigns.

**22. Notice**

22.1 Notice shall be deemed given upon transmission via facsimile, email with or without attachments or by placement of such written notice in the U.S. mail, postage prepaid, addressed to the other party hereto, either at Representative's last known address as contained in the Broker-Dealer's records or to the Broker-Dealer at its principal place of business.

**23. Effective Date**

23.1 This ICA Agreement is made and entered into as of the date executed by an authorized officer of the Broker-Dealer.

**24. Agreement Non-Violative/Choice of Law**

24.1 Nothing herein shall be violative of any applicable law, rule or regulation and this ICA Agreement shall be governed by and construed in accordance with the laws of the state of Delaware.

**25. Separate Authorization and Approval**

25.1 Representative understands that execution of this ICA by the Parties does not constitute automatic approval for Representative to engage in such securities, investment advisory or insurance activities if the Broker-Dealer's policies and procedures require additional and separate approval to engage in specific activities.

**26. Electronic Signatures**

26.1 This ICA and any amendments may be executed by electronic signature provided that such electronic signature is facilitated through an electronic medium/process approved by the Broker-Dealer.

October 22, 2018

Date_____

By:_____
          (Signature of OSJ/Manager)

Name: Alan P Niemann
                    (Please Print)

Page 13 of 14

Date_____

By:_____
          (Signature of OSJ/Manager, if applicable)

Name:_____
              (Please Print)

Date___10/19/2018_____

**Royal Alliance Associates, Inc.**

*Dmitry Goldin*

By:_____
       (Signature)

       Dmitry Goldin
       President and CEO

Rev. 7.18.18

**FINANCIAL INDUSTRY REGULATORY AUTHORITY**
**LETTER OF ACCEPTANCE, WAIVER AND CONSENT**
**NO. 2019062346201**

TO:   Department of Enforcement
      Financial Industry Regulatory Authority (FINRA)

RE:   Patrick J. Knox, Respondent
      General Securities Representative
      CRD No. 1206837

Pursuant to FINRA Rule 9216 of FINRA's Code of Procedure, Respondent Patrick J. Knox submits this Letter of Acceptance, Waiver and Consent (AWC) for the purpose of proposing a settlement of the alleged rule violations described below. This AWC is submitted on the condition that, if accepted, FINRA will not bring any future actions against Respondent alleging violations based on the same factual findings described herein.

I.

## ACCEPTANCE AND CONSENT

A.   Respondent hereby accepts and consents, without admitting or denying the findings, and solely for the purposes of this proceeding and any other proceeding brought by or on behalf of FINRA, or to which FINRA is a party, prior to a hearing and without an adjudication of any issue of law or fact, to the entry of the following findings by FINRA:

### BACKGROUND

Knox first became registered with FINRA in 1983. From September 1988 to July 2018, Knox was registered as a General Securities Representative through an association with Lincoln Investment (CRD No. 519). According to the Uniform Termination Notice for Securities Industry Registration (Form U5) that Lincoln filed on July 1, 2018, Knox voluntarily left Lincoln.

Since June 29, 2018, Knox has been registered as a General Securities Representative through an association with another FINRA member firm (New Firm).

### RELEVANT DISCIPLINARY HISTORY

Respondent does not have any disciplinary history with the Securities and Exchange Commission, any state securities regulators, FINRA, or any other self-regulatory organization.

### OVERVIEW

In June 2018, Knox took nonpublic personal customer information from Lincoln and

EXHIBIT B

gave it to the New Firm, without Lincoln's or the customers' knowledge or consent. As a result, Knox caused Lincoln to violate the SEC's Regulation S-P: Privacy of Consumer Financial Information and Safeguarding Personal Information (Regulation S-P) and, in so doing, violated FINRA Rule 2010.

## FACTS AND VIOLATIVE CONDUCT

Regulation S-P generally prohibits financial institutions from disclosing "nonpublic personal information" about a customer unless the customer receives proper notice and opportunity to opt out.

Information is considered to be "nonpublic personal information" if it contains personally identifiable financial information about one or more consumers, including: (1) information a consumer provides to a broker-dealer to obtain a financial product or service; (2) information about a consumer resulting from any transaction involving a financial product or service between a broker-dealer and a consumer; or (3) information a broker-dealer otherwise obtains about a consumer in connection with providing a financial product or service to that consumer. "Nonpublic personal information" includes, among other things, names, addresses, telephone numbers, social security numbers, and birth dates that are derived in whole or in part from information provided to a financial institution by a customer.

A registered person who discloses nonpublic personal information about a customer, and causes his or her member firm to violate Regulation S-P, violates FINRA Rule 2010, which requires registered persons to observe high standards of commercial honor and just and equitable principles of trade.

While he was still registered through an association with Lincoln, and in anticipation of moving to the New Firm, Knox printed his Lincoln customer list and gave it to the New Firm. This list included non-public personal information for more than 300 Lincoln customers, including, among other information, social security numbers and birth dates, which was information provided to Lincoln by the customers. Knox improperly removed the customers' nonpublic personal information and gave it to the New Firm without Lincoln's or the customers' knowledge or consent.

By virtue of the foregoing, Knox caused Lincoln to violate Regulation S-P, and in so doing, violated FINRA Rule 2010.

B.    Respondent also consents to the imposition of the following sanctions:

- A suspension from association with any FINRA member firm in any and all capacities for a period of ten business days; and

- A fine of $2,500.

Respondent agrees to pay the monetary sanction upon notice that this AWC has been accepted and that such payment is due and payable. Respondent has submitted an Election of Payment form showing the method by which he proposes to pay the fine

2

imposed.

Respondent specifically and voluntarily waives any right to claim an inability to pay, now or at any time hereafter, the monetary sanction imposed in this matter.

Respondent understands that if he is barred or suspended from associating with any FINRA member, he becomes subject to a statutory disqualification as that term is defined in Article III, Section 4 of FINRA's By-Laws, incorporating Section 3(a)(39) of the Securities Exchange Act of 1934. Accordingly, he may not be associated with any FINRA member in any capacity, including clerical or ministerial functions, during the period of the bar or suspension. See FINRA Rules 8310 and 8311.

The sanctions imposed herein shall be effective on a date set by FINRA staff.

## II.

## WAIVER OF PROCEDURAL RIGHTS

Respondent specifically and voluntarily waives the following rights granted under FINRA's Code of Procedure:

A.  To have a Complaint issued specifying the allegations against him;

B.  To be notified of the Complaint and have the opportunity to answer the allegations in writing;

C.  To defend against the allegations in a disciplinary hearing before a hearing panel, to have a written record of the hearing made and to have a written decision issued; and

D.  To appeal any such decision to the National Adjudicatory Council (NAC) and then to the U.S. Securities and Exchange Commission and a U.S. Court of Appeals.

Further, Respondent specifically and voluntarily waives any right to claim bias or prejudgment of the Chief Legal Officer, the NAC, or any member of the NAC, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including acceptance or rejection of this AWC.

Respondent further specifically and voluntarily waives any right to claim that a person violated the ex parte prohibitions of FINRA Rule 9143 or the separation of functions prohibitions of FINRA Rule 9144, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including its acceptance or rejection.

3

III.

## OTHER MATTERS

Respondent understands that:

A.   Submission of this AWC is voluntary and will not resolve this matter unless and until it has been reviewed and accepted by the NAC, a Review Subcommittee of the NAC, or the Office of Disciplinary Affairs (ODA), pursuant to FINRA Rule 9216;

B.   If this AWC is not accepted, its submission will not be used as evidence to prove any of the allegations against Respondent; and

C.   If accepted:

   1.   this AWC will become part of Respondent's permanent disciplinary record and may be considered in any future action brought by FINRA or any other regulator against Respondent;

   2.   this AWC will be made available through FINRA's public disclosure program in accordance with FINRA Rule 8313;

   3.   FINRA may make a public announcement concerning this agreement and the subject matter thereof in accordance with FINRA Rule 8313; and

   4.   Respondent may not take any action or make or permit to be made any public statement, including in regulatory filings or otherwise, denying, directly or indirectly, any finding in this AWC or create the impression that the AWC is without factual basis. Respondent may not take any position in any proceeding brought by or on behalf of FINRA, or to which FINRA is a party, that is inconsistent with any part of this AWC. Nothing in this provision affects Respondent's: (i) testimonial obligations; or (ii) right to take legal or factual positions in litigation or other legal proceedings in which FINRA is not a party.

D.   Respondent may attach a Corrective Action Statement to this AWC that is a statement of demonstrable corrective steps taken to prevent future misconduct. Respondent understands that he may not deny the charges or make any statement that is inconsistent with the AWC in this Statement. This Statement does not constitute factual or legal findings by FINRA, nor does it reflect the views of FINRA or its staff.

Respondent certifies that he has read and understands all of the provisions of this AWC and has been given a full opportunity to ask questions about it; Respondent has agreed to the AWC's provisions voluntarily; and no offer, threat, inducement, or promise of any

4

kind, other than the terms set forth herein and the prospect of avoiding the issuance of a
Complaint, has been made to induce him to submit this AWC.

8/28/2020
Date

Patrick J. Knox
Respondent

Reviewed by:

Christopher C. Coss
Counsel for Respondent
Coss & Momjian, LLP
114 Presidential Blvd., Suite 214
Bala Cynwyd, PA 19004

Accepted by FINRA:

09/09/2020
Date

Signed on behalf of the
Director of ODA, by delegated authority

Matthew M. Ryan
Principal Counsel
FINRA
Department of Enforcement
1601 Market St., Suite 2700
Philadelphia, PA 19103-2339

5

September 9, 2020
Page 2

If you have any questions concerning this matter, please call Matthew M. Ryan, Principal
Counsel at (215) 209-7094.

Matthew M. Ryan
Principal Counsel

Enclosure(s)

cc:     Patrick J. Knox
       140 Bishops Gate Lane
       Doylestown, PA 18901

       Christopher C. Coss,Esq.
       Coss & Momjian, LLP
       114 Presidential Blvd. Suite 214
       Bala Cynwyd, PA 19004